IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 1 2 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | C.A. No. B-04-28 |
| | § | C.R. No. B-02-377 |
| JOSE LUIS CRUZ-TREJO, | § | |
| Petitioner. | § | |
| | § | |

**RESPONDENT'S ANSWER TO SECTION 2255 MOTION,
MOTION FOR SUMMARY JUDGMENT,
MOTION FOR DISMISSAL AND BRIEF**

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the Government," by and through

the United States Attorney for the Southern District of Texas, files this Answer to

Section 2255 Motion, Motion for Summary Judgment, Motion for Dismissal, and

Brief.    In support thereof, the Government respectfully shows the court the

following:

## I.

## STATEMENT OF THE CASE/JURISDICTION

On July 16, 2002, a grand jury in the United States District Court for the

Southern District of Texas, Brownsville Division, Criminal No. B-02-377, returned

a superceding indictment charging Jose Luis Cruz-Trejo ("Cruz-Trejo") and other co-conspirators with conspiracy to transport and move illegal aliens within the United States and with substantive counts of illegally transporting those aliens. (Dkt 62).[1]  On October 10, 2002, Cruz-Trejo pleaded guilty to Count One in the superceding indictment in accordance with a plea agreement in which the Government agreed to dismiss all remaining counts. (Dkt 277, 278).  Count One alleged that he conspired to transport illegal "aliens" in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(1) and listed 34 overt acts involved in the conspiracy. (Dkt 62).

On January 21, 2003, the district court sentenced Cruz-Trejo to 41 months in the custody of the Bureau of Prisons, a three-year term of supervised release, and a $100.00 special assessment. (Dkt 383, 385).  The judgment of conviction and sentence was entered on March 3, 2003. (Dkt 416).  Cruz-Trejo did not appeal his conviction or sentence.  He filed the instant action, C.A. B-04-028, on January 16, 2004.  As such, it appears that his motion is timely and this court has jurisdiction under 28 U.S.C. § 2255.

---

[1]"Dkt" refers to the district clerk's docket.  The number following is the item number.

## II.

## DENIAL

The Government denies each and every allegation of fact made by Petitioner except those supported by the record and those specifically admitted herein, and demands strict proof thereof.

## III.

## FACTS UNDERLYING THE CONVICTION

### A. The instant offense:

In January 2002, federal agents obtained information about an alien smuggling operation organized by Alfonso Garcia-Coronado. (PSR ¶22).[2] The agents initiated an investigation using undercover agents and confidential informants. From January 1, 2001, to June 5, 2002, this organization smuggled and transported approximately 300 to 400 undocumented aliens each month from the Rio Grande Valley area to Houston, Texas. (PSR ¶23). The organization charged $2,300 to transport each of the approximately 7,500 aliens. *Id*. Garcia-Coronado directed and coordinated the entire organization which was divided into three sections: a Rio Grande Cell, a Kingsville Cell, and a Houston Cell. *Id*.

---

[2] "PSR" refers to the presentence investigation report. The number following refers to the specific paragraph in the PSR.

The undercover agents had approximately 35 contacts with different members of the organization including Cruz-Trejo. (PSR ¶ 31). On February 26, 2002, Cruz-Trejo guided 14 undocumented aliens around the Sarita, Texas Border Patrol checkpoint and hid in the brush near Ricardo, Texas. (PSR ¶ 39). The weather was below-freezing, so Palemon Infante instructed one of the undercover agents to retrieve the aliens and Cruz-Trejo and house them until Garcia-Coronado could pick them up. *Id.* On June 5, 2002, Cruz-Trejo transported approximately 12 other undocumented aliens within the United States. (PSR ¶ 44). However, Border Patrol agents arrested him and the 12 aliens near Ricardo, Texas. *Id.*

The investigation revealed that this alien smuggling operation produced between $50,000 to $75,000 weekly. (PSR ¶ 28). The organization would often transport groups of 25 to 35 aliens in large, extended cab trucks. (PSR ¶ 30). The undercover agents themselves transported 40 undocumented aliens for this organization receiving $19,000 for their participation. (PSR ¶ 29). However, leaders of the organization asked the undercover agents to transport larger loads advising that the organization could deliver 70 to 100 aliens per load. (PSR ¶ 30). Cruz-Trejo, Garcia-Coronado and another co-conspirator were arrested on June 7, 2002. (PSR ¶ 45).

## B. The presentence investigation report and sentencing hearing:

The presentence investigation report calculated Cruz-Trejo's base offense level at 12. (PSR ¶65). He worked within the organization and smuggled multiple loads of aliens totaling more than 100 in the Kingsville area. (PSR ¶55). As such, his offense level was increased by nine levels under U.S.S.G. § 2L1.1(b)(2)(C). (PSR ¶66). The offense level was also increased by two levels under U.S.S.G. § 2L1.1(b)(5) as the aliens were placed in substantial risk of death during the transportation activities. (PSR ¶67). With a three level reduction for accepting responsibility, the total offense level was 20. (PSR ¶75). With a criminal history category of I (PSR ¶78), the guideline range was 33 to 41 months imprisonment. (PSR ¶97).

Cruz-Trejo, via his defense counsel, submitted a written objection to the enhancement for reckless endangerment. (Dkt 326). He also objected to being held accountable for the number of undocumented aliens involved in the conspiracy, but only did so orally at the sentencing hearing. (ST at 7).[3]

---

[3] "ST" refers to the sentencing transcript. The number following refers to the page. Note: the sentencing transcript was apparently filed under defendant Alfonso Garcia-Coronado and contains the full sentencing proceeding for that defendant. The government recently received a sentencing transcript from the transcriber (SEE Attachment A) but it includes all of Garcia-Coronado's sentencing and the proceeding regarding asset forfeitures. The government will herein refer to Attachment A as the sentencing transcript and will note the pages therein referenced.

At the sentencing hearing, the government presented testimony from the case agent, Charlie Torres, regarding the extent of the conspiracy. (ST at 12-87). Agent Torres testified that the Coronado-Garcia smuggling organization was transporting between 200 and 300 aliens per week. (ST at 14). This information was obtained from a confidential source who the agent deemed reliable. (ST at 14-15). Also, the undercover agents informed Agent Torres that the leaders of the organization requested the agents to transport approximately 80 undocumented aliens per week. (ST at 16). The agents verified that Cruz-Trejo was directly involved with guiding approximately 40 aliens through brush areas around checkpoints during the cold days of February 26 and 27, 2002. (ST at 18-20). Another of the co-conspirators estimated to Agent Torres that he helped transport approximately 1,830 over 60 to 70 trips. (ST at 21). The agent continued testifying and undeniably established that this organization transported a number of undocumented aliens far exceeding 100.

After the evidence, Cruz-Trejo's attorney re-urged his objections. (ST at 100). He acknowledged that the evidence linked him to 27 aliens, but argued the evidence was insufficient to show his involvement in transporting thousands of undocumented aliens. (ST at 101). The government argued that the evidence established Cruz-Trejo is related to one of the primary leaders of the organization, and that Cruz-Trejo guided aliens around the checkpoints for "many years." (ST

6

at 102). The government reiterated that it was not seeking an upward departure for the thousands of undocumented aliens that this organization transported, but that the evidence established that Cruz-Trejo was clearly involved with more than 100 aliens as demonstrated by the PSR. *Id.*

The court inquired about the exact evidence regarding the number of aliens. In response, the government pointed to the two cooperating individuals who observed Cruz-Trejo involved on numerous occasions at different locations and even dropped him off and picked him up on certain occasions. (ST at 103). The Court thereinafter overruled Cruz-Trejo's objection specifically finding that admissions and witnesses who have participated in the conspiracy established that the total aliens involved was more than 100. (ST at 104). Thus, the court applied the nine-level enhancement and sentenced Cruz-Trejo to 41 months - the high end of the applicable guideline range. (ST at 104-06).

## IV.

## ISSUE PRESENTED

Cruz-Trejo's petition raises the following sentencing issue:

Whether the district court erred in applying a nine-level increase in Cruz-Trejo's offense level based on relevant conduct involving the illegal transportation of more than 100 undocumented aliens during the conspiracy offense?

## V.

## MOTION FOR SUMMARY JUDGMENT AND DISMISSAL

**A.**    **Procedural bar: Failure to Raise Issues Precludes Collateral Relief.**

Cruz-Trejo's sentencing issue is precluded in this present action as he failed to raise this issue prior to the present action. A defendant cannot raise an issue for the first time on collateral review without showing both "cause for his procedural default, and actual prejudice resulting from the error." *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991)(en banc), *cert denied*, 502 U.S. 1076, 112 S.Ct. 978 (1992) (citing *United States v. Frady*, 456 U.S. 152, 168, 102 S.Ct. 1584, 1594 (1982)). The "cause and actual prejudice standard" is "a significantly higher hurdle than the plain error standard" applied on direct appeal. *Id.* A defendant must reach this "higher hurdle" even when alleging a fundamental constitutional error. *Id.* (citing *Murray v. Carrier*, 477 U.S. 478, 493, 106 S.Ct. 2639, 2648 (1986)). The only acknowledged exception to the application of this high standard is in the "extraordinary" case where an actual innocent person has been wrongly convicted. *Shaid*, 937 F.2d at 232. Cruz-Trejo has not claimed or established his actual innocense and has failed to articulate any cause or actual prejudice in his failure to previously raise this issue. He is therefore procedurally barred from doing so in the present action.

**B.**   **Cruz-Trejo's sentencing issue concerns the court's application of the sentencing guidelines, and as such, this issue is not cognizable in a § 2255 motion.**

Cruz-Trejo's claim regarding the enhancement for the involvement of more than 100 aliens in his conspiracy offense addresses the court's technical application of the Sentencing Guidelines.   It is well established that such challenges are not cognizable in a § 2255 motion.   *See Kinder v. Purdy*, 222 F.3d 209, 211 (5th Cir. 2000), *cert. denied*, 531 U.S. 1132, 121 S.Ct. 894 (2001); *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999); *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998); *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992).   Therefore, even if Cruz-Trejo had not procedurally defaulted on the issue, he has not raised an issue warranting relief under § 2255.   Thus, this court should summarily dismiss his motion.

**C.**   **Cruz-Trejo has not established any error in the court's application of the sentencing guidelines in this case.**

Even absent his procedural and substantive preclusions, Cruz-Trejo has not demonstrated any error in the court's application of the sentencing enhancement in this case.   Cruz-Trejo claims that his offense involved transporting only 26 or 27 aliens therein only warranting, at most, a six level increase in the offense level. However, the record clearly demonstrated that the alien smuggling conspiracy in this

9

case involved the transportation of well over 100 undocumented aliens. Thus, the court did not err in applying the nine level enhancement under U.S.S.G. § 2L1.1(b)(2)(C).

### 1. *Facts supporting the sentencing enhancements under § 2L1.1*

During rearraignment, the government read the allegations regarding the conspiracy alleged in Count One. (RT at 9-14).[4] The recitation of the allegation included several of the overt acts. *Id.* The government also recited the factual basis of the offense specifically noting that Cruz-Trejo was responsible for "walking groups of aliens around Border Patrol checkpoints" and that "witnesses have revealed to agents that Jose Luis Cruz-Trejo would guide groups of 20 to 30 aliens at a time around the checkpoint and then travel with the groups to Houston once picked up by one of the drivers once through the checkpoints." (RT at 27). The government also stated as part of the facts that "witnesses have testified that agents of the organization would move up to 30 aliens per truck and up to three trucks leaving for Houston per day. It is, therefore, easily said that the organization transported thousands of aliens a year." (RT at 28). Cruz-Trejo admitted that those facts were correct. *Id.*

---

[4] "RT" refers to the rearraignment transcript. The numbers following refer to the page numbers.

Additionally, the PSR clearly established that this organization transported well over 100 undocumented aliens. (PSR ¶¶ 22-48). Under the relevant conduct provision in the PSR, Cruz-Trejo was considered an alien guide working directly for and with the leader, Garcia-Coronado. (PSR ¶ 55). The PSR states that Cruz-Trejo smuggled aliens into the United States and guided well over 100 aliens through South Texas to Garcia-Coronado in the Kingsville area. *Id.*

Additionally, Agent Torres testified during the sentencing hearing. His testimony undisputedly established that this was a very large, well organized alien smuggling operation that transported hundreds upon hundreds of illegal aliens. Although the indictment only alleged two dates in which Cruz-Trejo was directly involved, the sentencing evidence established that he was a significant participant in the overall smuggling scheme and extended well beyond those two instances.

2. *Application of U.S.S.G. § 2L1.1(b)(1)(C).*

Sentencing for smuggling, transporting or harboring an unlawful alien is determined by U.S.S.G. § 2L1.1. In this case, the 2002 edition. (PSR ¶ 64). Under specific offense characteristics, the offense level is increased by nine levels if the offense involved 100 or more undocumented aliens. U.S.S.G. § 2L2.1(b)(1)(C). The application notes state that an upward departure may be warranted if the offense involved substantially more than 100 aliens. U.S.S.G. § 2L1.1, comment. (n.4).

11

Guideline provision 1B1.3 governs the evaluation and inclusion of relevant conduct for an offense. That provision directs that relevant conduct shall be determined based on "all acts ... committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," and "all reasonably foreseeable acts ... of others in furtherance of the jointly undertaken criminal activity" that occurred during the commission of the offense of conviction. U.S.S.G. § 1B1.3(a)(1). A "jointly undertaken criminal activity" is a "criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3, comment. (n.2). Essentially, a defendant is responsible for the actions of his co-conspirators if those co-conspirators acted in furtherance of the jointly undertaken criminal activity and their acts were reasonably foreseeable in connection with that criminal activity. *Id.*

3.    *The court correctly applied the nine-level enhancement.*

Sufficient facts supporting the application of the nine-level enhancement for transporting more than 100 undocumented aliens came straight from Cruz-Trejo's admissions during the rearraignment - he admitted that this organization of which he belonged and participated transported "thousands of aliens a year." Based upon these judicial admissions, the court had sufficient factual evidence to warrant application of the nine-level enhancement for transporting more than 100 aliens in this case.

12

Additionally, Cruz-Trejo presented no evidence during sentencing to support his argument that his conduct only involved 26 or 27 aliens. As noted, the PSR contained reliable facts indicating otherwise. (PSR ¶¶ 22-48, 55). "As a general rule, a PSR bears sufficient indicia of reliability, such that a sentencing judge may consider it as evidence in making the factual determinations required by the Sentencing Guidelines." *United States v. Huerta*, 182 F.3d 361, 364 (5th Cir. 1999), *cert. denied,* 120 S.Ct. 1238 (2000). A district court may adopt facts contained in the PSR without further inquiry, "if those facts ha[ve] an adequate evidentiary basis and the defendant does not present rebuttal evidence." *Id.* (quoting *United States v. Puig-Infante*, 19 F.3d 929, 943 (5th Cir. 1994)). A defendant's objection does not suffice as competent rebuttal evidence. *Huerta*, 182 F.3d at 364 (quoting *United States v. Parker*, 133 F.3d 322, 329 (5th Cir. ), *cert. denied*, 523 U.S. 1142, 118 S.Ct. 1851 (1998)). To sufficiently rebut the facts in the PSR, a defendant's evidence must demonstrate that the information contained in the PSR is "materially untrue, inaccurate, or unreliable." *Id.* The defendant's failure to submit affidavits or some other rebuttal evidence to contradict the PSR permits the district court to freely adopt the PSR findings without further inquiry or explanation. *See United States v. Mitchell*, 166 F.3d 748, 754 (5th Cir. 1999). "The court is free to disregard a defendant's unsworn assertions that the PSR is unreliable." *United*

13

964 (5th Cir. 1990).

Although the allegations of a *pro se* complaint are held to a less stringent standard than the formal pleading drafted by lawyers, if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief, the cause will be dismissed. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594 (1972). The record in the present case is sufficient to enable this court to resolve Cruz-Trejo's sentencing issue without a hearing.

The government prays that the court enter an order denying Cruz-Trejo's request for relief under Section 2255 and dismissing this action.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

By: _____

TONY R. ROBERTS
Assistant United States Attorney
TX Bar No. 17022000
1701 W. Business 83, Suite 600
McAllen, Texas 78501-5160
(956) 618-8010

15

# ATTACHMENT

# A

21ja03d_Cruz-Trejo.txt

1                    IN THE UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF TEXAS
2                         BROWNSVILLE DIVISION

3       _____

4       UNITED STATES OF AMERICA        )
                                        ) CRIMINAL ACTION NO.
5       VS.                             ) B-02-377
                                        )
6       JOSE LUIS CRUZ-TREJO            )

7       _____)

8

9                          SENTENCING PROCEEDINGS
                    BEFORE THE HONORABLE HILDA G. TAGLE
10                       JANUARY 21 AND 22, 2003

11      APPEARANCES:

12      For the Government:        MS. LYNN KIRKPATRICK
                                   MR. CHARLES LEWIS
13                                 MR. ALAN HOFFMAN
                                   Assistant United States Attorneys
14                                 Brownsville, Texas

15      For the Defendant:         MR. ARMANDO VILLALOBOS
                                   Attorney at Law
16                                 Brownsville, Texas

17      Transcribed by:            BRECK C. RECORD
                                   Official Court Reporter
18                                 14 Thornhill Trail
                                   Brownsville, Texas  78521
19                                 (956)542-8893

20

21

22

23

24

25


               Captured and Transcribed by Computer - Eclipse

☐

1                              I-N-D-E-X
                                                        Page No.
2          Recess taken  . . . . . . . . . . . . . . . . .  11
                                Page 1

21ja03d_Cruz-Trejo.txt

```
         Recess taken  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .   64
 3       January 22, 2003 proceedings  .  .  .  .  .  .  .  .  .  .  .  147
         Court Reporter's Certificate  .  .  .  .  .  .  .  .  .  .  .  192
 4
                         ALPHABETICAL INDEX
 5                                                        Page No.
         TORRES, CHARLIE .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .   14
 6       TORRES, CHARLIE .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  172
```

 7                   CHRONOLOGICAL EXAMINATION

 8    GOVERNMENT'S WITNESSES   Dir Crs Rdir Rcrs FRdir FRcrs  VrDire

 9    CHARLIE TORRES           14  36  84   92

10                                56

11                                60

12                                64

13                                68

14                                71

15                                78

16                   ASSET FORFEITURE HEARING

17    GOVERNMENT'S WITNESSES   Dir Crs Rdir Rcrs FRdir FRcrs  VrDire

18    CHARLIE TORRES          172 178

19                   GOVERNMENT'S EXHIBITS

20    Exhibit No.                              OFFRD    ADMTD

21    Government's Exhibit 1                    173      173
      Government's Exhibit 2                     97       98
22
                   ADDITIONAL EXHIBIT INDEX
23    Exhibit No.                                     Page No.

24    Government's Exhibit 1 .  .  .  .  .  .  .  .  .  .  .  .  .  .  173

25


           Captured and Transcribed by Computer - Eclipse

□
                                                           3

 1          THE COURT:  All right.  At this time, The Court will

 2    call the docket and I'll ask you to announce for the record

 3    whether you're ready to proceed.  And if you had objections,

 4    whether they have been resolved or indicate if there are any

 5    pending motions that are opposed.
                         Page 2

21ja03d_Cruz-Trejo.txt

6      02-CR-377-01, The United States of America versus Alfonso

7  Coronado-Garcia.  What says the Government?

8      AUSA KIRKPATRICK:  Lynn Kirkpatrick for the Government,

9  Your Honor, along with co-counsel, Charles Lewis and Alan

10  Hoffman.  Mr. Hoffman will be proceeding on the asset forfeiture

11  arguments, Your Honor, with The Court's permission.

12      THE COURT:  What says the Defendant?

13      MR. TROIANI:  Anthony Troiani behalf of the Defendant

14  Alfonso Coronado.  We're present and ready to proceed.  We do

15  have objections.

16      THE COURT:  And I understood that there was some

17  announcement regarding the forfeiture hearing?

18      MR. TROIANI:  Your Honor, we're going to object to the

19  forfeiture hearing and raise our objections at that time.  And I

20  spoke with Mrs. Kirkpatrick and essentially her arguments on

21  there have to do with the number of aliens and we're gonna

22  address those in our main objections.

23      THE COURT:  Okay.  02-CR-377-02, The United States of

24  America versus Celestino Yanez-Flores.  What says the

25  Government?

Captured and Transcribed by Computer - Eclipse

▯

4

1      AUSA KIRKPATRICK:  Same announcement, Your Honor.  Lynn

2  Kirkpatrick along with co-counsel with the Government, we're

3  present and ready.

4      THE COURT:  What says the Defendant?

5      MR. CARDENAS:  Lazaro Cardenas for the Defendant.  We

6  have one objection.

7      THE COURT:  02-CR-377-03, The United States of America

8  versus Fernando Garcia.  What says the Government?

Page 3

21ja03d_Cruz-Trejo.txt

9      AUSA KIRKPATRICK:  Same announcement, Your Honor.  Lynn

10   Kirkpatrick along with co-counsel for the Government.  We're

11   present and ready.

12      THE COURT:  What says the Defendant?

13      MR. BALDERAS:  Anthony Balderas, Your Honor, for Mr.

14   Garcia and we're ready.  We have one objection.  I guess you

15   could count it as one and a half.

16      THE COURT:  Okay.  One and a half objections noted.

17      02-CR-377-08, The United States of America versus Jose Luis

18   Cruz-Trejo.  What says the Government?

19      AUSA KIRKPATRICK:  Lynn Kirkpatrick along with

20   co-counsel, Your Honor, for the Government.  We are present and

21   ready.

22      THE COURT:  What says the Defendant.

23      MR. VILLALOBOS:  Armando Villalobos for the Defendant,

24   Your Honor.  We're present and ready.  We do have objections,

25   Your Honor.  Also, under a timeframe with state court because

Captured and Transcribed by Computer - Eclipse

▢

5

1    we're in the middle of voir dire.  They excused me to come over

2    here and waiting for me to go back so we can finish voir dire.

3    We have a trial starting today.

4       THE COURT:  All right.  02-CR-377-09, The United States

5    of America versus Juan Olvera Martinez.  What says the

6    Government?

7       AUSA KIRKPATRICK:  Same announcement, Your Honor.  Lynn

8    Kirkpatrick along with co-counsel for the Government.  We are

9    present and ready to proceed.

10      THE COURT:  What says the Defendant?

11      MR. VILLARREAL:  Javier Villarreal for the Defendant,
                          Page 4

21ja03d_Cruz-Trejo.txt

12    Your Honor.  We're ready.  And we have three objections.

13         THE COURT:  02-CR-377-13, The United States of America

14    versus Juan Gabriel Nino.  What says the Government?

15         AUSA KIRKPATRICK:  Lynn Kirkpatrick, along with

16    co-counsel, Your Honor, for the Government, we are present and

17    ready to proceed.

18         THE COURT:  What says the Defendant?

19         MR. PULLEN:  Alberto Pullen for Mr. Nino, Your Honor.

20    We have two objections.

21         THE COURT:  02-CR-377-16, The United States of America

22    versus Homer Cruz.  What says the Government?

23         AUSA KIRKPATRICK:  Lynn Kirkpatrick along with

24    co-counsel, Your Honor, for the Government.  We are present and

25    ready to proceed.


          Captured and Transcribed by Computer - Eclipse

▯
                                                              6

1          THE COURT:  What says the Defendant?

2          MR. ADOBBATI:  Good afternoon, Your Honor.  Ricardo

3     Adobbati for the Defendant.  We are present and ready to

4     proceed.  We have one or two objections.

5          THE COURT:  Very well then.  It is The Court's intention

6     to take up Alfonso Garcia last, preceding him would be Homer

7     Cruz.  I'm sorry, I'm sorry.  Let me first take up

8     Mr.Villalobos's case.  I want to make sure that I mention that

9     so you don't get lost in the shuffle.  So, Mr. Villalobos,

10    you'll be first.  But, again, I was kind of working backwards,

11    because I want to take up Alfonso Garcia Coronado last.  And

12    before him will be Homer Cruz.  The one proceeding will be Juan

13    Olvera Martinez.  And then I'll take up Mr. Pullen's case and

14    then Mr. Cardenas's case and then Mr. Balderas's case.  But
                          Page 5

21ja03d_Cruz-Trejo.txt

15   then, like I said, so having worked backwards, I guess I want to

16   make sure that I at least take up Garcia-Coronado last.  But in

17   any event, let me first call Jose Luis Cruz-Trejo.  Mr.

18   Villalobos, if you will come forward with your client.

19       First, I'll ask about the Magistrate judge's report and

20   recommendation on the Defendant's plea of guilty.  Are there any

21   objections by the Government?

22           AUSA KIRKPATRICK:  None from the Government, Your Honor.

23           THE COURT:  By the Defendant?

24           MR. VILLALOBOS:  No, Your Honor.

25           THE COURT:  Then the report is approved and adopted by

Captured and Transcribed by Computer - Eclipse

7

1   The Court and the Defendant's plea of guilty is accepted and

2   based upon the evidence in the record at re-arraignment and the

3   Defendant's plea of guilty, The Court finds that the Defendant,

4   Jose Luis Cruz-Trejo, is guilty of the offense of conspiracy to

5   transport and harbor certain aliens within the United States for

6   private financial gain as alleged in Count One of this

7   indictment.  The Court having found the Defendant guilty will

8   proceed with sentencing.

9       Mr. Villalobos, have you reviewed the presentence report

10   with your client?

11           MR. VILLALOBOS:  Yes, I have, Your Honor.

12           THE COURT:  And you have indicated that there are

13   objections and also I note that there is a plea agreement; so,

14   let me first ask the Government if there's anything to add on

15   behalf of the Government?

16           AUSA KIRKPATRICK:  No, Your Honor.

17           THE COURT:  Mr. Villalobos, you may address The Court.
                            Page 6

21ja03d_cruz-Trejo.txt

18          MR. VILLALOBOS: Your Honor, my client, first of all,
19    objects to the number of estimates for relevant conduct for the
20    number of aliens that they're indicating that he's responsible
21    for.  He admitted his participation.  His participation being
22    that he was a guide on two occasions; that he would guide them
23    around the checkpoint.  He indicated -- the evidence will
24    support that he walked a small group around the checkpoint and
25    he's done it on two occasions.  There's nothing to support that


          Captured and Transcribed by Computer - Eclipse

☐
                                                                    8

 1    he participated in thousands and thousands of aliens that
 2    they're accusing him of transporting along the lines.  He had a
 3    very small role in it where he would be a guide to go around the
 4    checkpoint.  That would lead us to our second contention where
 5    they're indicating that one of the two times that he did, this
 6    the weather was cold weather.  They're indicating that it could
 7    at some point be freezing weather.  I haven't seen anything in
 8    the evidence to indicate what the actual temperature was that
 9    day or what they're indicating was dangerous about the weather,
10    other than it was cold.  My client was with the illegal aliens
11    when he was walking in the brush with them.  He had a phone.  He
12    indicates that he -- that at any point, if there was any sort of
13    danger he could communicate and contact somebody to pick them up
14    or contact emergency if need be.  They were dressed properly,
15    they were out there for a very short period of time and it
16    wasn't to where there was an unreasonable risk of freezing to
17    death or having hypothermia.  They weren't led through any
18    water -- anything that would indicate there lives were
19    unreasonably put at risk, Your Honor.
20          Additionally, they're indicating that at some point during
                              Page 7

21ja03d_Cruz-Trejo.txt

21  the transaction from when the -- when the aliens were brought

22  from the border until they reached their final destination that

23  they would travel ·in the bed of pickup trucks and they would --

24  they would indicate that he's responsible for that dangerous

25  behavior of having them in the pickup trucks and we would argue

Captured and Transcribed by Computer - Eclipse

9

1   that he has no participation in that.  His role was limited as

2   to the transferring or to the walking, like I mentioned before,

3   across the brush area, having no say-so in how they're

4   transported from that point forward or even having any knowledge

5   of how they're being treated whether in the back of a pickup or

6   how they're not being treated or what's going on with regards to

7   that.  There is no evidence that my client had my participation

8   in that and we feel that he shouldn't be given relevant conduct

9   points for that behavior, Your Honor.

10      I'll allow the Government to respond and I also want for the

11  Probation Department to supplement with any evidence that

12  they've been able to obtain in their independent investigation.

13      Mrs. Kirkpatrick?

14      AUSA KIRKPATRICK:  Your Honor, the Government intends to

15  put on live testimony, particularly for the case of Alfonso

16  Coronado-Garcia concerning the number of aliens that this alien

17  smuggling organization has, in fact, moved.  I don't know if The

18  Court would prefer that we do this all at once -- start off with

19  the live testimony or The Court would prefer just a proffer of

20  what the testimony is to come with regard to the asset

21  forfeiture proceedings of Mr. Alfonso Coronado-Garcia.

22      THE COURT:  If the number's gonna be an issue contested

23  by all defendants, then maybe it would be appropriate to have

Page 8

21ja03d_Cruz-Trejo.txt

24    the testimony elicited and then have The Court consider it for

25    all sentencings that are -- in which the objection of numbers is

Captured and Transcribed by Computer - Eclipse

10

1    a -- something that I'm going to have to be ruling on.

2            AUSA KIRKPATRICK:  Yes, Your Honor.

3            THE COURT:  So, Mr.Villalobos, let me think about this.

4    who is the judge in state court that you're selecting a jury

5    for.

6            MR. VILLALOBOS:  Judge Limas, Your Honor, 404th District

7    Court.

8            THE COURT:  Let me recess so I can call Judge Limas and

9    just advise him that we have a situation where you might be tied

10    up for a greater part of the afternoon or at least so that he

11    can plan accordingly and so that you won't get in trouble with

12    him.

13            MR. VILLALOBOS:  Thank you, Judge.

14            THE COURT:  And so I think that's probably the more

15    appropriate way to proceed is whenever testimony's gonna be

16    elicited and if it is gonna be for the purpose of all

17    objections.  Is there any one of the defendants who's not

18    raising the issue of the number that is 2L1.1B2C.

19            MR. ADOBBATI:  There's a plea agreement in which he

20    agreed that the number of aliens was between six and 24 aliens;

21    so, we would not be presenting any evidence to dispute that

22    number, Your Honor.

23            THE COURT:  Okay.  And anybody else?  Mr. Pullen?

24            MR. PULLEN:  No, Your Honor.  We have the same

25    objection.

Page 9

21ja03d_Cruz-Trejo.txt

Captured and Transcribed by Computer - Eclipse

11

1        THE COURT:  As to numbers?

2        MR. PULLEN:  Yes.

3        THE COURT:  Okay.

4        MR. BALDERAS:  Your Honor, I didn't make that specific

5    objection in what I submitted to The Court.  We have a plea

6    agreement with the Government that my client was responsible for

7    less than a hundred.  But if The Court's gonna find otherwise,

8    then I guess I would join in that.  But my plea agreement with

9    the Government -- or our -- they were in a better position to

10   know.  I think --

11       THE COURT:  You don't have to argue it now.  I just need

12   to know whether that's gonna be something that would be salient

13   information and evidence for me to consider in ruling on the

14   objections because, you know, obviously you still have to

15   convince me that I should accept your agreement and which

16   includes any stipulation as to number.  So let me recess for

17   that purpose and then I'll -- so, have any witnesses ready to go

18   or any exhibits that you might be offering, be ready to be

19   tendered.  If there's gonna be objections, then, you know, y'all

20   need to talk about that.

21       AUSA KIRKPATRICK:  Yes, Your Honor.

22   (Recess taken.)

23       THE COURT:  Mr. Villalobos, I've spoken with Judge Limas

24   and he's indicated that your associate, he's gonna ask him to

25   stand in all.  He's gonna do is swear in the jurors or something

Captured and Transcribed by Computer - Eclipse

12

Page 10

21ja03d_Cruz-Trejo.txt

1   like that. So, anyway, he indicated that he realized you had a

2   commitment that was gonna tie you up for a little bit.

3       MR. VILLALOBOS: Thank you, Judge.

4       THE COURT: All right then. I'm gonna have all

5   witnesses who will be testifying in these sentencings in Cause

6   No. 02-CR-377 to come forward so they may be sworn.

7       AUSA KIRKPATRICK: Your Honor, at this time the

8   Government intends to only call Charlie Torres, the case agent

9   in this case.

10      THE COURT: Very well.

11      (Witness sworn.)

12      THE COURT: Sir, if you will have a seat here.

13      MR. TROIANI: Your Honor, we'd like to invoke the rule.

14      THE COURT: If there's any witnesses that the Government

15  or the Defendant may be calling, can you please identify those

16  witnesses that may be called by the defense?

17      MR. TROIANI: Your Honor, the only concern was that

18  Mrs. Kirkpatrick had prefaced her comment "at this time." If

19  say has other witnesses that she intends to call at a little bit

20  later time, we'd like to know about it. If this is her only

21  witness, that would be the case agent, that's fine. If she has

22  other witnesses that she does intend to call, we'd like to know

23  about that.

24      AUSA KIRKPATRICK: Your Honor, once again, I only intend

25  to call Mr. Torres unless an unforeseen circumstance arises. I

Captured and Transcribed by Computer - Eclipse

13

1   have other agents who have been part of the organization or part

2   of the investigation, but Mr. Torres can testify to everything

3   that they can testify to.

Page 11

21ja03d_Cruz-Trejo.txt

4          THE COURT:  All right.  If it becomes apparent that

5    there will be a need to call any other witness, then the rule

6    has been invoked and they're to be instructed as to that.

7          AUSA KIRKPATRICK:  Yes, Your Honor.

8          THE COURT:  All right.  Sir, have a seat please over

9    here.

10         And what I'm gonna do is on cross, I guess I'll just go

11   numerically down the row with Mr. Troiani.  His case is No. 1

12   and thereafter Mr. Cardenas, Mr. Balderas, Mr. Villalobos, Mr.

13   Villarreal, Mr. Pullen, and Mr. Adobbati.  If you-all are all

14   objecting to the number of -- I mean the number of aliens, then

15   that's the order in which you can follow up with any other

16   further cross beyond what has been done by Mr. Troiani or

17   counsel who has preceded you.  Because all evidence elicited at

18   this hearing will be considered for all of the sentencings

19   pending this afternoon.

20         AUSA KIRKPATRICK:  Your Honor, if may inquire of The

21   Court.  Would The Court prefer that I inquire of the witness all

22   information regarding asset forfeiture provisions, as well,

23   because it is a continuation of the witness's testimony?  Or

24   would you prefer to have two different proceedings this

25   afternoon?


              Captured and Transcribed by Computer - Eclipse

▯

                                                              14

1          THE COURT:  No, two different proceedings.

2          AUSA KIRKPATRICK:  Yes, Your Honor.

3                        CHARLIE TORRES,

4    the witness, having been first duly cautioned and sworn to tell

5    the truth, the whole truth and nothing but the truth, testified

6    as follows:

                          Page 12

21ja03d_Cruz-Trejo.txt

7                    DIRECT EXAMINATION

8    BY AUSA KIRKPATRICK:

9    Q    Could you please state your full name for the record?

10   A    My name is Charlie Torres.

11   Q    How are you employed?

12   A    I'm employed as a senior special agent by the Immigration

13   and Naturalization Service.  I'm assigned to the Border Patrol.

14   Q    And Agent Torres, have you been involved in what has been

15   termed "Operation Northern Exposure"?

16   A    Yes, ma'am.

17   Q    Were you, in fact, involved in the inception of "Operation

18   Northern Exposure"?

19   A    Yes, ma'am.

20   Q    Can you tell us very briefly what happened to bring about

21   this undercover operation?

22   A    Okay.  This investigation which is named, "Northern

23   Exposure" was --

24            THE COURT:  Sir, excuse me, I'm having a hard time

25   hearing you.  You can either move closer to the microphone or


            Captured and Transcribed by Computer - Eclipse

▯
                                                                15

1    move it closer to you.

2            THE WITNESS:  Yes, ma'am.

3    A    This investigation was predicated on information and

4    intelligence gathered and collected by the Kingsville Border

5    Patrol station.  The information indicated that Mr. Alfonso

6    Coronado-Garcia was involved in transporting or assisting in

7    transporting large numbers of undocumented aliens around the

8    Border Patrol checkpoints outside in Falfurrias.

9    Q    Was an estimate given to you by the Kingsville agents as to

21ja03d_Cruz-Trejo.txt
10  how much their information had produced Mr. Alfonso

11  Coronado-Garcia was moving?

12  A    Yes, ma'am.  Their information indicated Mr. Alfonso

13  Coronado-Garcia and several unidentified associates were

14  transporting as many as 200 aliens per week through the area.

15  Q    Okay.  Was that an estimate of 200 to 300 aliens per week?

16         MR. TROIANI:  Objection.  Leading.

17         THE COURT:  I'm gonna allow it.

18  A    Yes, ma'am.

19  BY AUSA KIRKPATRICK:

20  Q    Okay.  How did they receive this information?  Without

21  giving any identities of individuals, how did they receive this

22  information?

23  A    This information that they received was -- came from

24  non-testifier informant.

25         THE COURT:  I'm sorry?

              Captured and Transcribed by Computer - Eclipse

▯

                                                                  16

1          THE WITNESS:  Came from.

2          THE COURT:  Non what?

3          THE WITNESS:  Testifier.

4          THE COURT:  Explain what that is.

5          THE WITNESS:  An informant who was not willing to

6  testify.  A confidential source.

7  BY AUSA KIRKPATRICK:

8  Q    Had they used this confidential source in the past?

9  A    Yes, ma'am.

10  Q    And did they know this confidential source to have a

11  relationship with the organization which would produce reliable

12  information?

                          Page 14

21ja03d_Cruz-Trejo.txt

13    A    Yes, ma'am.  This informant was at one time an associate of

14    the holding station of Alfonso Coronado-Garcia and the informant

15    provided several locations, which led to the arrest of persons

16    transporting undocumented aliens in the Kingsville area.

17    Q    300 aliens per week, how many weeks was -- well, actually,

18    we indicted the Defendants in an eighteen-month period; is that

19    correct -- or actually 17 and a little over?

20    A    Yes, ma'am.  The indictment runs back to January 1st of the

21    year 2001.

22    Q    Okay.  72 weeks, 300 aliens per week, we're looking at a

23    total of first estimate being 21,600 aliens?

24    A    Yes, ma'am.

25    Q    Okay.  That was just an estimate; is that correct?


            Captured and Transcribed by Computer - Eclipse

0

                                                                17

1    A    Yes, ma'am.

2    Q    Now, were you then involved in the preparation and

3    instigation of an undercover investigation?

4    A    Yes, ma'am.  Predicated upon the information that we had

5    about the smuggling organization, I requested permission from

6    INS headquarters in an undercover review committee -- a

7    Department of Justice undercover review committee to conduct two

8    meetings with transporting illegal aliens in order to

9    effectively infiltrate and dismantle this organization.

10    Q    And were you able to introduce undercover agents working

11    with you in this capacity?

12    A    Yes, ma'am.

13    Q    Did they, in fact, begin having meetings with individuals by

14    the name of Adan and Palimone Infante?

15    A    Yes, ma'am.

                        Page 15

21ja03d_Cruz-Trejo.txt

16   Q   And as part of their meetings, were these meetings recorded?

17   A   Yes, ma'am, some were.

18   Q   Okay.  Now, state what you mean by that?

19   A   Some meetings, due to technical difficulties and other

20   difficulties some meetings were not recorded, but the majority

21   were.

22   Q   Did you also send in a confidential informant who was not an

23   undercover agent?

24   A   Yes, ma'am.

25   Q   Okay.  And were there opportunities that he had to meet --

Captured and Transcribed by Computer - Eclipse

18

1   he or she had to meet with individuals where recordings were not

2   possible?

3   A   Yes, ma'am, that is correct.

4   Q   Okay.  Now, when your undercover agents were first

5   approached by the Infantes to smuggle illegal aliens, did they

6   give an estimate of how many aliens they would be able to

7   deliver to you or your agents per week, let's say?

8   A   Yes, ma'am.  During one of the first meetings between the

9   confidential informant and an undercover agent and the Infantes,

10   they informed the confidential informant and the agent that they

11   could deliver as many as 80 undocumented aliens per week.

12   Q   80 aliens at 72 weeks comes up with a figure of 5760; is

13   that correct?  No. 4 under the estimates?

14   A   Yes, ma'am.

15   Q   Now, were those just the aliens that they were given to

16   deliver to the agents?

17   A   Yes, ma'am.

18   Q   Okay.  Now, were the agents, as far as you could tell

Page 16

21ja03d_Cruz-Trejo.txt

19  through the undercover investigation, the only people working

20  with the Infantes?

21  A    No, ma'am.  They had other people that transported aliens.

22  Q    Okay.  Now, during the course of your investigation, did it

23  become evident during various meetings with the Infantes and

24  with other co-conspirators and co-defendants that additional

25  aliens were, in fact, being smuggled?  In February, for

Captured and Transcribed by Computer - Eclipse

19

1  instance, did they state that they had 30 additional aliens

2  coming that were not part of the group you were moving?

3  A    Yes, ma'am.  On that date and several other occasions, those

4  comments were made.

5  Q    Okay.  Again, on February 13th, they stated 20 next week?

6  A    Yes.

7  Q    These are apart from the aliens that your agents were

8  transporting?

9  A    Yes, ma'am.

10  Q    How many aliens did, in fact, your agents transport for the

11  organization?

12  A    We transported a total of 40.

13  Q    40.  That's that first number right at the top?

14  A    Yes, ma'am.

15  Q    How did you receive these aliens?

16  A    These aliens were received from the Infantes -- Adan Infante

17  or Palimone Infante in the Edinburg area.

18  Q    They were delivered to who?

19  A    They were delivered to Celestino Yanez in Houston and

20  Fernando Garcia.

21  Q    Okay.  Now, they were picked up from co-conspirators and

Page 17

21ja03d_Cruz-Trejo.txt
22  delivered to co-conspirators; is that correct?

23  A   Yes, ma'am.

24  Q   You didn't bring these aliens yourself into the conspiracy,

25  did you?


        Captured and Transcribed by Computer - Eclipse

                                                              20

1   A   No, ma'am.

2   Q   Did you, in fact, personally receive a call from an

3   individual that stated that he was one of the Infantes on

4   February 26th regarding a load of aliens from Jose Luis

5   Cruz-Trejo.

6   A   Yes, ma'am, I did.

7   Q   Can you tell this court what was the nature of that phone

8   call?

9   A   This call was received early in the evening, possibly about

10  8:00 or 9:00 o'clock timeframe and the caller informed me that

11  Mr. Jose Luis Cruz-Trejo had a group of approximately 15

12  undocumented aliens in the brush near Ricardo, Texas, near

13  Alfonso Garcia-Coronado's house and it was very cold and that

14  Alfonso Garcia-Coronado had not gone to pick them up yet and

15  they needed to be picked up immediately due to the cold weather.

16  Q   Okay.  And did you have an opportunity to then relay that

17  information on to anyone?

18  A   Yes, ma'am.  I relayed this information to border patrol

19  agents in Kingsville, Texas.

20  Q   Okay.  Were you able to ascertain whether those aliens were

21  ever picked up?

22  A   On the following day, Kingsville Border Patrol agents acted

23  on information that I supplied on the following day.  They

24  responded to the area and they encountered a group approximately

                          Page 18

21ja03d_Cruz-Trejo.txt
25   40 undocumented aliens in the brush who managed to get away,

Captured and Transcribed by Computer - Eclipse

21

1    elude apprehension because it was only two agents out in the
2    field.
3    Q   Now, was this the same area that you directed them to that
4    was relayed to you from Jose Luis Cruz-Trejo's through
5    undercover agents who had conversations with them?
6    A   Yes, ma'am.
7    Q   Okay.  Now, you had also -- had you also received
8    information that there was an additional group that may have
9    join Jose Luis Cruz-Trejo, in addition to 15 aliens that were
10   with him in the brush that night?
11   A   Yes, ma'am.  This information was received on the 27th, I
12   believe.
13   Q   Okay.  So just recap, on the 26th, you received information
14   that Mr. Jose Luis Cruz-Trejo was out in the brush and needed to
15   be picked up; is that correct?
16   A   Yes, ma'am.
17   Q   And on the 27th, how did you ascertain where Mr. Jose Luis
18   Cruz-Trejo was in fact located?  Were there conversations with
19   Jose Luis Cruz-Trejo through co-conspirators?
20   A   Yes, ma'am.  Mr. Jose Luis Cruz-Trejo was contacted by one
21   of the co-defendants -- I can't remember the name -- via
22   telephone and got specific directions to his location in the
23   brush.
24   Q   Was that co-defendant, in fact, being transported with your
25   undercover agents in an undercover capacity?

Captured and Transcribed by Computer - Eclipse

Page 19

21ja03d_Cruz-Trejo.txt

22

1   A    Yes, ma'am.

2   Q    And your undercover agents had not been exposed as agents at

3   the time; is that correct?

4   A    Right.

5   Q    Okay.  And did they later on get in contact again with Jose

6   Luis Cruz-Trejo who indicated they had, in fact, been picked up?

7   A    Yes, ma'am.  Later on that day, when contact was established

8   he met with Mr. Jose Luis Cruz-Trejo and it was learned that he

9   had already been picked up at the place and was no longer

10  there -- in fact, no longer there.

11  Q    Who was he picked up by, did he indicate?

12  A    I cannot remember.

13  Q    You indicated that there was a group of 40 that agents had

14  attempted to pick up at that same location; is that correct?

15  A    Yes, ma'am.

16  Q    And that's that number.  We have 15 by Jose Luis Cruz-Trejo

17  down at this number right here and you add 25 for a total of 40;

18  is that correct?

19  A    Yes, ma'am.

20  Q    Now, did you have the opportunity, after the undercover

21  operation was exposed, to interview witnesses and cooperators --

22  A    Yes, ma'am.

23  Q    -- as to the extent of the organization?

24  A    Yes.

25  Q    And did individuals -- confidential individuals, in fact,

Captured and Transcribed by Computer - Eclipse

23

1   indicate to you how many people they had actually moved for the

2   organization?

Page 20

21ja03d_Cruz-Trejo.txt

3   A   Yes, ma'am.

4   Q   Okay.  Did one of these witnesses, the first witness, did

5   this individual have personal knowledge within the organization?

6   A   Yes, ma'am.

7   Q   And did you, in fact, corroborate, through other individuals

8   and through other witnesses the fact that this person had, in

9   fact, been involved with Alfonso Coronado Garcia organization?

10  A   That's correct, ma'am.

11  Q   Okay.  Did this witness, in fact, admit under oath that here

12  or she was, in fact, involved?

13  A   Yes, ma'am.

14  Q   Okay.  Did this individual, in fact, testify to you and to

15  others that they had moved approximately 30 aliens on 60 to 70

16  different occasions and three aliens on 10 occasions for a total

17  of 1830 aliens -- we'll estimate that at 1800 aliens right there

18  by Witness No. 1?

19  A   Yes, ma'am.

20  Q   Okay.  And that's just for that witness; is that correct?

21  A   Correct.

22  Q   In what capacity did this witness act?

23  A   As a transporter.

24  Q   Okay.  As a driver?

25  A   Yes.


            Captured and Transcribed by Computer - Eclipse

☐

                                                              24

1   Q   Okay.  You had a second witness that you interviewed.  Did

2   that witness, in fact, also testify under oath to you and in a

3   sworn statement that, in fact, that individual, he or she, also

4   drove for the organization and moved approximately 20 loads of

5   20 aliens for a total of 400 aliens?

                        Page 21

21ja03d_Cruz-Trejo.txt

6   A   Yes, ma'am.

7   Q   Okay.  And that is their personal involvement?

8   A   Yes, ma'am.

9   Q   And was that corroborated through the testimony of witness

10  No. 1 and through independent sources?

11  A   Yes, ma'am.

12  Q   Namely, material witnesses, et cetera?

13  A   Right.

14  Q   Witness No. 3, did they indicate to you that they had also,

15  in fact, been transporting with the Alfonso Coronado Garcia

16  organization for approximately a three-month period?

17  A   Yes, ma'am.

18  Q   And did they, in fact, admit to you that they had

19  transported 150 aliens.

20  A   Yes, ma'am.

21  Q   Separate and apart from the others; is that correct?

22  A   That's correct.

23  Q   Did you also have an opportunity to interview an individual

24  by the name of Taboada, T-A-B-O-A-D-A?

25  A   I did not personally interview this individual, ma'am.


          Captured and Transcribed by Computer - Eclipse

□
                                                          25

1   Q   Okay.  Was he, in fact, deposed under oath?

2   A   Yes.

3   Q   Did he, in fact, state under oath during depositions that he

4   had contacted and moved with Alfonso Garcia-Coronado on five

5   different occasions anywhere from three to six people?

6   A   Yes, ma'am.

7   Q   Taking a conservative number, we estimate that to be

8   approximately 20; is that correct?

                    Page 22

21ja03d_Cruz-Trejo.txt

9    A    Yes, ma'am.

10   Q    So, by personal admissions of individuals personally and

11   firsthand knowledge of the organization, only their involvement,

12   we have a total of 2,370 aliens; is that correct?

13   A    Yes, ma'am.

14   Q    Okay.  Agent, I'm gonna take you back to June of last year,

15   the arrest of these defendants.  How did the arrest come about

16   briefly?

17   A    Okay.  The arrest came about as a result of surveillance by

18   border patrol agents in Kingsville, Texas.

19   Q    And they, in fact, saw Alfonso Garcia-Coronado along with

20   Juan Olvera Martinez exiting a restaurant with abnormally large

21   quantities of food; is that correct?

22   A    That is correct.

23   Q    And they followed the individuals how to a field; is that

24   correct?

25   A    Yes, that is correct.


          Captured and Transcribed by Computer - Eclipse

□                                                                    26

1    Q    Was Alfonso Garcia-Coronado and Juan Olvera Martinez, in

2    fact, arrested -- were they, in fact, arrested with six aliens?

3    A    Yes, they were.

4    Q    And that's where I have agency and I have a six.  Do you see

5    that?

6    A    Yes, ma'am.

7    Q    Okay.  Now, later on, did you receive -- while interviewing

8    Alfonso Garcia-Coronado, did you, in fact, receive a phone call

9    on his personal cellular phone from Celestino Yanez-Flores?

10   A    Yes, I did.

11   Q    What information did Celestino Yanez-Flores give you?

21ja03d_Cruz-Trejo.txt

12   A   He told me that defendant Jose Luis Cruz-Trejo was in the

13   brush with a group of 12 undocumented aliens waiting to get

14   picked up by Alfonso Garcia-Coronado and gave me specific

15   directions as to Jose Luis Trejo's location.

16   Q   Did you have find Jose Luis Trejo at that location?

17   A   Yes, ma'am.

18   Q   And did you find him with 12 aliens?

19   A   Yes, ma'am.

20   Q   Where I have JLCT on the chart, I have 12.  Okay.  Prior to

21   that, one or two months prior to that, did you also have the

22   opportunity to be involved in the arrest of an individual named

23   Armado Sepeda?

24   A   Yes, ma'am, I did.

25   Q   And what was unusual about that case?


            Captured and Transcribed by Computer - Eclipse

□
                                                              27

1   A   Okay.  Alfonso Garcia-Coronado was travelling with Armado

2   Sepeda at the time of the arrest.

3   Q   And he was, in fact, seen at the motel?

4   A   Yes, ma'am.

5   Q   Now, why didn't you proceed in a case against Alfonso

6   Garcia-Coronado with Armado Sepeda at that time?

7   A   The material witnesses in this case failed to identify

8   Alfonso Garcia-Coronado as being involved in transporting and

9   there was no additional evidence to support a criminal case of

10   him.

11   Q   But weren't we involved in a large-scale investigation as

12   well?

13   A   Yes, ma'am.

14   Q   And we didn't want to proceed on five aliens at that time,

                        Page 24

21ja03d_Cruz-Trejo.txt

15   did we?

16   A   Right.

17   Q   Okay.  So if there are five aliens -- now, did Armado Sepeda

18   initially indicate that Alfonso Garcia-Coronado was, in fact,

19   involved?

20   A   Yes, ma'am.  After I advised him of his rights, Armado

21   Sepeda told me that he was in Kingsville to deliver a group of

22   five undocumented aliens to Alfonso Garcia-Coronado for a fee.

23   Q   Okay.  That's the five that we have there?

24   A   Yes, ma'am.

25   Q   Now, also that summer -- or the earlier part of the summer,

Captured and Transcribed by Computer - Eclipse

28

1   was there an individual by the name of Joseph Antonio Torres

2   that was arrested in a vehicle that had been described by your

3   surveillance agents as being part of the Alfonso Garcia-Coronado

4   organization?

5   A   Yes, ma'am.

6   Q   And how many aliens did Mr. Torres have?

7   A   At the time of his arrest, he was transporting 13

8   undocumented aliens.

9   Q   Okay.  Now, did you have an opportunity to interview any of

10   the material witnesses involved in that case?

11   A   Yes, ma'am, I did.

12   Q   Did they, in fact, physically identify Alfonso

13   Garcia-Coronado to your undercover agents?

14   A   Yes, ma'am.

15   Q   That's the 13 right there; is that correct?

16   A   Yes.

17   Q   And then the 15 and the 25 are the group that the agents

Page 25

21ja03d_Cruz-Trejo.txt

18    attempted to --

19    A    Right.

20    Q    So that's 116 total aliens that have actually been

21    apprehended or moved by agents with personal knowledge; is that

22    correct?

23    A    Yes, ma'am.

24    Q    Okay.  Now, let's go over the estimates.  We already had one

25    estimate and that was the estimate that started this case out;

Captured and Transcribed by Computer - Eclipse

29

1    is that correct?

2    A    Yes, ma'am.

3    Q    That was the 21,600?

4    A    Yes.

5    Q    Okay.  Did you have an opportunity to also interview other

6    witnesses and cooperators?  Well, you have already stated that

7    you have, in fact?

8    A    Yes, I have.

9    Q    Okay.  Did you have the opportunity to ask them how many

10    aliens Alfonso Garcia-Coronado would move on a daily or weekly

11    basis?

12    A    Yes, ma'am, I did.

13    Q    Did the same Witness No. 1, who gave us the 1800 that he or

14    she was personally reliable for, did that individual, in fact,

15    state to you that at times more than one truck per day would

16    travel to Houston into the direction of Alfonso Garcia-Coronado?

17    A    Yes, ma'am, that is correct.

18    Q    And did that individual further state that approximately 30

19    aliens were involved in each truck?

20    A    Yes, ma'am.

Page 26

21ja03d_Cruz-Trejo.txt

21  Q   Okay.  So, if we took just one truck per day and we even

22  reduced the amount of days to 500 days as part of the

23  conspiracy, we're looking at 15,000 aliens, aren't we?

24  A   That is correct, ma'am.

25  Q   Okay.  Now, Witness No. 3 that we discussed earlier, the one


           Captured and Transcribed by Computer - Eclipse

☐
                                                                    30

1   who gave you the 150 number, did that individual also give you

2   an estimate?

3   A   Yes, he did.

4   Q   Okay.  Now, was that estimate specifically from the Adan

5   Infante organization?

6   A   Yes, it was.

7   Q   What was that estimate?  Was it approximately 60 two to

8   three times a week they would deliver aliens?

9           THE COURT:  Excuse me.  Mr. Pullen, you have an

10  objection.

11          MR. PULLEN:  For the record, this is all hearsay.  Those

12  witnesses are not here.

13          THE COURT:  Overruled.

14  A   Yes, ma'am.

15  BY AUSA KIRKPATRICK:

16  Q   Okay.  That was approximately two to three trips per week at

17  approximately 30 aliens per trip?

18  A   Yes, ma'am.

19  Q   Is this corroborated by tape-recorded conversations that you

20  were able to obtain during the course of the undercover

21  investigation?

22  A   That is correct, ma'am.

23  Q   In fact, did the Infantes indicate to you that they had
                            Page 27

21ja03d_Cruz-Trejo.txt

24   delivered or they do deliver approximately two to three loads to

25   Alfonso Garcia-Coronado per week?


        Captured and Transcribed by Computer - Eclipse

⧠
                                                                  31

1    A   Yes, ma'am.

2    Q   Okay.  Anywhere from 20 to 30 aliens?

3    A   Right.

4    Q   Okay.  And if you take 60 aliens per week, times a 72-week

5    figure, you come up with 8,640; is that correct?

6    A   Yes, ma'am.

7    Q   Okay.  Now, this is just from the Adan Infante organization;

8    is that correct?

9    A   Yes, ma'am.

10   Q   Do you know from personal through your undercover

11   investigation and from witness corroboration, as well as any

12   other evidence or corroboration that you can think of, do you

13   know if the Infantes are the only people who worked with Alfonso

14   Garcia-Coronado?

15   A   There is other people that work with Alfonso

16   Garcia-Coronado.

17   Q   So, if we took -- I'm sorry, I'm gonna backtrack because I

18   gave a figure I need to work it.  60 aliens at 72 is actually

19   4320.

20          THE COURT:  Just slow down.

21          AUSA KIRKPATRICK:  Sorry, Your Honor.

22   BY AUSA KIRKPATRICK:

23   Q   If you took just two people, one other group who delivered

24   the same amount of aliens, then you would have a figure of

25   8,640; is that correct?

                        Page 28

21ja03d_Cruz-Trejo.txt

Captured and Transcribed by Computer - Eclipse

32

1    A    Yes, ma'am.

2    Q    Okay.  Now, when you were first approached by the Infantes

3    to smuggle aliens and I believe you have already testified to

4    this, but I'm gonna rehash it, you indicated that they could

5    deliver to you 80 aliens per week; is that correct?

6    A    That is correct.

7    Q    Times 72 weeks, that comes out to be 5,760 just to you?

8    A    Right.

9    Q    Do other people drive for the Infantes and move for the

10   Infantes?

11   A    Yes, ma'am.

12   Q    Okay.  And did you, in fact, have the opportunity to

13   interview a confidential informant within the Infante

14   organization who indicated to you that the Infantes actually

15   moved up to 150 aliens per week?

16   A    Yes, ma'am.

17   Q    Okay.  And times 72 weeks of the conspiracy, we're talking

18   10,800 aliens; is that correct?

19   A    Yes.

20   Q    Okay.  Now, these are just various estimates that you have

21   received and collected over the course of your investigation; is

22   that correct?

23   A    That is correct, ma'am.

24   Q    Okay.  Now, in addition to the investigation of actual

25   numbers and bodies of aliens, let's talk about money.  What did

Captured and Transcribed by Computer - Eclipse

33

21ja03d_Cruz-Trejo.txt

1    your confidential informant learn about the proceeds that he

2    could expect or that could be expected to be collected by

3    Celestino Yanez-Flores?

4    A    Mr. Yanez-Flores offered my informant to assist in

5    collecting Western Union transactions, Western Union money, that

6    was smuggling fees from local Western Unions in Texas in

7    exchange for his collection and payment of 5 percent of the

8    proceeds, whatever he collected.  Mr. Yanez-Flores in this

9    conversation told the informant the informant could expect to

10   receive approximately $25,000 per week.

11   Q    Okay.  What were the total proceeds approximately?  Was it

12   approximately 50 to $75,000 per week that the Western Union

13   would collect?

14   A    The informants told that he could expect to get at least

15   $25,000 and the informant had previously informed Mr. Celestino

16   Yanez-Flores that he would be available for about 45 days.

17   Q    Okay.  25,000 personally received as a percentage of the

18   proceeds?

19   A    Yes, ma'am.

20   Q    What percentage of the proceeds was that?

21   A    5 percent.

22   Q    That was 5 percent of the proceeds.  Okay.  Now, did you

23   also have the opportunity to, in fact, subpoena several Western

24   Unions?

25   A    Yes, ma'am, I did.


             Captured and Transcribed by Computer - Eclipse

0
                                                                  34

1    Q    Did you subpoena all the Western Unions in the State of

2    Texas?

3    A    No, ma'am.

                          Page 30

21ja03d_Cruz-Trejo.txt

4  Q   Okay.  What did you determine in subpoenaing the Western
5  Unions that were closest to the stash houses that you had
6  interaction with?
7  A   Okay.  My administrative subpoena served to verify that
8  large amounts of money were being transferred and received by
9  associates of the Alfonso Garcia-Coronado smuggling group.
10 Q   And did you, in fact, come up with a figure that was
11 approximately $300,000 from several co-defendants?
12 A   Yes, ma'am.
13 Q   Okay.  Now, Mr. Torres -- or Agent Torres, could you
14 describe to The Court what the typical alien smuggling payment
15 schedule is like?  First of all, have you been able to ascertain
16 from this organization and through your cooperators an
17 approximation of how much money was charged to each alien?
18 A   The money -- the smuggling fees vary from alien to alien.
19 Some aliens pay as little as $1800; others pay as high as four
20 or $5,000.
21 Q   And were you also told by your cooperators how much Alfonso
22 Garcia-Coronado received personally from each one of these?
23 A   Yes, ma'am.  From information that I learned through
24 undercover contacts, it was discovered Mr. Alfonso
25 Garcia-Coronado received between 250 and $500 per alien.

             Captured and Transcribed by Computer - Eclipse

0
                                                          35

1  Q   Okay.  Now, when we were talking about Western Union
2  proceeds, is it your opinion as an investigator that this would
3  complete the entire amount of money that transpires between
4  co-conspirators or between aliens and their smugglers?
5          MR. TROIANI:  Objection.  Speculation, Your Honor.
6          THE COURT:  I'll allow it.  Go ahead.
                        Page 31

21ja03d_Cruz-Trejo.txt

7   A    No, ma'am.  It's been my experience that I have learned over

8   the years that alien smuggling requires upfront fees, as much

9   as -- sometimes aliens are required to pay one half of the total

10  fee in cash upfront before any transportation takes place.  The

11  balance usually takes -- sometimes takes the form of Western

12  Union transaction.

13  BY AUSA KIRKPATRICK:

14  Q    Okay.  Does it also, in fact, take the form of cash --

15  A    Yes, ma'am.

16  Q    -- in-kind payments?

17  A    Yes.  The balance is paid off sometimes in Western Union

18  transactions, others in cash or other means.

19  Q    Okay.

20          AUSA KIRKPATRICK:  Your Honor, I'm gonna pass the

21  witness at this time as to the relevant conduct issue, but would

22  request to be able to recall for the asset forfeiture.

23          THE COURT:  Mr. Troiani?

24          MR. TROIANI:  Thank you, Your Honor.

25                          CROSS-EXAMINATION


            Captured and Transcribed by Computer - Eclipse

                                                    36

1   BY MR. TROIANI:

2   Q    Good afternoon, Agent Torres.

3   A    Good afternoon.

4   Q    Okay.  In preparation of this matter, you provided my office

5   with numerous boxes of information, correct?

6   A    Yes, sir.

7   Q    Okay.  At no time did you provide any written statements,

8   sworn or otherwise, regarding Witnesses 1, 2 or 3 to my office,

9   did you?

                        Page 32

21ja03d_Cruz-Trejo.txt

10    A    No.  No, sir.

11    Q    Okay.  That information was never provided to any defense

12    counsel, was it?

13    A    No, sir.

14    Q    That information hasn't been provided to us until you sat

15    here in this stand today, correct?

16    A    That information was developed after the discovery period,

17    sir.

18    Q    Okay.  And that was never provided to us during the

19    discovery period, correct?

20    A    Correct.

21    Q    We've not been able to verify that information other than

22    your statements here today, correct?

23    A    Right.

24    Q    We don't have the names of those individuals nor can we

25    substantiate or verify those numbers, can we?


                Captured and Transcribed by Computer - Eclipse

                                                                37

1    A    That is correct.  You do not have the names.

2    Q    Okay.  Nor can we substantiate or verify those numbers,

3    correct?

4    A    Without the names, it would be difficult.  I don't think so,

5    sir.

6    Q    Okay.  Additionally, you provided Western Union receipts to

7    my office, correct?

8    A    Yes, sir.

9    Q    Okay.  You failed to provide any Western Union receipts as

10    to Alfonso Garcia-Coronado?

11    A    I believe -- I believe you're correct, sir.

12    Q    Okay.  Nor did you provide Western Union receipts as to his

                            Page 33

21ja03d_Cruz-Trejo.txt

13  spouse, correct?

14  A   That is correct, sir.

15  Q   Okay.  You simply provided totals as to those amounts,

16  correct?

17  A   I provided specific transaction -- Western Union transaction

18  numbers, dates, names and amounts.

19  Q   To my office?

20  A   I believe so, sir.

21  Q   Okay.  We'll address that in a moment.  Now, you had an

22  opportunity to be present when Mr. Taboada was deposed, correct?

23  A   Yes, sir.

24  Q   Okay.  He was the only individual who was actually presented

25  to The Court who provided information regarding the operations

            Captured and Transcribed by Computer - Eclipse

                                                              38

1   of this organization or organizations, correct?

2   A   He provided information regarding his participation with the

3   cooperation or workings with Alfonso Garcia-Coronado, sir.

4   Q   Okay.  And he was, I believe, charged as a material witness,

5   correct?

6   A   Yes, sir.

7   Q   Okay.  But, in fact, he was actually a smuggler of aliens?

8   A   That is correct, sir.

9   Q   Okay.  So he was given a rather substantial deal in order to

10  provide the information for you, correct?

11  A   Well, the reason he was charged as a material witness was as

12  a result of a error or mistake on my part.  I did not see a

13  report that an undercover agent wrote regarding his conversation

14  with him after he was arrested.  And I informed the United

15  States Attorney's Office that I did not feel we had enough to

                              Page 34

21ja03d_Cruz-Trejo.txt

16  charge him with this alien principal as a smuggler.  After those

17  charges -- smuggling charges were dropped, I discovered this

18  report and I informed the Assistant United States Attorney of

19  what had happened.

20  Q    And he was not prosecuted in this matter, correct?

21  A    As a smuggler, he was not prosecuted, sir.

22  Q    As a smuggler.  And he was -- he received a major benefit by

23  your oversight, correct?

24  A    Yes, sir.

25  Q    Okay.  Additionally, Witnesses No. 1, 2 and 3 were not

Captured and Transcribed by Computer - Eclipse

39

1   prosecuted in this matter either, were they?

2   A    Okay.  I believe Witnesses No. 1 is a co-defendant --

3   Q    I'm looking at Witnesses No. 1, 2 and 3 only, sir.  These

4   individuals where we have --

5   A    No. 1, 2 and 3.

6   Q    Correct.

7   A    They were co-defendants of either this case or other cases.

8   Q    But they were not prosecuted in this case?

9   A    Yes, some were.

10  Q    Just a yes or no, were they or were they not prosecuted in

11  this case?

12  A    As it relates to all of them, I cannot answer that.  Some

13  were prosecuted as part of this case.  The others were

14  prosecuted as part of another case.

15  Q    And now Mr. Taboada said that -- and I believe if we look at

16  his deposition testimony, which you were present for that

17  deposition and you also had the chance to debrief him, correct?

18  A    Yes, sir.

Page 35

21ja03d_Cruz-Trejo.txt

19   Q    Okay.  He indicated that he worked with more than one

20   smuggler, correct?

21   A    Yes.

22   Q    Okay.  And the Infante organization, you indicate, worked

23   with more than one smuggler, correct?

24   A    That is correct.

25   Q    Okay.  You had extensive reconnaissance and involvement with


Captured and Transcribed by Computer - Eclipse

❐

                                                                    40

1    the Infante organization; did you not?

2    A    Yes, sir.

3    Q    You have numerous tape recordings of the Infante

4    organization, correct?

5    A    Yes, sir.

6    Q    Okay.  You worked very closely with their organization,

7    correct?

8    A    As close as we could get, sir.

9    Q    Okay.  And actually you had face-to-face meetings with

10   Palimone and Adan Infante, correct?

11   A    Yes.

12   Q    And when they talked about moving large numbers of

13   individuals, there is no way to specifically divide up which

14   individuals went to the Coronado operation or which individuals

15   went to other operations, is there?

16   A    Their information indicated that their method of operation

17   was such that they selected from the larger number of aliens

18   groups of aliens that they brought in.  A certain percentage of

19   these aliens would be transported from stash house in one part

20   of the valley to another stash house --

21        MR. TROIANI:  I object to nonresponsive.

                              Page 36

21ja03d_Cruz-Trejo.txt

22      THE COURT:  Sustained.  Ask the question.

23  BY MR. TROIANI:

24  Q   The question was, there's no way to determine how those

25  aliens that they said that they could provide on a weekly basis

Captured and Transcribed by Computer - Eclipse

0

41

1   were divided up between various smugglers, correct?

2   A   Other than the personal -- personal information that they

3   gave us, no.

4   Q   It is all speculation, isn't it?

5   A   Well, yes and no.  Partial speculation.

6   Q   Hold on.  Now, the receipts that you provided us indicate

7   roughly $300,000 or so, but once you remove the monies sent to

8   Mr. Coronado and Mrs. Coronado and other individuals who you

9   didn't provide us receipts for, those numbers drop significantly

10  to under -- I believe you're saying that 7500 individuals were

11  moved at one point, but when you divide it up with the monies

12  that were received, you're only looking at 149 individuals at

13  most based on the amount that you're saying was charged,

14  correct?

15  A   Well, the total of $191,741.99, that includes -- does not

16  include any amounts to Mrs. Cardenas and only a $600 transaction

17  to Mr. Alfonso Garcia-Coronado.

18  Q   Okay.  Now, these are supposedly -- or Mr. Coronado is

19  supposedly the main individual in this organization, correct?

20  A   I believe so, sir.

21  Q   And actually I think you provided information that would

22  indicate or trying to present information that would indicate

23  that he was in control of all three locations of this smuggling

24  operation?

Page 37

21ja03d_Cruz-Trejo.txt
25    A    Yes, sir.


        Captured and Transcribed by Computer - Eclipse

                                                              42

1     Q    But, in fact, the Infante organization is its own entity and
2     operates out of the Rio Grande Valley, correct?
3     A    Well, this smuggling organization consisted of three
4     different separate rings or cells within the organization.  Each
5     cell is responsible for activities within their own geographic
6     area.  The Infante organization operated in the Rio Grande
7     Valley.
8     Q    The Infante organization, as you testified to The Court,
9     provides aliens not only to Mr. Coronado-Garcia, who's pled
10    guilty to smuggling aliens, but to other organizations, as well,
11    correct?
12    A    Yes, sir.
13    Q    There's, I believe, in the PSI report that there's also a
14    Adonia Anna?
15    A    Right.
16    Q    There's also another Infante brother who is also involved in
17    that, as well, or other family members of the Infantes who also
18    move aliens, as well, correct?
19    A    Yes.
20    Q    And they also move these aliens to Houston and other points
21    and ports north, correct?
22    A    That is correct.
23    Q    Okay.  And the division of those numbers of aliens or the
24    attribution of those numbers of aliens cannot with any certainty
25    be attributed to any organizational group, can it?


        Captured and Transcribed by Computer - Eclipse

                        Page 38

21ja03d_Cruz-Trejo.txt

43

1  A   No, sir.

2  Q   The information that you are providing here today is

3  essentially secondhand hearsay information from individuals such

4  as Mr. Taboada who received a very substantial benefit from his

5  testimony or other individuals who have not been charged with

6  criminal offenses, correct?

7  A   No, sir.  This information is based on undercover contacts

8  between the Infantes and undercover agents and informants.

9  Q   I understand that.  And some of these undercover informants

10 are individuals who were not charged with any criminal activity

11 as a result of this investigation, correct?

12 A   Right.  Those informants -- in particular, the undercover

13 informants were directed by the case agent, which is myself, to

14 engage in activity.

15 Q   Let's back up here.  You, as a case agent, were responsible

16 for the movement of illegal aliens in your capacity as an

17 undercover officer, correct?

18 A   Yes.

19 Q   Okay.  And you contract with the Infantes to move aliens on

20 behalf of the organization in furtherance of your investigation,

21 correct?

22 A   Yes, sir.

23 Q   You admittedly moved about 40 illegal aliens on behalf of

24 the Infantes, correct?

25 A   With the direction -- with the information that these aliens

Captured and Transcribed by Computer - Eclipse

44

1  belonged to Alfonso Garcia.  They were bound to Alfonso

2  Garcia-Coronado or his associates in Houston.

Page 39

21ja03d_Cruz-Trejo.txt

3    Q    Okay.  That's information you received, but you received the
4    aliens from the Infantes, correct?
5    A    Yes.
6    Q    With any of those 40 aliens, did you make contact with
7    Alfonso Garcia-Coronado with those 40 aliens?
8    A    As a matter of fact, on the first load, there was a mix-up
9    on the payments and after delivering the aliens to Mr.
10   Celestino, telephone contact was directed to Celestino Yanez to
11   Alfonso Garcia-Coronado and Fernando Garcia to deliver five of
12   those aliens.
13          MR. TROIANI:  I object to nonresponsive.
14   BY MR. TROIANI:
15   Q    Did you speak to Alfonso Coronado-Garcia?
16   A    My informant that was working the case was the only person
17   to speak to Mr. Alfonso Garcia-Coronado on the telephone on that
18   occasion.
19   Q    Can you tell me what happened to those 40 aliens that you,
20   as an agent, transferred to Houston?
21   A    10 of them were arrested by the border patrol near Rivera,
22   Texas.
23   Q    Okay.
24   A    The other 30 remained in the United States and efforts were
25   made to locate them.


          Captured and Transcribed by Computer - Eclipse

                                                          45
1    Q    Okay.  But they're essentially released into the interior of
2    the United States on your transport?
3    A    Yes, sir.
4    Q    Now, the 40 aliens you talked about, the 15 aliens and 25
5    aliens that were found in the brush, we're talking about, I
                              Page 40

21ja03d_Cruz-Trejo.txt

6  believe, the February incident and you indicated that, I

7  believe, it was Mr. Trejo was in the brush and that he had

8  called because it was cold and that he was wanting to have Mr.

9  Coronado come pick him up, correct?

10  A   He indicated to me on the telephone, yes.

11  Q   So when he talked to you, he said, "We need to get picked up

12  and this is the way we want to do it.  We want to have Mr.

13  Coronado pick us up," right?

14  A   He told me Mr. Coronado had failed to show up and pick him

15  up and he wanted us to make arrangements to pick him up

16  immediately.

17  Q   When we had the deposition of Mr. Taboada, I believe he said

18  that he used Mr. Coronado on occasion.  I believe he said used

19  him three occasions.  He made five trips and on three of those

20  trips he used Mr. Coronado?

21  A   I think so.  I'm not sure, but I believe that's correct.

22  Q   Would you agree with me that Mr. Taboada said it would take

23  five to eight hours for Mr. Coronado to come meet him when he

24  called him?

25  A   I do not remember that, sir, but it's quite possible.


          Captured and Transcribed by Computer - Eclipse

□

                                                              46

1  Q   If it is indicated in his deposition, you would not argue

2  with that, would you?

3  A   No, sir.

4  Q   Okay.  And the information that you provided The Court also

5  in your direct examination was that the following morning that

6  Mr. Trejo and the 15 aliens which he described to you were all

7  picked up, correct?

8  A   It was -- this information did not come to us until later on

                          Page 41

21ja03d_Cruz-Trejo.txt

9   in the day.  It was not the following morning.

10  Q    So you found out at a later point sometime down the road

11  that Mr. Trejo and the aliens were all picked up by Mr.

12  Coronado?

13  A    Right.

14  Q    And that would be -- that would be consistent with the

15  statements of Mr. Taboada who indicated that it would take five

16  to eight hours for Mr. Coronado to come pick up individuals in

17  the brush, correct?

18  A    I want to say that, sir, yes.

19  Q    Okay.  Now, the other aliens that you throw into the mix of

20  this 25, you have no connection or there's no way to

21  specifically connect them to this organization, is there?

22  A    Other than they joined the Trejo brothers.

23  Q    Are you sure that they joined Jose Trejo in the brush?

24  A    The two agents that responded to this information went out

25  there and --

                Captured and Transcribed by Computer - Eclipse

□                                                                    47

1   Q    The aliens weren't there, were they?

2   A    They chased the group of approximately 40 aliens, they

3   reported to me.

4   Q    How many aliens enter this country on a daily basis?  You're

5   telling me already -- I assume from your non-response that you

6   can't give me an estimate on the number of aliens that enter

7   this country?

8   A    It would be pretty difficult to make a guess of that.

9   Q    And you've been practicing as an agent for a number of years

10  and you're very familiar with the practices and patterns of

11  alien smuggling in this country, correct?
                        Page 42

21ja03d_Cruz-Trejo.txt

12  A   Somewhat familiar, sir, yes.

13  Q   You're holding yourself out as an expert to give an opinion

14  as to estimates.

15  A   I can't -- I don't think I can guess how many aliens enter

16  the United States illegally.  I know that border patrol is --

17  unofficial estimates, the border patrol apprehends something

18  like 10 to 15 percent of all the undocumented aliens that enter

19  the United States.

20  Q   Okay.  And so it would not be surprising considering the

21  fact that there are multiple organizations that we know of in

22  just this small organizational investigation that you have we're

23  looking at the Infantes, Adonia Anna, the Garcia-Coronado and

24  other organizations that we haven't even mentioned here which

25  you have knowledge of operating in the south Texas area that

Captured and Transcribed by Computer - Eclipse

⬚

48

1  those aliens -- these other 25 aliens or 40 aliens that these

2  border patrol agents saw could have been attributed to another

3  organization, correct?

4  A   That is correct, sir.

5  Q   Okay.  And so it's simply speculation and conjecture on your

6  part to indicate that those 40 aliens that two border patrol

7  agents saw the following day were somehow related to the

8  Coronado organization?

9  A   The 25 aliens, sir.

10  Q   Was it 25 or 40 that the two agents saw?

11  A   Well, they chased approximately 40.  It was believed the

12  group of 25 join the 15.

13  Q   But that was, I believe, based on speculation and

14  conjecture, correct?

Page 43

21ja03d_Cruz-Trejo.txt

15    A    The 25, yes.

16    Q    Okay.  Are you aware of Celestino Yanez-Flores also

17    moonlighting with other organizations?

18    A    Yes.

19    Q    He did; did he not?

20    A    Yes.

21    Q    And he also carried on activity outside of his relationship

22    with Alfonso Garcia-Coronado, correct?

23    A    Yes, sir.

24    Q    And you're attributing a large number of Western Union

25    receipts to Mr. Celestino Yanez-Flores, correct?


        Captured and Transcribed by Computer - Eclipse

                                                              49

1    A    Yes.

2    Q    Mr. Yanez-Flores received how much money from the Western

3    Union receipts.

4    A    Celestino Yanez-Flores received -- actually it was a small

5    amount received.  Most of that money was sent to a subject named

6    Donia Castellano.

7    Q    How much money did the Yanez-Castellano organization

8    receive?

9    A    Okay.  According to Western Union records, Mr. Castellano

10    received approximately $74,000.

11    Q    Okay.  And it is your testimony to this court that Mr.

12    Celestino Yanez had his own separate organization apart from his

13    business activities with Mr. Alfonso Garcia-Coronado?

14    A    Yes, sir.  Alien smuggler organizations are unique in as

15    much as they don't have an exclusive relationship with any other

16    cells involved in the organization.

17    Q    Okay.  And that's also carried forth -- your statement is
                        Page 44

21ja03d_Cruz-Trejo.txt

18   also carried forth by the testimony of Mr. Taboada who indicated

19   if he couldn't get ahold of Mr. Garcia-Coronado, that he would

20   look for another individual to help him in assistance, correct?

21   A    That is common practice among alien smugglers.

22   Q    So, if the Infantes per se could ship, let's say, 80 to 150

23   aliens, that doesn't mean that 80 to 150 aliens fell into the

24   hands of Alfonso Garcia-Coronado?

25   A    That is correct.


        Captured and Transcribed by Computer - Eclipse

                                                              50

1    Q    So these estimates that the prosecutor or the --

2    Mrs. Kirkpatrick has put up there are simply business

3    projections or speculations for ostensibly a business plan that

4    may or may not have come to fruition and more than likely is

5    mostly speculation, correct?

6    A    Information from one of the witnesses indicated that the

7    Infantes were smuggling as many as 200 aliens per week to a

8    specific stash house in the valley.  10 to 15 aliens out of this

9    group were --

10            MR. TROIANI:  I object to nonresponsive.

11            THE COURT:  Sustained.  Answer the question, please.

12   A    Can you repeat the question?

13   BY MR. TROIANI:

14   Q    Sure.  Essentially what I'm saying --

15            THE COURT:  Short question.

16            MR. TROIANI:  I don't know if I can, Your Honor.

17   BY MR. TROIANI:

18   Q    Because of your prior statements, you indicated there's no

19   way of knowing how many individuals actually got into the hands

20   of the Alfonso Garcia-Coronado organization from the Infantes

                            Page 45

21ja03d_Cruz-Trejo.txt

21 because they used other organizations.  Your own statement was

22 that these type of movements are fast and loose, correct?

23 A   Right.

24 Q   So there's no way of knowing actually how many individuals

25 were in the Alfonso Garcia-Coronado organization or actually

        Captured and Transcribed by Computer - Eclipse

                                                        51

1  moved by that organization, correct?

2  A   To find that out would depend on the witness testimony that

3  was given to me.

4  Q   Okay.  And that also brings up another point and that is

5  your statement that Celestino Yanez-Flores had his own

6  organization outside of the Garcia-Coronado organization where

7  he moved individuals obviously for the Infantes and other

8  organizations, as well, correct?

9  A   Mr. Celestino Yanez-Flores was responsible for harboring

10 undocumented aliens from Alfonso Garcia-Coronado, as well as

11 others, yes.

12 Q   And others, correct?

13 A   Yes.

14 Q   So aliens attributable to Mr. Celestino Yanez-Flores would

15 not necessarily be attributable to the Alfonso Garcia-Coronado

16 organization, correct?

17 A   Correct.

18 Q   As well as moneys received by that organization, as well,

19 Celestino Yanez-Flores organization, correct?

20 A   Yes, sir.

21 Q   And if we start subtracting these figures and these numbers

22 from actual aliens that we're looking at and we start going

23 down, if we take out Celestino Yanez-Flores monies, if we take

                        Page 46

21ja03d_Cruz-Trejo.txt

24    out the money from these other individuals, we come up with an

25    actual figure less than 100 aliens; do we not?


Captured and Transcribed by Computer - Eclipse

52

1    A    I'm not really sure, sir.  I don't know how you arrive at

2    that figure.

3    Q    Okay.  And I guess that's the whole problem that I have with

4    this entire proceeding is that how do you come up with these

5    figures.  You're basing them on speculation and conjecture and

6    you have already admitted to The Court that there are multiple

7    organizations who use multiple transporters and that these

8    organizations are not necessarily vertical or in any way

9    connected other than through the actual individuals moved,

10    correct?

11    A    Right.

12    Q    So then to attempt to speculate or to come up with an

13    estimate of the actual figures of individuals moved by Alfonso

14    Garcia-Coronado, would essentially be speculation and

15    conjecture?

16    A    No, sir.  This information was based on testimony provided

17    to me by witnesses in this case.

18    Q    Can you divide out the aliens that were moved by Celestino

19    Yanez-Flores and those moved by Alfonso Garcia-Coronado?

20    A    I know that Celestino Yanez-Flores harbored aliens belonging

21    to Alfonso Garcia-Coronado, as well as aliens from other groups.

22    Q    Can you tell me how many?

23    A    I can tell you that based on the information that I have

24    from informants and testifying co-defendants that would have

25    testified, those figures up on the board are correct.


Page 47

21ja03d_Cruz-Trejo.txt

Captured and Transcribed by Computer - Eclipse

53

1   Q   But as you have already stated before, those figures were

2   not provided to us in the discovery process, those individuals

3   are unnamed and unknown and you have also stated that Celestino

4   Yanez-Flores and I believe other individuals, as well in the

5   organization, operated independently of Mr. Garcia-Coronado,

6   correct?

7   A   Right.

8        MR. TROIANI:  If I can just have one minute, Your Honor.

9   BY MR. TROIANI:

10  Q   Mr. Taboada testified that he was placed in the back of a

11  pickup truck, correct?  He was placed in the cab of the pickup

12  truck, I believe?

13  A   I do not remember that, sir.  But if it is read from the

14  transcript, it must be correct.

15  Q   Okay.  And Mr. Taboada said that he moved between three and

16  six aliens at most at a time to -- on the three occasions that

17  he moved them with Mr. Garcia-Coronado, correct?

18  A   I believe that you are correct, sir.

19  Q   Okay.  And the largest number that was ever discovered in

20  the presence of agents or anyone else with Mr. Garcia-Coronado

21  or Mr. Olvera was, I believe you indicated, 15 individuals at

22  most?

23  A   Well, they were arrested with six when they were attempting

24  to feed six aliens.

25  Q   They were attempting to feed six and not even 15, correct?

Captured and Transcribed by Computer - Eclipse

54

Page 48

21ja03d_Cruz-Trejo.txt

1  A   Correct.

2  Q   Okay.  And this information that the individuals -- the

3  aliens were actually placed in pickup trucks, in the beds of

4  pickup trucks, there's no information or no information was

5  provided to defense counsel as to which aliens or which groups

6  or which arrests that would involve, was there?

7  A   Mr. Alfonso Garcia-Coronado was not arrested for

8  transporting the aliens; so, therefore, we could not say that

9  these aliens were, in fact, in the pickup.

10 Q   Okay.  And what about Mr. Olvera?  Was there anything

11 indicating that Mr. Olvera transported them in the bed of the

12 pickup and Mr. Taboada indicated that he was transported in an

13 extended --

14      THE COURT:  You have to slow down, slow down.

15 A   Yes.

16 BY MR. TROIANI:

17 Q   And you have already testified that actually Mr. Alfonso

18 Garcia-Coronado would have had no control of the aliens coming

19 to him from the Infantes or any other organization, correct?

20 A   Okay.  Well, Mr. Alfonso Garcia-Coronado in this case is a

21 transporter and his job was a transporter.  He's also an alien

22 smuggler and he had his own aliens routed through these

23 particular cells to him.  These aliens were bound from their

24 home down all the way to Alfonso Garcia-Coronado exclusively.

25 Q   Has any of that information been presented to us previously

Captured and Transcribed by Computer - Eclipse

55.

1  other than this moment --

2  A   Well --

3  Q   -- that he himself recruited -- I believe Mr. Taboada said

Page 49

21ja03d_Cruz-Trejo.txt

4   that he contacted Mr. Garcia-Coronado once he arrived in south

5   Texas and he did not attempt to contact him or any other

6   smuggler until after he passed the Sarita checkpoint, correct?

7   A    Right.

8   Q    And I believe -- okay.  Let's back up a little bit.  The

9   Infantes, they're not the only smuggling organization on the Rio

10  Grande border, is there?

11  A    I wish they were.

12  Q    But they're not?

13  A    No, they're not.

14  Q    Okay.  And there is no way of really telling how many people

15  enter this country through smugglers, et cetera, correct?

16  A    You are correct, sir.

17  Q    Okay.  And in an attempt to enumerate or to divide these

18  aliens is almost from what you are telling me impossible?

19  A    It is pretty difficult, sir.  Without an inside tract, it is

20  pretty difficult.

21  Q    And it is also very difficult for -- based on the testimony

22  of Mr. Taboada and based on your own statements regarding the

23  operation of the Infantes, it would be very difficult for Mr.

24  Garcia-Coronado or any other smuggler to know what happened to

25  the aliens prior to their arrival to his section or into his

Captured and Transcribed by Computer - Eclipse

▢

56

1   hands, correct?

2   A    They're pretty much alien smugglers, pretty much don't care

3   what happens to the aliens.

4   Q    That's a broad generalization, isn't it?

5   A    Yes.

6   Q    And specifically when Mr. Alfonso Garcia-Coronado was

Page 50

21ja03d_Cruz-Trejo.txt

7    arrested, he was viewed by border patrol agents taking a large

8    amount of food to aliens, correct?

9    A    That's correct, sir.

10   Q    Okay.  They thought it was strange that he had so much food,

11   correct?

12   A    I don't think so, sir.

13   Q    I think that's what you testified to?

14   A    I don't think so, sir.

15   Q    Okay.

16          MR. TROIANI:  I will pass the witness.

17          THE COURT:  All right.  Mr. Cardenas?

18                      CROSS-EXAMINATION

19   BY MR. CARDENAS:

20   Q    My name is Lazaro Cardenas.  I'm an attorney for Celestino

21   Yanez-Flores.

22   A    Yes, sir.

23   Q    I heard your testimony and you have mentioned a lot of

24   confidential informants.  Based on your own personal knowledge,

25   with how many aliens do you think Celestino Yanez-Flores was

          Captured and Transcribed by Computer - Eclipse

□

                                                          57

1    involved?  Your own personal knowledge?

2    A    There was -- let's see, 30 aliens delivered to him by

3    undercover agents.  On those occasions, there were -- that the

4    aliens were delivered, at least one occasion there was other

5    aliens already present there.  On another occasion, the

6    cooperating individual was delivered to Celestino Yanez-Flores's

7    residence and groups of aliens were there being harbored.

8    Q    And what was the time span involved in this deliveries?

9    A    Okay.  Our undercover investigation was initiated in late

                              Page 51

21ja03d_Cruz-Trejo.txt

10  January and ended basically from February the 6th to March the

11  27th of 2002.

12  Q   I understand one of the agents received money from Celestino

13  Yanez-Flores; is that correct?

14  A   Yes, sir.

15  Q   Do you know where that money is?

16  A   It is in a safe at my office.

17  Q   Your office?

18  A   Yes.

19  Q   And you were able to get another load without paying or what

20  was the purpose of giving you the money?

21  A   Okay.  The purpose of giving us the money, my undercover

22  agents were paid by -- we would directly transport illegal

23  aliens on behalf of Alfonso Garcia-Coronado and were paid for

24  their services by either Celestino Yanez-Flores or the Infantes

25  or Alfonso Garcia-Coronado.  Someone had to pay for those

Captured and Transcribed by Computer - Eclipse

0

58

1  services.

2  Q   And how much money was received by the agents?

3  A   Total, sir?

4  Q   Yes.

5  A   $13,000.

6  Q   $13,000?

7  A   Yes.

8  Q   Do you have the names of the 40 aliens that were smuggled

9  and delivered by the immigration?

10  A   I have the majority of those names, sir.

11  Q   Where are they at right now?

12  A   10 of those 40 aliens are -- I presume, they're back in

21ja03d_Cruz-Trejo.txt

13  Mexico.  They were apprehended and returned to Mexico.  The

14  remainder, they -- I don't know where they're at.

15  Q    But are you testifying you delivered illegal aliens without

16  checking their background?

17  A    We -- during the transportation, during the course of

18  transporting those undocumented aliens every effort was taken by

19  the undercover agents to identify the persons and know who they

20  are, where they're going, for the purpose of attempting to get

21  ahold of them later on.

22  Q    Have you?

23  A    We have attempted.  I've notified other INS offices within

24  the jurisdiction where the aliens were delivered to.

25  Q    Were any type of traces filed on them as far as names --


        Captured and Transcribed by Computer - Eclipse

☐

                                                        59

1           AUSA KIRKPATRICK:  I object, Your Honor, as to

2   relevance.

3           THE COURT:  What is the relevance, Mr. Cardenas?

4           MR. CARDENAS:  We're talking about relevant conduct

5   here.  They deliver some of these aliens; so, I mean, based on

6   those figures, I'm trying to eliminate 40 and I'm trying to get

7   down to the relevant conduct.

8           THE COURT:  Okay.  The question was do you -- did you

9   determine -- did you make an effort to determine their

10  identities and where they're from.  He's already clarified that

11  they do not; so, beyond that, what other evidence are you gonna

12  be developing?

13          MR. CARDENAS:  Well, my original question.

14  BY MR. CARDENAS:

15  Q    Did you see the house in Houston?

                        Page 53

21ja03d_Cruz-Trejo.txt

16   A   Yes.

17   Q   Was it a rental property?

18   A   Yes, sir, it was.

19   Q   And when Celestino Yanez-Flores was arrested, did you find

20   any money, any jewelry, any automobiles, any property?

21   A   On the date of his arrest, he had moved out of that stash

22   house and moved to another address.

23   Q   Okay.

24   A   Another rental place.

25   Q   But as far as you know, did he make any money in this

Captured and Transcribed by Computer - Eclipse

0

60

1   participation of this?

2   A   Well, his participation in this illegal activity leads one

3   to believe that he would have been paid for his participation.

4   Q   But are you able to -- he was living in Houston?

5   A   Right.

6   Q   He doesn't have no real state in Houston, right?

7   A   I did not find any bank accounts or monies anywhere

8   belonging to him.

9          MR. CARDENAS:  Thank you.  I'll pass the witness.

10         THE COURT:  Mr. Balderas?

11         MR. BALDERAS:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   BY MR. BALDERAS:

14   Q   Good afternoon, Agent Torres.

15   A   Good afternoon, sir.

16   Q   As you have already testified, it is true then that a lot of

17   what you have said is based on information that cannot be

18   verified because it is speculation; isn't that true?

Page 54

21ja03d_Cruz-Trejo.txt

19   A   Well, the information came to me from informants.

20   Q   All right.  But my question is, isn't it true that a lot of

21   your information is based on speculation?

22   A   A lot of my information is based on . . .  The information

23   comes to me from sources.  I do not speculate as to the

24   information itself.

25   Q   But as the sources that you have, a lot of this information

Captured and Transcribed by Computer - Eclipse

□

61

1   is hearsay to you.

2   A   Well, this -- the source --

3   Q   I mean but my question is yes or no.

4   A   No.

5   Q   No, it is not?  So this is direct evidence that you have --

6   A   This is --

7   Q   -- things that you have participated in?

8   A   This is information that came to me from persons who had

9   direct contact with the associates of this organization.

10   Q   Again, then it is true the information is hearsay to you

11   because --

12   A   Yes.

13   Q   -- you don't have direct knowledge of it; isn't that true?

14   A   You are correct, sir.

15   Q   Okay.  Now, you have told attorney Cardenas that you had --

16   or you had agents or confidential informants working within this

17   smuggling organization; is that correct?

18   A   That's correct, sir.

19   Q   And the purpose of the agents and the confidential

20   informants working within your organization was to facilitate

21   the smuggling of aliens?

21ja03d_Cruz-Trejo.txt

22  A   The purpose of that was to infiltrate a criminal

23  organization that was involved in alien smuggling and the agents

24  to monitor this activity for the purpose of court proceedings.

25  Q   Okay.  But in the process of monitoring the smuggling


Captured and Transcribed by Computer - Eclipse

62

1   organization, did not the agents and confidential informants

2   also participate and aid in the smuggling in order to be a part

3   of it?

4   A   Yes, sir, they affected it.

5   Q   Those agents and confidential informants, when they were in

6   the process of helping move aliens, they didn't have any intent

7   to break the law, did they?

8   A   No, sir.  It was an authorized operation.

9   Q   All right.  So, therefore, if they had no intent to break

10  the law, then the people that were a part of this alien

11  smuggling organization that they were investigating could not

12  have conspired with those agents, there was no intent to break

13  the law?

14  A   Right.  The agents --

15  Q   There was no conspiracy with those agents, yes or no?

16  A   Right, correct.

17  Q   So how many aliens then would you have to subtract that the

18  agents and confidential informants were a part of?

19  A   Okay.  The agents transported a group of 40 undocumented

20  aliens.  They were not part of the conspiracy.  They received

21  the aliens from members of the smuggling organization and

22  delivered the aliens to other members of the organization

23  completing their conspiracy.

24  Q   But, again -- but if you can't conspire with an agent

Page 56

21ja03d_Cruz-Trejo.txt
25   because there's no intent, then there's no conspiracy?


             Captured and Transcribed by Computer - Eclipse

                                                                    63

 1            AUSA KIRKPATRICK:  Your Honor, I object.  Counsel is
 2   calling legal conclusions on a fact-based witness and I would --
 3            MR. BALDERAS:  First of all, this is cross-examination,
 4   Your Honor.
 5            THE COURT:  Okay.  I'm gonna sustain the objection, but
 6   also if, I guess, you're trying to just clarify what numbers
 7   would have been transported without having had any contact with
 8   a conspiracy.  Why don't you just ask him that and then you make
 9   an argument to me.
10   BY MR. BALDERAS:
11   Q   How many aliens -- I think you have asked it very well, Your
12   Honor, the way you have asked it -- how many aliens that were
13   moved were not part of the conspiracy?
14   A   I do not know.
15   Q   Okay.  Because it is speculation, correct?
16   A   Well, we had -- I have no way of getting an accurate number.
17   I can only tell you what the information that I had, specific
18   numbers.
19   Q   What you have written up here on the Government's Exhibit,
20   those numbers, you have the word "estimate."
21   A   Yes.
22   Q   And the reason why you can't give anything more than an
23   estimate is because you don't know?
24   A   That is correct, sir.
25   Q   Okay.  Now as far as my client's concerned, Mr. Garcia, you

             Captured and Transcribed by Computer - Eclipse

                            Page 57

21ja03d_Cruz-Trejo.txt

64

1    know for a fact that he moved five aliens in Houston?

2    A    Yes, sir, that is correct.

3    Q    Okay.  And at the time that he entered into the plea of

4    guilty and the agreement with the Government, the plea bargain

5    agreement was that we know five, but less than 100; isn't that

6    true?

7    A    I am not -- I do not remember particulars of the agreement,

8    sir.

9    Q    You don't know that Mr. Garcia entered into an agreement

10   where the Government would limit his relevant conduct to less

11   than 100?

12   A    I believe there's something to that, but I do not remember

13   the particulars.

14   Q    Okay.  All right.

15         MR. BALDERAS:  I'll pass this witness, Your Honor.

16   Thank you.

17         THE COURT:  Why don't we take a break and we'll resume

18   at 3:30.  Thank you.

19      (Recess taken.)

20         THE COURT:  Mr. Villalobos.

21                        CROSS-EXAMINATION

22   BY MR. VILLALOBOS:

23   Q    Agent Torres, I represent Mr. Jose Luis Cruz-Trejo.

24   A    Yes, sir.

25   Q    I'm sorry about the vantage point, but I really couldn't see

              Captured and Transcribed by Computer - Eclipse

65

1    you?

2              COURT REPORTER:  Excuse me.  Is that better?

21ja03d_Cruz-Trejo.txt

3          MR. VILLALOBOS:  Yes.

4     BY MR. VILLALOBOS:

5     Q    You indicated earlier that you received a phone call in

6     February and that he was with 15 undocumented aliens out in the

7     brush and that it was cold; is that correct?

8     A    Yes, sir.

9     Q    Okay.  And then later on you found out that he had been

10    picked up sometime during the night?

11    A    The following day I found that out.

12    Q    Okay.  Where did you ascertain that information or how did

13    you come about that?

14    A    That information came to us as a result of a contact between

15    an individual who was a co-defendant in this case and a subject

16    named Palimone.

17    Q    Was he part of that group, as well?

18    A    Part of this --

19    Q    With Jose Luis Cruz-Trejo that night on the 22nd?

20    A    No, no, he wasn't.

21    Q    Okay.  So were you able to verify, other than through him

22    and your conversations with him when he was actually picked up

23    that night?

24    A    No, sir, I did not.

25    Q    Okay.  So you don't have any information for The Court as to

              Captured and Transcribed by Computer - Eclipse

0

                                                              66

1     how long they were actually out in the brush or how long they

2     were exposed to the elements?

3     A    No, sir, I do not have that information.

4     Q    Do you have any information as to what -- how the aliens

5     were prepared for the weather or how -- what kind of problems,

                         Page 59

21ja03d_Cruz-Trejo.txt

6    if any, that they had while they were out there?

7    A    No, sir, I do not have that information.

8    Q    Okay.  And you're not sure -- you had indicated something

9    about two agents went out and they saw a total of 40 that they

10   estimate and you're thinking that's the same group that involved

11   Jose Luis Cruz-Trejo?

12   A    Yes, sir.  The information -- we got the information that

13   Jose Luis Cruz-Trejo had already been picked up.  We learned

14   that another group had joined them.

15   Q    Okay.  But that's what I'm trying to figure out here.  He

16   had been picked up and another group joined him.  How did he get

17   that information?

18   A    Joined before.  I don't know exactly what happened.  I have

19   no information as to exactly what happened.  What I believe is

20   the border patrol agents went out there and chased the group

21   out -- out of their location.  And when border patrol retreated,

22   maybe they came back and got picked up.  I have no way of

23   proving that.

24   Q    Okay.  So you have no idea whether this was actually his

25   group or not.  You're just speculating that those 40 people are

Captured and Transcribed by Computer - Eclipse

D

67

1    part of his group?

2    A    Because of the location, the specific location, sir.

3    Q    Okay.  And those agents didn't pick up anybody out of the 40

4    people?

5    A    No, sir.  As a matter of fact, the only thing recovered was

6    a Mexican birth certificate that was left behind by an

7    individual that got away.

8    Q    Okay.  But 40 people there and not a single one was
                              Page 60

21ja03d_Cruz-Trejo.txt

9    apprehended?

10   A    Yes, sir.

11   Q    And when Mr. Jose Luis Cruz-Trejo was arrested, he had 12

12   aliens with him at the time?

13   A    Yes, sir.

14   Q    Okay.  So verifiably through Mr. Jose Luis Cruz-Trejo, 12

15   and 15 that he said on the telephone would be a total of 37?

16   A    Yeah.

17   Q    I'm sorry, 27?

18   A    Yeah.

19   Q    27.  My math was off.  27 total?

20   A    Yes, sir.

21   Q    Okay.  And Mr. Jose Luis Cruz-Trejo was a guide that would

22   walk them through the brush?

23   A    It was our information that his job within this smuggling

24   cell was that of a guide, a walker, walk the aliens around the

25   border patrol checkpoints.


Captured and Transcribed by Computer - Eclipse

☐

68

1    Q    So his role would be limited to that?

2    A    I guess.

3    Q    From your information, your knowledge of what a guide

4    does --

5    A    Right.

6    Q    -- your experience --

7    A    Right.

8    Q    -- he's limited to walking people in the brush?

9    A    His primary -- from my experience and knowledge of his

10   membership in this particular cell, his specialty within the

11   organization was to walk the aliens around the checkpoint, yes.

Page 61

21ja03d_Cruz-Trejo.txt

12   Q   Okay.

13            MR. VILLALOBOS:  That's all I have, Your Honor.

14            THE COURT:  Mr. Villarreal?

15                         CROSS-EXAMINATION

16   BY MR. VILLARREAL:

17   Q   Agent Torres, I represent Mr. Juan Olvera Martinez.  The

18   questions I'm going to ask pertain just to my client's relevant

19   conduct, okay?

20   A   Okay.

21   Q   Isn't it true that the information that you provided to my

22   office and Mr. Troiani's office limits my client's participation

23   the only four months in the year 2002, which is March, April,

24   May and June?

25   A   I believe that's correct, sir.


          Captured and Transcribed by Computer - Eclipse

                                                              69

1   Q   Okay.  And isn't it true also that he was initially

2   recruited to work as a repairman or a handyman around a

3   mechanic's shop?

4   A   Those were your client's statements to me, sir.

5   Q   Okay.  Now, isn't it also true that only three people have

6   positively identified my client as having to do anything with

7   smuggling or transporting illegal aliens?

8   A   Prior to his arrest?

9   Q   Excuse me?

10   A   Is that prior to his arrest or after his arrest?

11   Q   After the arrest, the depositions were taken of four

12   witnesses and only three of them identified Juan Olvera

13   Martinez.

14   A   I believe that is probably correct, sir.  I do not know

                         Page 62

21ja03d_Cruz-Trejo.txt

15   exactly how many identified him.

16   Q   And those four people -- well, rather the three people that

17   testified and ID'd my client were part of a group of six people

18   that were captured on June 5th near the Kingsville area?

19   A   All right, sir.  Yes.

20   Q   Is that correct?

21   A   Yes, sir.

22   Q   Okay.  So we have three people out of the whole conspiracy

23   identifying my client?

24   A   That particular group, yes, sir.

25   Q   And out of the 116 people upon that board, if we subtract

Captured and Transcribed by Computer - Eclipse

⬛

70

1   three, how many of the 113 that are left have positively

2   identified my client as having to do anything with this

3   conspiracy?

4   A   I don't believe a single one, sir.

5   Q   Okay.  The next question I need to ask you is to your

6   knowledge, was there any evidence presented that the people that

7   were arrested, the six illegal aliens, were they suffering from

8   hyperthermia or any kind of exposure to the elements when you

9   arrested my client?

10   A   Okay.  On the date of the arrest of Mr. Alfonso

11   Garcia-Coronado and your client it was not cold.  I believe the

12   temperature was pretty nice.

13   Q   Do you agree that my client played a minimal role in this

14   conspiracy?

15   A   I don't think I can answer that because --

16   Q   Well, let's see here.  If he only participated four months,

17   three people ID'd them, they only count him with six aliens,

Page 63

21ja03d_Cruz-Trejo.txt

18   wouldn't you say that would be a minimal role considering the

19   scope of this conspiracy?

20   A   Well, that's not a decision for me to make, but he had

21   participation in this activity.  Participation that I could --

22   that we know about, we can monitor, we can testify to, yes, it

23   indicates that it is minimal, but that's all we can do.

24        MR. VILLARREAL:  Those are all my questions, Your Honor.

25        THE COURT:  Mr. Pullen.


        Captured and Transcribed by Computer - Eclipse

□                                                                    71

1        MR. PULLEN:  Thank you, Judge.

2                      CROSS-EXAMINATION

3    BY MR. PULLEN:

4    Q   Mr. Torres, I think you know me.  My name is Alberto Pullen.

5    A   Yes.

6    Q   I represent Juan Gabriel Nino.  And if I may, Mr. Torres,

7    I'm gonna reference some of the facts set forth in the

8    Presentence Investigation Report, which I believe were obtained

9    through government sources.  First of all, and if I may read.

10   It says here that the undercover agents picked up 10

11   undocumented aliens within the United States to stage

12   apprehension of the alien load near Rivera.  It says,

13   "Garcia-Coronado never showed up to retrieve them, so the agents

14   contacted Yanez-Flores and he referred them to Nino," meaning

15   Juan Gabriel Nino?

16   A   Yes, sir.

17   Q   "Yanez-Flores assured agents that Nino sent Garcia-Coronado

18   to pick them up.  When no one showed up, the agents called Nino

19   again.  Nino indicated he sent Garcia-Coronado to pick them up

20   but Garcia-Coronado was unable to locate them after driving

                         Page 64

21ja03d_Cruz-Trejo.txt

21   around the area." Now, this is the only reference to 10

22   undocumented aliens. Are you aware of this incident?

23   A   Yes, I remember that incident.

24   Q   This was in February 21, 2002?

25   A   Yeah, I believe so.


Captured and Transcribed by Computer - Eclipse

72

1   Q   It further states, "On July 2, 2002, undercover agents

2   effected a consensually monitored telephone call to Nino," again

3   meaning Juan Gabriel Nino?

4   A   Yes, sir.

5   Q   "The agents advised Nino that they were getting ready to

6   deliver a load of aliens to Tino, (Yanez-Flores) in Houston,

7   Texas. The agents asked Nino if he had any aliens he needed

8   transported to Houston because they had a tractor-trailer in

9   which they could transport at least 40 aliens. Nino negotiated

10   with the aliens about the method of delivery and the charge for

11   each alien. Nino further advised the agents that at the moment

12   he had only two aliens, but would call the agents back to see

13   how many aliens he could get." Are you aware of this incident?

14   A   Yes, sir.

15   Q   Is that the way it happened?

16   A   Yes, sir. That conversation is exactly the way it happened.

17   There was action that happened after the conversation.

18   Q   Okay. So this is the involvement of Juan Gabriel Nino?

19   A   Yes, sir.

20   Q   Also, the Government has provided us with evidence showing

21   that Mr. Nino received $30,300 through the Western Union. Are

22   you aware of that?

23   A   Yes, sir. That -- can you repeat that figure, please?

Page 65

21ja03d_Cruz-Trejo.txt

24   Q   I think it is $30,300.

25   A   Yes, sir.


          Captured and Transcribed by Computer - Eclipse

▯
                                                              73

1    Q   Okay.  And that's all the evidence that you have that would

2    show that Mr. Nino received any money at all?

3    A   Yes, sir.

4    Q   Okay.  Now, how much of this money would you say was

5    legitimate, say -- and by legitimate, I mean from legal sources

6    and how much of that money would you say or do you have any

7    evidence to show came from alien smuggling operations?

8    A   Okay.  Based on the pattern of the money where it was sent

9    from and all that, I believe that --

10   Q   Sir, I'm not asking your belief.

11   A   Well, I thought you had.

12   Q   Any direct evidence to show that any of that money comes

13   from illegal sources?

14         THE COURT:  Okay.  Mr. Pullen, don't interrupt the

15   witness.  If he gives you a response that is not clear or is not

16   what he answered, you can object at that time.

17         MR. PULLEN:  I'm sorry, Your Honor.

18         THE COURT:  Are you asking him if he believes or what

19   happened?

20         MR. PULLEN:  Let me rephrase the question, if I may.

21   BY MR. PULLEN:

22   Q   What direct evidence do you have, if you have any, to show

23   that any of those $30,300 came from illicit sources?

24   A   I don't believe I have any, sir.

25   Q   So -- all right.  Assuming just for the sake of argument,

                          Page 66

21ja03d_Cruz-Trejo.txt

Captured and Transcribed by Computer - Eclipse

74

1    assume with me that those $30,000 came from alien smuggling

2    operations.  How many -- based on the testimony you gave of how

3    much each alien charges, what would be your estimate as to how

4    many aliens were involved according to those figures?

5    A    If a person received $30,000, the $30,000 in themselves are

6    not indicative of a number because some aliens --

7         MR. PULLEN:  Objection, Your Honor, nonresponsive.

8         THE COURT:  Well, the way you have asked the question, I

9    think he's trying to explain why that is not -- if you're trying

10   to get him to divide and come up with a figure, I'm not gonna

11   make you -- I'm gonna overrule your objection.  He's trying to

12   explain why that's not indicative of a figure you want him to

13   provide.

14        MR. PULLEN:  Okay.  Allow me to rephrase the question,

15   Your Honor.

16   BY MR. PULLEN:

17   Q    If we were to assume for the sake of argument that the

18   $30,300 came from illicit operations -- from alien smuggling

19   operations and based on your previous testimony that people

20   charge between 1800 and 4,000 to $5,000 per trip, would you

21   agree with me that $30,000 would represent six to 15 aliens

22   approximately?

23   A    If the aliens were of exotic nationalities, it could only be

24   one alien, because Chinese pay in excess of $45,000 to get

25   smuggled and transported within the United States.  Those aliens

Captured and Transcribed by Computer - Eclipse

75

21ja03d_Cruz-Trejo.txt

1    were various nationalities, which we do not know.  If we assume
2    they are Mexicans, then you can say they're paying the average
3    of $1500 which would raise the number into the 20s.
4    Q    All right.  So based on that, you would agree with me that
5    it could be from one alien to around 15 aliens, correct?
6    A    Yes, sir.
7    Q    So that would limit the relevant conduct of Mr, Nino
8    according to those figures, to a maximum of 15 aliens, correct.
9         AUSA KIRKPATRICK:  Your Honor, I'm going to object.  It
10   calls for a legal conclusion by a fact witness.  It is an
11   argument.
12        THE COURT:  No, I think he's trying to get him to do the
13   math.  I'm gonna allow the question.  But, you know, I still
14   have to contend with the fact that he's testified that some
15   people pay cash up front and what's picked up may be partial
16   payment so, you know, I'm not gonna be able to do anything with
17   the math the way you're doing it.
18   BY MR. PULLEN:
19   Q    This is evidence that you haven't received yet.  So, I'm
20   just trying to ascertain how many aliens were involved for the
21   sake of payment as far as he received payment for certain
22   aliens.  So again, you agree that it is probably a maximum of
23   about 15 aliens, correct?
24   A    Well, if it represented full payment for 15 aliens, that
25   would probably be how it was.  If it was partial payment, it

Captured and Transcribed by Computer - Eclipse

□

                                                                    76

1    could have been 30 aliens.  If it was a single alien, with
2    exotic nationality, it could have only been one alien.
3    Q    Also, the Presentence Investigation Report goes on to say
                        Page 68

21ja03d_Cruz-Trejo.txt

4   that "Juan Gabriel Nino was involved in counting the aliens

5   smuggled into the United States, made arrangements for payment

6   of alien smuggling and to serve as a lookout for law enforcement

7   near U.S. border patrol checkpoint.  According to Western Union

8   record, Nino is also responsible for collecting approximately

9   30,300," which we already talked about --

10  A   Yes.

11  Q   -- "from Garcia-Coronado.  Nino did not have managerial role

12  over the participants, but managed smuggling organization

13  assets.  He does not appear to have a managerial role over the

14  participants in the organization."  Now, would you agree with

15  that statement?

16  A   The organization was composed of three cells.  Mr. Nino

17  basically belonged to the Rio Grande Valley cell.  Within this

18  organization, I know that he worked closely with another one of

19  the co-defendants in this case.  And he did -- his participation

20  was to transport the aliens and serve as a lookout for law

21  enforcement around the border patrol checkpoints.

22  Q   Now, do you have any direct evidence of that statement that

23  you just made?

24  A   No, sir.

25  Q   Now, you have testified before that there was a total of 116

                Captured and Transcribed by Computer - Eclipse

0
                                                                    77

1   aliens smuggled during the period at issue; is that correct?

2   A   116 verifiable aliens based on our figures.

3   Q   Verifiable.  Okay.  Now also, you have said that of those

4   116, 25 was speculation, correct?

5   A   Well, I guess they could be speculation there.

6   Q   So that brings it down to 91 aliens.  Now, if you take the

                              Page 69

21ja03d_Cruz-Trejo.txt

7  40 aliens that were moved by the undercover agents themselves,

8  you would bring down the figure to 51 aliens, correct?

9  A  Yes, but those aliens were moved to complete the conspiracy

10  between the defendants on trial in this case.

11  Q  Yes, but they were moved by undercover agents, correct?

12  A  Yes.

13  Q  So, again, that would bring down the figure to 51 aliens

14  actually moved by the defendants, correct?

15  A  Using your logic, yes, sir.

16  Q  Okay.  Is there any other direct evidence that you have in

17  the way of photographs, pictures, recording documents that have

18  not been provided to us?

19  A  I do not believe so.

20       AUSA KIRKPATRICK:  Your Honor, I'm going to object to

21  that question.  That's overly broad.

22       THE COURT:  I'm gonna allow it.

23  BY MR. PULLEN:

24  Q  You may answer.

25  A  I believe we provided everything that we have.


         Captured and Transcribed by Computer - Eclipse

                                                      78

1  Q  One more question.  The month of February 2002, do you

2  remember what the temperature was?

3  A  Well, I remember that on February 26th and 27th it was

4  probably the coldest day of the year to that date.  On that day,

5  I was physically in Houston, Texas, and I know the temperature

6  was in the 20s, mid 20s.

7  Q  Which you would agree that Houston and Brownsville or

8  Kingsville is quite different.

9  A  Well, it was one of those rare cold fronts that came through

                    Page 70

21ja03d_Cruz-Trejo.txt

10   this area and shot the temperature way down in this area, also.

11   I believe it was maybe in the high 20s in the Kingsville area

12   maybe in the 30s in Brownsville.  But I have no information in

13   that regard.

14   Q   Thank you, sir.

15           MR. PULLEN:  Pass the witness.

16           THE COURT:  All right.  Mr. Adobbati?

17           MR. ADOBBATI:  Thank you, Your Honor.

18                          CROSS-EXAMINATION

19   BY MR. ADOBBATI:

20   Q   Agent Torres, my name is Ricardo Adobbati and I represent

21   Mr. Cruz and I'm gonna limit my questions to Mr. Cruz

22   specifically; is that all right?

23   A   Yes, sir.

24   Q   Let me ask you a quick question.  You have listed here 116

25   aliens that were actually an approximation of the 2,370 based on

Captured and Transcribed by Computer - Eclipse

79

1   Witnesses 1, 2, 3 and Mr. Taboada.  Do you have any direct

2   evidence to indicate that any of those aliens had anything to do

3   Mr. Cruz?

4   A   Okay.  The information from -- that came from Torres, which

5   is 13 aliens, implicated Mr. Cruz.

6   Q   Okay.  And other than those 13 aliens, are there any other

7   witnesses listed on that page that implicated Mr. Cruz as being

8   involved in the transportation of illegal aliens?

9   A   Not to my recollection, sir.

10   Q   All right.  Now, you said that there were 13 aliens

11   involved.  Other than Mr. Torres' statement, do you have any

12   photographs implicating my client is involved with the transport

Page 71

21ja03d_Cruz-Trejo.txt

13  of any other illegal aliens?

14  A   No, sir, I do not.

15  Q   What about any documents?

16  A   I believe there may have been some Western Union

17  transactions.  I am not sure.

18  Q   Well, we're gonna get to the Western Union in a moment.  But

19  with regard to outside of the Western Union documents, the other

20  letters or contacts or any sort of method of correspondence

21  where they would have implicated Mr. Cruz?

22  A   No, sir.

23  Q   What about actual recordings tape recordings or video

24  recordings of he being involved in the transport of illegal

25  aliens?

Captured and Transcribed by Computer - Eclipse

80

1   A   No recordings.

2   Q   And other than Mr. Torres, do you have any or agents that

3   would have observed him doing any sort of illegal activity other

4   than those 13 aliens?

5   A   No, sir.

6   Q   Now, you have testified and I just want to clarify with

7   regard to witness W1, W2 and W3, they never made any mention of

8   Mr. Cruz; is that correct?

9   A   Yes, sir -- that is not correct.

10  Q   That is not correct?

11  A   Right.

12  Q   Which one of the witnesses made mention of Mr. Cruz?

13  A   Let's see, I believe it was W2 and W1.

14  Q   W2 and W1.  Would that be something that was corroborated

15  through the 13 aliens you mentioned of Mr. Torres?

Page 72

21ja03d_Cruz-Trejo.txt

16  A   Partially, yes, sir.

17  Q   Are there any other aliens other than those 13 in which Mr.

18  Cruz was implicated?

19  A   No, sir.

20  Q   Okay.  So we have not changed the number; we're still at 13

21  aliens for Mr. Cruz?

22  A   Yes.

23  Q   Now, Mr. Cruz stated in his PSI that basically his function

24  as the minor role was simply keeping some illegal aliens on his

25  property.  Do you agree or disagree with that?


                Captured and Transcribed by Computer - Eclipse

                                                              81

1   A   I believe that was his primary function.

2   Q   Did you ever observe any evidence, any direct evidence, that

3   would implicate his actual moving of illegal aliens from one

4   portion or one area to another?

5   A   I never witnessed such an action.

6   Q   Do you have any agents that would have seen or observed that

7   he took part in anything other than simply having illegal aliens

8   stay on his property?

9   A   I do not believe we have any agents in that position.

10  Q   Other than -- there were also some witnesses that were

11  identified earlier by one of the other attorneys.  Did any of

12  those witnesses identify Mr. Cruz as having been involved in any

13  of the transportation?

14  A   We're talking about the witnesses that were deposed as part

15  of the Alfonso Garcia-Coronado?

16  Q   Yes.

17  A   He was not identified.

18  Q   I'm sorry?

                        Page 73

21ja03d_Cruz-Trejo.txt

19    A    To my recollection, your client was not identified.

20    Q    So he was not identified by any of those witnesses that we

21    deposed?

22    A    Right.

23    Q    Now, with regard to the money, you mentioned something about

24    the Western Union documents.  Do you have any evidence to show

25    that my client received money as a result of his activity?


                Captured and Transcribed by Computer - Eclipse

                                                                    82

1    A    No, sir.

2    Q    Do you have any money -- any evidence to show how much he

3    was expecting to receive as a result of his activity?

4    A    No, sir.

5    Q    Do you have any evidence to show whether or not he was ever

6    paid for the activity?

7    A    I have statements from cooperators and witnesses in this

8    case to that effect, but I have no direct evidence.

9    Q    You have no direct evidence?

10    A    Right.

11    Q    Now, you have indicated that Mr. Torres has been the only

12    one that's implicated him in any illegal activity.  Are you

13    referring to someone else other than Mr. Torres?

14    A    Witness No. 1 and Witness No. 2.

15    Q    All right.  But they would have no knowledge as to whether

16    Mr. Cruz actually ever received any money?  And I ask that you

17    not speculate.

18    A    Yeah.  I believe the testimony was -- would be such to the

19    effect that they received aliens from your client.  I do not

20    remember if there was a discussion of payments.

21    Q    Okay.  And I'm trying to differentiate between the 13 aliens

                                Page 74

21ja03d_Cruz-Trejo.txt

22    and actual receipt of money.  So, now your testimony is that

23    actual money received by Mr. Cruz you have no evidence of that?

24    A    Correct.

25    Q    All right.  Now, with regard to the transcripts that were

Captured and Transcribed by Computer - Eclipse

83

1    provided to Mr. Troiani's office, is it not true that in none of

2    those transcripts was Mr. Cruz ever involved in any of the

3    conversations?

4    A    Yes, sir, you are correct.

5    Q    And there's no discussion with Mr. Cruz in those tapes?

6    A    None, sir.

7    Q    Is there any mention of Mr. Cruz in those tapes?

8    A    No, sir.

9    Q    And again since there's no mention of him, there would also

10    be no mention of money if he ever received any and no mention as

11    to the number of aliens in those transcripts; is that correct?

12    A    Right, correct.

13    Q    Is there any other evidence that would implicate anything

14    other than the 13 undocumented aliens that we've been discussing

15    about?

16    A    Not to my knowledge, sir.

17    Q    Now, on May 2002 when these 13 aliens were arrested -- is

18    that correct?

19    A    Yes, sir.

20    Q    All right.  And this was May 8, 2002.  Do you recall what

21    the weather was like during that time?

22    A    It was sunny.  Temperature was probably in the 70s.  I do

23    not remember.  It was a nice day.

24    Q    70s or 80s.  Would you have any reason to believe that these

Page 75

21ja03d_Cruz-Trejo.txt
25   aliens were subjected to harsh conditions while they were


                Captured and Transcribed by Computer - Eclipse

                                                                    84

 1   residing at my client's property?

 2   A   No, sir.

 3           MR. ADOBBATI:  Your Honor, I'll pass the witness.

 4           THE COURT:  Mrs. Kirkpatrick?

 5           MR. ADOBBATI:  Thank you, Agent Torres.

 6           AUSA KIRKPATRICK:  Yes, Your Honor.

 7                        REDIRECT EXAMINATION

 8   BY AUSA KIRKPATRICK:

 9   Q   Let's start backwards beginning with your most recent

10   testimony.  In regards to Juan -- I'm sorry, to Homer Cruz,

11   Witness No. 2 -- No. 1 -- I'm sorry, Witness No. 1, in fact,

12   stated that he'd picked up aliens from Homer Cruz previously; is

13   that correct?

14   A   That is correct.

15   Q   But very few?

16   A   Yes.

17   Q   That's uncontested by any witnesses approximately six times,

18   one to two aliens at a time; is that correct?

19   A   That is correct.

20   Q   Okay.  And even in the material witnesses in Mr. Torres's

21   case, just for clarification, not all of them were harbored at

22   Mr. Cruz's location; is that right?

23   A   That is correct, ma'am.

24   Q   And that's why you and I talked about a plea agreement for

25   under 25; is that correct?


                Captured and Transcribed by Computer - Eclipse

                            Page 76

21ja03d_Cruz-Trejo.txt

85

1   A    Right.

2   Q    Now, going one defendant up with Juan Gabriel Nino, in fact,

3   the evidence that you do have is that Witness No. 1 stated to

4   you that they understood Mr. Nino to be responsible for

5   recruiting aliens and had actually physically witnessed Mr. Nino

6   calling families to make payment arrangements; is that correct?

7   A    Yes, ma'am.

8   Q    Okay.  There was a lot of talk about dividing, but you

9   mentioned earlier that a lot of money was paid in cash; is that

10  right?

11  A    Yes, ma'am.

12  Q    And how does this work?  If Mr. -- who is responsible for

13  collecting the money in Houston according to what your witnesses

14  have told you and your undercover agents understand?

15  A    If they were bound for Mr. Celestino Yanez's residence or

16  the other associate Veronica Castellanos would collect the

17  money.

18  Q    And out of, let's say, $1200 that he would collect, how does

19  Witness No. 1 get paid, who drove?  How does Alfonso

20  Garcia-Coronado get paid his 250, 300, $350, how does Jose Luis

21  Cruz-Trejo who walked the group around, how do they each get

22  paid?

23  A    On this particular operation, Mr. Celestino Yanez-Flores was

24  paid a sum of $50 per person per alien landing at his stash

25  house.  The rest of the money he collected, he transferred to

Captured and Transcribed by Computer - Eclipse

86

1   the person who sent him the aliens.  This transfer most often

2   took place in person.

Page 77

21ja03d_Cruz-Trejo.txt

```
 3   Q   Okay.  So a lot of times Mr. Yanez-Flores or whoever in
 4   Houston would send money down to Alfonso Garcia-Coronado; is
 5   that the true?
 6   A   Yes, ma'am.
 7   Q   In fact, Witness No. 1 and Witness No. 2 and Witness No. 3
 8   all stated that they delivered money to Alfonso Garcia-Coronado
 9   from Mr. Yanez-Flores; is that correct?
10   A   Yes, ma'am.
11   Q   So the fact that Mr. Nino only has $30,000 coming to him in
12   Western Union, is that the total amount of money that Mr. Nino
13   ever would have seen or any of these people, their amounts to
14   their Western Unions, are these exclusive numbers?
15   A   No, ma'am.  While they could be the total amount, they do
16   not necessarily reflect that to be the case because of the
17   manner in which payments are structured.
18   Q   Okay.  And, in fact, your CI -- our CI, in fact, was
19   approached to collect money in his name; isn't that true?
20   A   Yes, ma'am.
21   Q   So Western Unions come in all different names and aliases;
22   is that right?
23   A   That is correct.
24   Q   All right.  Now, you were asked some questions about
25   Fernando Garcia.  Is it your understanding that he did, in
```

Captured and Transcribed by Computer - Eclipse

□

```
 1   fact -- you have direct evidence that he, in fact, moved five
 2   aliens from the stash house on one occasion; is that correct?
 3   A   Yes, ma'am.
 4   Q   But you have evidence that indicates that through witness
 5   testimony from direct involvements that, in fact, he'd received
```

Page 78

21ja03d_Cruz-Trejo.txt

6    more than that but was not as big of a player as, for instance,

7    Mr. Celestino Yanez-Flores; is that correct?

8    A    That is correct.

9    Q    Okay.  And we did, in fact, enter into a plea agreement for

10   under a hundred aliens, is that correct, to the best of your

11   recollection?

12   A    Yes.

13   Q    Okay.  And is it foreseeable from one alien smuggler to know

14   that somebody else that they're dealing with is gonna deal with

15   other people, as well?

16   A    Yes.

17   Q    Okay.  And, in fact, didn't Mr. Taboada state during his

18   deposition that he -- actually, I'm gonna correct myself.  Did

19   Mr. Taboada state to undercover Agent Cortez, not knowing that

20   he was an undercover -- that's the undercover part -- while he

21   was in the cell, didn't he state that he used Alfonso

22   Garcia-Coronado on five different occasions, but that he, in

23   fact, knew of six other people who used Alfonso Garcia-Coronado?

24   A    Yes, ma'am, he did.

25   Q    Okay.  And now as far as Juan Olvera Martinez, the evidence

Captured and Transcribed by Computer - Eclipse

88

1    only showed that he worked for the organization for a few

2    months; is that correct?

3    A    Yes, ma'am.

4    Q    And did Witnesses No. 1 and No. 2 identify Juan Olvera

5    Martinez as being a driver for the organization?

6    A    Yes, ma'am.

7    Q    But did they state that to the best of our knowledge he

8    moved approximately three trips?

Page 79

21ja03d_Cruz-Trejo.txt

9    A    Yes.

10   Q    Okay.  Now, on February 26th, 2002, did you receive

11   information that on the same day that you received information

12   about Jose Luis Cruz-Trejo being lost in the brush and not being

13   picked on that cold day, did you also receive information that

14   Alfonso Garcia-Coronado had a breakdown two hours outside of

15   Houston and he had a group of aliens on the side of the road?

16   A    Yes, I did.

17   Q    And is it foreseeable that that could have been the group

18   that joined the Jose Luis Cruz-Trejo group?

19   A    I guess it could have been that.

20   Q    Okay.  Or it could have even been a separate group?

21   A    Yes.

22   Q    Okay.  But were those 25 people who joined -- approximately

23   25 people who joined the 15 that Jose Luis Cruz-Trejo indicated

24   to undercover agents that he had with him, were they found in

25   the exact same spot that Jose Luis Cruz-Trejo indicated where he

Captured and Transcribed by Computer - Eclipse

□

89

1    would be picked up?

2    A    Yes.

3    Q    And was that a common spot that was later identified to

4    undercover agents by Witnesses 1, 2 and 3, aliens who were

5    transported and multiple different sources, other unindicted

6    co-conspirators who aided in walking, did they also identify

7    that as a location where Jose Luis Cruz-Trejo usually met

8    Alfonso Garcia-Coronado or one of the other drivers?

9    A    Yes, ma'am.

10   Q    Now, we met with defense counsel, didn't we on several

11   different occasions, different defense counsel?

Page 80

21ja03d_Cruz-Trejo.txt

12    A    Yes.

13    Q    Okay.  And were the estimates that you've come to hear,

14    these 30 aliens, one truck -- at least one truck per day, were

15    those given in statements to defense counsel when we met with

16    them in informal discovery?

17    A    Yes.

18    Q    And those statements, we didn't hand over everything, did

19    we?  I want to clear the record on that.  We complied with the

20    discovery rules, but the certain cooperating individuals, if

21    their statements were taken, then those were not turned over to

22    defense counsel; is that correct?

23    A    Yes, ma'am.

24    Q    Okay.  I just wanted to clear the record on that.  Now,

25    you've heard a lot of people say -- everybody seems to come up

Captured and Transcribed by Computer - Eclipse

                                                              90

1    here and ask you that this is speculation, that all of these

2    numbers are speculation.  Did you make up any of these numbers?

3    A    Those numbers were determined, were arrived at by -- after

4    conversations between you and I regarding the operation.

5    Q    Okay.  Well, I haven't heard too much argument that the 116

6    is speculation, but Witness 1 told you -- told us that -- or

7    told you specifically that that individual moved at least 1800

8    people.

9    A    Yes, ma'am.  He had direct knowledge that he moved those

10    aliens; however, what he told me and what I say may be

11    speculation.

12    Q    Now, that's to the Alfonso Garcia-Coronado organization,

13    correct?

14    A    Correct.

Page 81

21ja03d_Cruz-Trejo.txt

15    Q    Not to anybody else?

16    A    Right.

17    Q    Witness No. 2 stated that he or she had moved 400 aliens

18    apart from the 1800 --

19    A    Right.

20    Q    -- for Alfonso Garcia-Coronado?

21    A    Yes.

22    Q    Witness No. 3 stated that he or she moved 150 aliens to the

23    Alfonso Garcia-Coronado organization?

24    A    Yes, ma'am.

25    Q    And Mr. Taboada stated during depositions that he moved

Captured and Transcribed by Computer - Eclipse

91

1    approximately 20.  Now, that's an estimate that I made based on

2    the fact that he said he used them five times during deposition

3    and between three to six aliens; so, I used four.  Okay?  But

4    approximately 20; is that correct?

5    A    Yes, ma'am.

6    Q    Okay.  Now, regarding the testimony earlier that you gave

7    about what was said on the record by Adan Infante that I stated

8    to you was corroborated by Witness No. 3 who gave the exact same

9    estimate of 50 to 60 aliens a week from the Infantes, who were

10    those being delivered to?

11    A    Alfonso Garcia-Coronado.

12    Q    Nobody else?

13    A    Nobody else.

14    Q    And that figure alone is 4,320?

15    A    Right.

16    Q    Okay.  Now, assuming that this 8,640 is assuming that

17    Alfonso Garcia-Coronado did not work exclusively with the Adan

Page 82

21ja03d_Cruz-Trejo.txt

18    Infantes and actually worked with at least one other person who

19    provided as many that we came up with 8,640, but we're talking

20    two verifiable amounts of 4,320 that came just from the Infantes

21    to the Alfonso Garcia-Coronado organization; is that correct?

22    A    Yes, ma'am.

23    Q    Okay.

24          AUSA KIRKPATRICK:  I'll pass the witness, Your Honor.

25          THE COURT:  Mr. Troiani?


          Captured and Transcribed by Computer - Eclipse

☐
                                                              92

1          MR. TROIANI:  Thank you, Your Honor.

2                          RECROSS-EXAMINATION

3    BY MR. TROIANI:

4    Q    Good afternoon.

5    A    Good afternoon.

6    Q    Okay.  Now, previously you testified that there was no way

7    to determine whether or not the proceeds from Western Union were

8    legitimate or illegitimate transactions, correct?

9    A    There is a way, but -- by contacting the center and asking

10   them exactly what the transaction was about.

11   Q    But we have no information present for this court today to

12   indicate whether those transactions that were discovered in your

13   investigation were legitimate or illegitimate source, correct?

14   A    You are correct, sir.

15   Q    Okay.  Now, and any attempt to do so would simply be

16   speculation or conjecture on your part, correct?

17   A    Yes, sir.

18   Q    Okay.  Now, the other thing that you indicated is that we're

19   here for a conspiracy charge, correct?

20   A    Yes, sir.

                          Page 83

21ja03d_Cruz-Trejo.txt

21  Q   You're saying this is a conspiracy, an organization for one

22  single individual which would be Alfonso Garcia-Coronado,

23  correct?

24  A   Yes, sir.

25  Q   And it is an investigation of his organization, correct?


Captured and Transcribed by Computer - Eclipse

93

1   A   Yes, sir.

2   Q   Okay.  But you're saying that -- and I think you have

3   already testified to this, that there were other conspiracies

4   that did not involve Mr. Alfonso Garcia-Coronado within this

5   organization and other organizations, as well, correct?

6   A   To my knowledge there is, sir.

7   Q   Okay.  So then we would have to divide out those other

8   conspiracies, correct, which he did not have a role in?

9   A   Yes, sir.

10  Q   Okay.  Now, Mrs. Kirkpatrick's comments regarding a

11  breakdown for Alfonso Garcia-Coronado, you indicated that he was

12  somewhere in the Houston area at that time, correct?  I believe

13  it was in February we're talking about the inclimate weather?

14  A   Yes.

15  Q   That he had a breakdown?

16  A   The information that I received was that he had --

17  Q   Hold on a second, sir.  I just want to confirm that that's

18  what we're talking about.

19  A   Yes.

20  Q   Okay.  Now, that is north of the location where the

21  individuals were out in the brush, correct?

22  A   Yes, sir.

23  Q   Okay.  The entire purpose of the organization is to move

Page 84

21ja03d_Cruz-Trejo.txt

24    people northward, correct?

25    A    Yes, sir.


        Captured and Transcribed by Computer - Eclipse

▯                                                                        94

1    Q    Okay.  It is highly unlikely that he returned south with

2    aliens, correct?

3    A    It is unlikely, but it happens in smuggling, sir.

4    Q    Okay.  It is unlikely; is it not?

5    A    Yes.

6    Q    Okay.  Now, one of the things that we had talked about was

7    how do we determine the number of aliens in this case, correct?

8    I think we've gone ad nauseam about some of that.  Now, the

9    number 116 which is -- the number 116 is number of confirmed

10   aliens that you feel that you could legitimately tell this court

11   were involved during your investigation, correct?

12   A    Yes, sir.

13   Q    Okay.  But you have told me that 25 of those individuals you

14   were speculating about, correct?

15   A    My agents saw about 40 aliens in the brush, which led them

16   to arrest them.

17        THE COURT:  Excuse me, Mr. Troiani, to avoid the ad

18   nauseam, please don't have him repeat what he has already

19   testified on cross unless it is something that has been brought

20   out on redirect that would be necessary.  I don't want to have

21   to hear a rehash of everything you have already crossed him on.

22        MR. TROIANI:  Your Honor, what I wanted to get down to

23   was simply a breakdown that if you eliminated 25 that he's

24   already indicated was speculation and conjecture and then 40

25   that were transported by the agents themselves, we come to a


                          Page 85

21ja03d_Cruz-Trejo.txt

Captured and Transcribed by Computer - Eclipse

95

1    number of approximately 51 aliens that you can identify as being

2    transported by Alfonso Garcia-Coronado.

3    BY MR. TROIANI:

4    Q    Correct?

5    A    Yes, sir.

6          THE COURT:  He's already testified to that, Mr. Troiani;

7    so, I mean that number is already in the evidence and so please

8    do not repeat.

9          MR. TROIANI:  Okay.

10   BY MR. TROIANI:

11   Q    Now -- and you also -- okay.  Do you have any information

12   that would indicate the amount of money actually received by

13   Alfonso Garcia-Coronado in this organization?  Any direct

14   evidence or any information that is not speculation or

15   conjecture which would indicate a identical amount of money

16   received by Alfonso Garcia-Coronado?

17   A    I have no information as to the actual amount that Mr.

18   Garcia-Coronado might have received.

19   Q    Okay.  The only information you have is that -- through

20   sources, et cetera, that he may have received 200 to $500 per

21   alien as his cut, correct?

22   A    Correct.

23   Q    Okay.  The -- do you have any information that would

24   indicate that other than his property in Kingsville that he

25   personally owns or maintains other properties?

Captured and Transcribed by Computer - Eclipse

96

Page 86

21ja03d_Cruz-Trejo.txt

1  A   I have information from informants to the effect that he has

2  purchased property and placed it in his daughters' and sons'

3  name, both real estate and vehicle-type property.

4  Q   Okay.  But do you have any direct information or information

5  that he holds title to any other property other than the

6  property in Kingsville?

7  A   In his name, that is the only property he has in his name.

8  Q   Okay.  And that property that he purchased in Kingsville was

9  property that was paid for from funds other than the proceeds of

10  your alleged smuggling, correct?

11  A   I do not know that, sir.

12  Q   Okay.

13         MR. TROIANI:  I'll pass the witness.

14         THE COURT:  All right.  Anybody else wish to direct

15  anymore questions on cross?

16         MR. CARDENAS:  We pass the witness, Your Honor.

17         MR. VILLARREAL:  We pass.

18         MR. ADOBBATI:  No questions.

19         MR. PULLEN:  No questions.

20         MR. BALDERAS:  No questions, Your Honor.

21         MR. VILLALOBOS:  No questions, Your Honor.

22         THE COURT:  Very well, sir, you may step down.

23      All right.  I'm gonna call now for sentencing unless there's

24  gonna be more evidence -- oh, yeah, one thing that I wanted to

25  make sure that I brought up.  Mr. Michael Gonzalez of probation

Captured and Transcribed by Computer - Eclipse

▯

97

1  did indicate to me that he had gotten an official record from

2  the weather service regarding the temperature in the area that

3  the witness -- I mean, that the aliens who were in the brush --

Page 87

21ja03d_Cruz-Trejo.txt

4    you know, in that general area what that temperature was on

5    February 26th.  That would be the right date.

6         PROBATION OFFICER:  Mr. Salas has got the information,

7    Your Honor.

8         THE COURT:  All right.  Thank you.

9         AUSA KIRKPATRICK:  I'm sorry, Your Honor?

10        THE COURT:  Yes.  There was an exhibit in the form of

11   National Weather Service.

12        AUSA KIRKPATRICK:  Yes, Your Honor.  I've just been

13   provided that by the Probation Office and we would offer that as

14   an exhibit at this time.  It indicates that -- the defense

15   counsel references that the low on the 26th was 30, the high was

16   66.  The low on the 27th was 24 and the high was 52.  So, Your

17   Honor, I would ask that this be admitted as Government's Exhibit

18   No. 2.

19        MR. BALDERAS:  Can we see it, ma'am?

20   (Discussion off the record among counsel.)

21        AUSA KIRKPATRICK:  Your Honor, actually the Government

22   would move that The Court take judicial notice.  I believe that

23   this is an evidentiary fact that The Court can take judicial

24   notice of based on the verifiable information from the probation

25   office.


         Captured and Transcribed by Computer - Eclipse

☐
                                                              98

1         THE COURT:  Well, if you have got it as an exhibit, I'm

2    gonna --

3    (Consultation between the judge and the law clerk.)

4         MR. TROIANI:  Your Honor, the only objection that I

5    would offer on behalf of Alfonso Garcia-Coronado is that the

6    location where this was taken is Corpus Christi.  There's -- we

21ja03d_Cruz-Trejo.txt

7   have no idea how close this was to the area that we're talking
8   about. We're talking about somewhere --
9        THE COURT: Okay. I'll take judicial notice of the
10  distance between Corpus Christi and Raymondville.
11       MR. BALDERAS: Also, Your Honor, the other objection is
12  the accuracy of this Exhibit No. 2, Government's Exhibit No. 2
13  is that this was something that was taken off the Internet. We
14  don't know where on the Internet this information came from.
15       THE COURT: I'm gonna take judicial notice of the
16  temperature as reported by the National Weather Service.
17       MR. BALDERAS: That's my objection, Your Honor.
18       THE COURT: Overruled.
19       AUSA KIRKPATRICK: Your Honor, at this time, we would
20  offer to admit Government's Exhibit No. 2.
21       THE COURT: Admitted.
22    (Consultation between the judge and the law clerk.)
23       THE COURT: Okay. So does the Government rest?
24       AUSA KIRKPATRICK: Yes, Your Honor. On the issue of
25  numbers, not on the issue of asset forfeiture, but yes, we rest.


          Captured and Transcribed by Computer - Eclipse

☐                                                              99

1        THE COURT: Yeah, on that, how much more evidence do you
2   expect to solicit for purposes of Mr. Troiani's hearing?
3        AUSA KIRKPATRICK: Actually, very brief, Your Honor.
4        THE COURT: Okay. All right. Then any witnesses to be
5   called on behalf of any of the defendants? Mr. Troiani?
6        MR. TROIANI: No, Your Honor.
7        THE COURT: Mr. Cardenas?
8        MR. CARDENAS: No, Your Honor.
9        THE COURT: Mr. Balderas?
                      **Page 89**

21ja03d_Cruz-Trejo.txt

10      MR. BALDERAS:  No, Your Honor.

11      THE COURT:  Mr. Villalobos?

12      MR. VILLALOBOS:  No, Your Honor.

13      THE COURT:  Mr. Villarreal?

14      MR. VILLARREAL:  No, Your Honor.

15      THE COURT:  Mr. Pullen?

16      MR. PULLEN:  No, Your Honor.

17      THE COURT:  Mr. Adobbati?

18      MR. ADOBBATI:  No, Your Honor.

19          THE COURT:  All right.  Then I'll call for sentencing

20  Cause No. 02-CR-377-03, The United States of America versus

21  Fernando Garcia.

22          AUSA KIRKPATRICK:  Lynn Kirkpatrick for the Government,

23  Your Honor.

24          THE COURT:  All right.  First, I'll inquire whether

25  there is an objection to the report and recommendation of the

Captured and Transcribed by Computer - Eclipse

▯

100

1   Magistrate Judge on guilt?

2          AUSA KIRKPATRICK:  None from the Government, Your Honor.

3          THE COURT:  From the Defendant?

4          MR. BALDERAS:  None from the Defendant, Your Honor.

5          THE COURT:  Then the report is approved and is adopted

6   by The Court and the Defendant's plea of guilty is accepted and

7   based upon the evidence in the record at re-arraignment and the

8   Defendant's plea of guilty, The Court finds that the defendant,

9   Fernando Garcia, is guilty of the offense of conspiracy to

10  transport and harbor certain aliens within the United States for

11  private financial gain as alleged in Count One of this

12  indictment.  The Court having found the Defendant guilty will

Page 90

21ja03d_Cruz-Trejo.txt

13  now proceed with sentencing.

14      There is a plea agreement and I'll ask now for the

15  Government to recite in summary the terms of the agreement.

16          AUSA KIRKPATRICK:  Yes, Your Honor.  In exchange for the

17  Defendant's plea of guilty to Count No. 1, as well as his waiver

18  of appeal rights as outlined within the plea agreement, the

19  Government recommends that this court sentence the Defendant to

20  the bottom of the guideline level for which he scores; that he

21  be given full credit for his acceptance of responsibility.  The

22  Government will not seek an upward departure based on the number

23  of aliens as to this defendant and we will recommend that the

24  defendant's relevant conduct be limited to a number under 100

25  aliens.


        Captured and Transcribed by Computer - Eclipse

                                                            101

1           THE COURT:  Mr. Balderas, I'll ask you whether you have

2   reviewed the presentence report with your client?

3           MR. BALDERAS:  I have, Your Honor.

4           THE COURT:  And you have may address The Court on your

5   objections.

6           MR. BALDERAS:  Your Honor, initially the only objection

7   that we had was to the two-point increase for the substantial

8   risk of harm to the aliens that were spoken about on, I believe,

9   Page 15 of the presentence report, Paragraph 66.

10      My objection, Your Honor, was that -- and as Your Honor has

11  heard here today, there's really no way to contradict or to

12  offer any evidence because of general nature of the proposition

13  of the proposed danger to the aliens.  We don't know the weather

14  conditions, we don't know how the aliens were dressed, we don't

15  know whether or not they had any heating available to them such

                        Page 91

21ja03d_Cruz-Trejo.txt

16  as a camp fire or other means of keeping warm.  So, we don't

17  really know -- the Court can't really know the substantial risk

18  of harm or the foreseeable risk of harm to the aliens that were

19  involved in the brush.

20      My client lives in Houston, works in Houston.  We know that

21  he is responsible for picking up five aliens and the Government

22  had evidence that possibly more and that's why we agreed to

23  limit his relevant conduct to under 100.  As to the aliens that

24  were in the brush, my client had no contact with the aliens that

25  we know of that -- because of the speculated nature of the


            Captured and Transcribed by Computer - Eclipse


                                                          102

1   statement in Paragraph 66.

2       I would ask that Your Honor attribute to my client less than

3   a hundred aliens which would put it at a level 18, not increase

4   by two for the -- for Paragraph 66, wherein the probation

5   officer says that these aliens were at a risk of physical harm

6   or potential harm.  There's no way to gauge that, there's no way

7   to test in any kind of an evidentiary manner that proposition.

8   There's no medical testimony, no paramedic, a nurse, doctor has

9   been brought before The Court to be able to tell this court with

10  any type of certainty which aliens we're talking about.  When,

11  how they -- and whether or not they were dressed properly,

12  whether or not they had any access to shelter or to heat or

13  anything.  And so I would ask this court to sentence my client

14  to a level 15, which is 12 plus six which would be under a

15  hundred would be six points makes it a level 18, minus three

16  points for acceptance, makes it a level 15.

17          THE COURT:  Mrs. Kirkpatrick?

18          AUSA KIRKPATRICK:  Yes, Your Honor.  While the

                        Page 92

21ja03d_Cruz-Trejo.txt

19   Government does argue that there was substantial risk of death

20   or serious bodily injury on that day on the 26th and we do

21   concur with the overall view of the probation office, we will

22   point out to The Court that we have no evidence whatsoever that

23   this defendant ever actually transported aliens.  The primary

24   objectives of this defendant from what we understand other than

25   within Houston, Texas from one stash house to other stash houses

Captured and Transcribed by Computer - Eclipse

103

1   is that this defendant was primarily responsible for collecting

2   money and sending it back down to his uncle in the Kingsville

3   area.

4        We stand by our plea agreement, Your Honor, and we'd ask The

5   Court sentence -- accept the plea agreement, sentence this

6   defendant to the bottom of guidelines and give him credit for

7   acceptance and find that his relevant conduct is less than a

8   hundred.  As to the matter of endangerment, we would defer to

9   The Court, but point out that defendant's -- his direct

10   involvement with substantial risk of serious bodily injury.

11        THE COURT:  I'm going to sustain the objection to the

12   evidence that this defendant -- that it was reasonably

13   foreseeable that the circumstances as far as the exposure to the

14   elements on the date of February 26th, 2002.  I have more of a

15   problem with the fact that although he was involved in Houston,

16   that, you know, there is a -- there is evidence regarding the

17   manner of transportation in the bed of the extended cab trucks,

18   which it is more likely that he would have been aware of, but

19   out of -- I guess, I'm gonna give that doubt to the Defendant

20   and sustain that objection as to the substantial risk of death

21   or serious bodily injury as to this defendant.  And so, that

Page 93

21ja03d_Cruz-Trejo.txt

22    being said, then anything else on the -- whether The Court

23    should accept the plea agreement as to the relevant conduct?

24    Mr. Balderas.

25          MR. BALDERAS: Well, again, Your Honor, I would ask The

Captured and Transcribed by Computer - Eclipse

104

1    Court accept the plea agreement. This is something you can tell

2    by Mrs. Kirkpatrick's knowledge of this case that she has worked

3    on this case quite a bit, quite an extensive knowledge and quite

4    an extensive number of hours that she has worked on this case

5    and her case agent. And in our negotiations with them, they

6    were satisfied that my client's relevant conduct was less than a

7    hundred aliens and I would ask The Court to accept that. This

8    is the Government's work and this is the Government's agreement.

9    This was their case and this was what -- they're satisfied that

10    my client's relevant conduct was less than a hundred aliens and

11    that's what we agreed with and that's what he entered his plea.

12    I would ask The Court to accept that only because the Government

13    has spent so much time and effort in preparing and being ready

14    for this case. They know their case. They know my client's

15    involvement.

16          Also, my client being in Houston, he did -- we know that he

17    picked up the five aliens and as to the others, we're not sure

18    about, but we know it couldn't have been more than a hundred.

19    And so, as Mrs. Kirkpatrick has told The Court, he is mostly

20    responsible for picking up money. And so we're asking The Court

21    to accept the agreement between my client and the Government

22    that his relevant conduct was less than a hundred.

23          THE COURT: Sir, is there anything you wish to say to

24    The Court?

Page 94

21ja03d_Cruz-Trejo.txt
25          THE DEFENDANT:  I know I broke the law and I'm sorry.


              Captured and Transcribed by Computer - Eclipse

                                                                    105

 1    And I didn't know that it would bring me this much trouble.  I'm
 2    a family man and I've kept a job in Houston for the last 10
 3    years.  I have three kids and this is not something that I did
 4    for a living.  This is something that I would do every now and
 5    then for these people.  They would ask me a favor and I would go
 6    to Western Union and I didn't think that it would be bringing me
 7    up to this much trouble and I am sorry.
 8          THE COURT:  Well, I guess you should be since you're
 9    risking losing your resident alien status.
10          MR. BALDERAS:  That's the shame of it, Your Honor.  He
11    has a good job.  I've met his employer.  His employer's the one
12    who's helped him in being able to make his money, to retain
13    counsel, is involved in the construction business.  His
14    employer, as the presentence report tells The Court, thinks the
15    world of him as an employee.  A hard-working man.  If you look
16    at his hands, his hands are all chewed up from the type of work
17    he does.  He has three children.  After this case, after he
18    spends his time in the penitentiary, he's gonna more than likely
19    be deported, separated from his family.  I'm asking The Court to
20    give him as short amount of time as possible, Your Honor, as low
21    as the end of the guidelines as The Court thinks is just because
22    he's gonna suffer a great deal other than that sentence, Your
23    Honor, because he's gonna have to be separated from his family.
24          THE COURT:  All right.  Having sustained that objection,
25    what was the guideline range?


              Captured and Transcribed by Computer - Eclipse

                          **Page 95**

21ja03d_Cruz-Trejo.txt

106

1          PROBATION OFFICER:  18 to 24 months, Your Honor.

2          AUSA KIRKPATRICK:  That's correct, Your Honor.  That's

3     assuming the less than 100 aliens, Your Honor.

4          THE COURT:  Yes, I'll accept the plea agreement and

5     limit the relevant conduct then of this defendant to less than

6     100 aliens.  And pursuant to the Sentencing Reform Act of 1984

7     The Court hereby sentences you to a term of imprisonment of 18

8     months.  Upon release from imprisonment, you shall be placed on

9     supervised release for a term of three years.  If you are

10    deported as a result of this conviction, then understand that

11    this supervised release will be without direct supervision, but

12    that you would still have to comply with the special and

13    mandatory conditions such as that you are not to violate the

14    law, state, federal or local.

15         Please understand that should you commit any crime during

16    this three-year period after your release from prison, you are

17    subject to being brought back into court in connection with this

18    case and being are ordered to serve more time in prison.  Do you

19    understand that?

20         THE DEFENDANT:  Yes, ma'am.

21         THE COURT:  Even if you are here because your family is

22    here and you don't have a life anymore in Mexico and you can't

23    earn a living to support yourself in Mexico, that's not gonna be

24    a defense to being here in this country illegally.  Do you

25    understand that?


          Captured and Transcribed by Computer - Eclipse

107

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  And that if, in fact, you are found guilty
                              Page 96

21ja03d_Cruz-Trejo.txt

```
 3  of having committed another crime, any sentence that you would
 4  get on a new case may very well be ordered to be served
 5  consecutively to any sentence that I would give you in this case
 6  should I revoke your term of supervised release.  Do you
 7  understand that?
 8          THE DEFENDANT:  Yes, ma'am.
 9          THE COURT:  And that although you are facing a maximum
10  term of imprisonment of 10 years in this case, that illegal
11  re-entry after a conviction for a felony such as this may result
12  in -- I mean, the punishment for that, the maximum amount is 20
13  years.  Do you understand that?
14          THE DEFENDANT:  Yes, ma'am.
15          THE COURT:  So that there's a possibility that the
16  sentence you would face for an illegal re-entry after this
17  conviction may be greater than the -- I mean that the sentence
18  of -- that's a maximum for that offense is greater than the
19  conspiracy maximum that you were facing in this case.  Do you
20  understand that?
21          THE DEFENDANT:  Yes, ma'am.
22          THE COURT:  All right then.  While on supervised
23  release, you shall not illegally possess a controlled substance
24  and shall refrain from any unlawful use of a controlled
25  substance; you shall not possess a firearm or destructive
```

Captured and Transcribed by Computer - Eclipse

□

108

```
 1  device; and if, again, you are deported, you are not to re-enter
 2  the United States illegally.
 3      The Court finds that although you are employed, do not have
 4  the income such that you are able to pay a fine so The Court
 5  does not order that you pay a fine based on that indigency.
```
Page 97

21ja03d_Cruz-Trejo.txt

6     However, The Court does impose a special assessment of $100.

7          Sir, this sentence is in conformance with the Sentencing

8     Reform Act of 1984 and as justification for this sentence The

9     Court adopts the findings in the presentence report other than

10    the finding regarding the limitation of relevant conduct to less

11    than 100 -- I'm sorry, also except for the objection, as well,

12    to the substantial risk of death or serious bodily injury.

13         So, again, the law does provide that you have a right to

14    appeal your sentence and you can do so even though you are

15    indigent, but you must give notice of that intention within 10

16    days.

17         Is there anything else?

18              AUSA KIRKPATRICK:  Nothing further, Your Honor.

19              MR. BALDERAS:  My client has been on bond up until now.

20    May he remain on bond and until he receives notice as to where

21    he's to report to start serving his sentence?

22              AUSA KIRKPATRICK:  Mrs. Kirkpatrick?

23              PRETRIAL OFFICER:  My understand he has been in

24    compliance.

25              AUSA KIRKPATRICK:  I have no objection then, Your Honor.


          Captured and Transcribed by Computer - Eclipse

☐
                                                              109

1              THE COURT:  All right then.  The request is granted.

2              MR. BALDERAS:  Thank you, Your Honor.

3              THE COURT:  You are excused.

4         ██████████████████████████████████████████████████

5         ██████████

6              AUSA KIRKPATRICK:  Lynn Kirkpatrick for the Government,

7     Your Honor, present and ready.

8              MR. VILLALOBOS:  Armando Villalobos for the Defendant,
                              Page 98

21ja03d_Cruz-Trejo.txt

9    Your Honor, we're present and ready.

10        THE COURT:  I'm waiting for the report and

11   recommendation.  Let me ask, is there an objection to the report

12   and recommendation of the Magistrate Judge regarding the guilt

13   of this defendant?  From the Government?

14        AUSA KIRKPATRICK:  Nothing from the Government.

15        THE COURT:  From the Defendant.

16        MR. VILLALOBOS:  No, Your Honor.

17        THE COURT:  There being no objection, the report is

18   approved and adopted by The Court and the Defendant's plea of

19   guilty is accepted and based upon the evidence in the record at

20   re-arraignment and the Defendant's plea of guilty, The Court

21   finds that the Defendant, Jose Luis Cruz-Trejo, is guilty of the

22   offense of conspiracy to transport and harbor certain aliens

23   within the United States for private financial gain as alleged

24   in Count One of this indictment.

25        The Court having found the Defendant guilty will now proceed

Captured and Transcribed by Computer - Eclipse

☐

110

1    with sentencing.  There is a plea agreement and so I'll ask the

2    Government to address The Court on that agreement.

3        AUSA KIRKPATRICK:  Your Honor, the plea agreement in

4    this case is in exchange for the Defendant's plea of guilty to

5    Count One, as well as his waiver of appeal rights, the

6    Government is prepared to recommend and does hereby recommend

7    that the Defendant be sentenced at the bottom of the guideline

8    level for which he scores; that he be given full credit for

9    acceptance of responsibility.  Furthermore, the Government

10   agrees that it will not seek an upward departure for this

11   defendant for the number of aliens involved and we would move to

21ja03d_Cruz-Trejo.txt

12    dismiss the remaining count at the time of sentencing which we
13    intend to do.
14            THE COURT:  Mr. Villalobos?
15            MR. VILLALOBOS:  Your Honor, we would reiterate our
16    objections that we lodged earlier.
17            THE COURT:  I'm sorry, and you have reviewed the
18    presentence report with your client?
19            MR. VILLALOBOS:  Yes, I have, Your Honor.
20            THE COURT:  All right.  Go ahead.
21            MR. VILLALOBOS:  Your Honor, with regards to the
22    temperature, there's been limited testimony as to the danger
23    that Mr. Trejo is in along with the aliens.  They've indicated
24    that the temperature range was from, I believe in the 30s to 60s
25    on that day, the 26th, with the mean temperature of 48.  That,


            Captured and Transcribed by Computer - Eclipse

                                                                111

1     in and of itself, I don't believe is sufficient to say that
2     somebody is in danger of either freezing to death or
3     hyperthermia.  Depending on what region you're from, depending
4     on how you are, depending on what your activities are would
5     indicate whether or not you would be in danger of freezing at
6     any temperature really.  I think if you get below the 30s or
7     into the 20s and the teens, I think you could maybe say, per se,
8     you're in some sort of danger.  But there was no testimony by
9     the agent that they interviewed anybody regarding what the
10    conditions were like, what exactly they were facing when they
11    were out there, how long they were actually out there and
12    whether or not they actually were suffering in the cold, placing
13    them in danger.  The only thing they have is an indication that
14    to me it was colder than usual than we have here in South Texas
                          Page 100

21ja03d_Cruz-Trejo.txt

15    and they presented a temperature range that, on the high end, is
16    still rather high.  And even on the low end, on that day, the
17    26th of 31, that could be a reading from 6 o'clock in the
18    morning or 3 o'clock in the morning.  I mean, there's no
19    indications as to when these people were there, how dangerous
20    that activity would be.
21        My client has indicated, and the record would indicate, that
22    he had a cellular phone to contact somebody to pick them up.  If
23    they were in any danger, he could obviously contact Border
24    Patrol or 911, you know, if there was some sort of situation
25    where they would be immediate attention required and there's

            Captured and Transcribed by Computer - Eclipse

0
                                                        112

1    nothing in the record to indicate that that was done or that
2    that was even necessary.
3        We would object as to just the temperature being, per se,
4    being cold because that's all we have here; that that would be
5    enough to substantiate my client placing people in danger, Your
6    Honor.
7        As to my second point, Your Honor, in regards to the
8    numbers, it is clear that there's -- that they have direct
9    evidence linking my client to two transportations equalling 27
10   people.  We don't feel that the evidence is sufficient to show
11   that he was involved in a situation involving thousands of
12   people as they've alleged in the PSI.  We feel that the
13   testimony was pretty clear from the agent indicating his
14   involvement and what actually the numbers that he had
15   controlled.  So, we feel that placing him for over a hundred, as
16   they're asking in the PSI, would be incorrect in this case, Your
17   Honor.
                        **Page 101**

21ja03d_Cruz-Trejo.txt

18        THE COURT: Mrs. Kirkpatrick?

19        AUSA KIRKPATRICK:  Your Honor, first in response to

20   Defendant's arguments about the numbers of aliens, we would

21   argue that the evidence has shown and his contained within the

22   PSI that Mr. Jose Luis Cruz-Trejo is actually related to one of

23   the Infantes, as well as has been walking groups of aliens for

24   them for many years.  He is -- has been responsible for many

25   groups of aliens being walked around the checkpoints.  We would

Captured and Transcribed by Computer - Eclipse

113

1    argue the amount was clearly over a hundred.  We are not seeking

2    an upward departure for this Defendant based on the number;

3    however, we would argue that the calculations contained within

4    the presentence report are correct.  In regards to the

5    temperature readings, Your Honor, as stated in Government's

6    Exhibit No. 2 and as stated by the Case Agent Charlie Torres,

7    the temperature were in the 20s in the area where Mr. Jose Luis

8    Cruz-Trejo was located, which is a brushy, South Texas area,

9    it's not within the city.  Temperatures are colder.  They would

10   stay there overnight because no one was available.  In fact, Mr.

11   Jose Luis Cruz-Trejo indicated to undercover agents, as

12   testified to by Charlie Torres on the stand, that Alfonso

13   Garcia-Coronado was supposed to pick them up, but failed to do

14   so.

15        Later testimony came out that Alfonso Garcia-Coronado was

16   nowhere near the area to pick them up.  In fact, he was just

17   short of Houston, Texas, with a breakdown; so, he was nowhere

18   near picking them up and nobody was available to pick them up

19   until the next day.  So, they spent the night out in the South

20   Texas ranch country.

Page 102

21ja03d_Cruz-Trejo.txt

21    Furthermore, I believe the PSI states that the trip takes a
22    couple of days.  And being in the South Texas country with Jose
23    Luis Cruz-Trejo out there at the risk of being lost or risk of
24    exposure and not only during the winter times but also during
25    the summer months, does, in fact, create the risk of

         Captured and Transcribed by Computer - Eclipse

                                                              114

1     endangerment or serious bodily injury.
2          THE COURT:  Okay.  I guess I wanted to clarify maybe you
3     and the Case Agen can pinpoint the evidence.  I know that there
4     was evidence regarding Cruz-Trejo having walked 12 -- or the
5     group being 15 and then for a total of 27, but, you know, he's
6     only fessed up to four instances.  And I'm not saying that I
7     believe that it is limited to that, but beyond that, regarding
8     the extent of his participation in the conspiracy whether, you
9     know, as a result of working for the Infante organization and
10    then connecting with the Garcia-Coronado organization.
11         AUSA KIRKPATRICK:  Your Honor, the witnesses one and
12    two, cooperating individuals with the Government, have both
13    indicated that they have seen and had dropped off Mr. Jose Luis
14    Cruz-Trejo on numerous occasions at different locations and have
15    picked them up.  So, he's been involved and he was, in fact,
16    stated by witnesses one and two to Agent Torres to Agent Cortez
17    and to me, they all stated that he was, in fact, one of the lead
18    walkers and led most of the groups around the checkpoint.  That
19    is why we did not agree to under 100 aliens for this defendant.
20         THE COURT:  Okay.  Then the objection is overruled to
21    the two points, that is, The Court finds that the evidence is
22    such in the record through the testimony of the agent today and
23    as a result of the independent investigation by the probation
                              Page 103

21ja03d_Cruz-Trejo.txt

24    department that, one, that the number of aliens that this
25    defendant is -- it is reasonably foreseeable that he was


Captured and Transcribed by Computer - Eclipse

☐
                                                                    115

1    involved in or that has been supported by the evidence either
2    through his own admission or through other witnesses who have
3    worked with him during the period of time that he's been
4    involved in this conspiracy such that the total was more than
5    100. So, for that reason, the calculation of an additional nine
6    points or nine levels, pursuant to 2L1.1B2C is overruled.
7         Further, also, the evidence being that the temperature in
8    the area -- immediate area as was testified to by the case agent
9    was in the 20s is supported by the Government Exhibit No. 2.
10   The fact that he had a cell phone and would have the means for
11   which to call 911 or somebody in law enforcement for assistance
12   is ludicrous, because the whole point is to avoid detection.
13   And, you know, too, for the Defendant to want me to believe that
14   he was -- he had any amount of concern for the safety of these
15   people, that he was not more concerned with the financial gain
16   as well as avoiding detection is just difficult for me to
17   swallow. So, for that reason and for the fact that the evidence
18   has been that the aliens were transported in the means in which
19   is described in Paragraph 67, that is, in the beds of extended
20   cab trucks which placed them -- which would thereby place them
21   in substantial risk of death or serious bodily injury, that that
22   kind of danger is reasonably foreseeable to somebody who had the
23   extent of participation in this conspiracy as this defendant.
24   And so for that reason, the objection to the additional two
25   levels pursuant to 2L1.1B5 is also overruled.

                        Page 104

21ja03d_Cruz-Trejo.txt
Captured and Transcribed by Computer - Eclipse

116

1    All right.  That being the case, then the guideline range is
2    between 33 to 41 months.
3        Mr.Villalobos, tell me why I should accept the Government's
4    recommendation that is based on the plea agreement.
5        MR. VILLALOBOS:  Your Honor, we would ask that you
6    follow the plea agreement based on my client's lack of record.
7    This is the first time he's been involved with law enforcement,
8    even though The Court disagreed with his assertion that he was
9    concerned about that, we would also point out that he was right
10   there with them.  I believe that he would not -- if he's along
11   with them, he would not be placing them in danger because he
12   would be placing himself in danger, as well.  My client is not a
13   super human being that would be able to put people in dangerous
14   situations and him himself not be in a dangerous situation.
15       THE COURT:  You know the reason that I find that just
16   not worthy of belief either is that somebody who's going to be
17   making money from this, is going to have the responsibility,
18   they have time to prepare and be dressed properly as opposed to
19   somebody who had to bring all of their -- anything and
20   everything that they can carry over many miles and that a lot of
21   people just cannot carry everything that they need and, as such,
22   would be placed in a situation where they may not have
23   sufficient clothing, where if somebody who is just coming from
24   wherever he has been residing, which is in Mission, Texas, and
25   only has to walk them up to a certain point can be more

Captured and Transcribed by Computer - Eclipse

117

Page 105

21ja03d_Cruz-Trejo.txt

1  prepared.  So that argument just does not hold water as far as
2  I'm concerned.

3       MR. VILLALOBOS:  Well, Your Honor, we would respectfully
4  disagree.  We don't feel like he's purposely trying to place
5  people in danger.  He's accepting The Court's decision on his
6  role, but his role is limited to the walker.  They tell him what
7  to do, he does it.  He readily admits to what he does in this
8  organization.  He readily admits that he walks them past the
9  checkpoint.  He's not one of the deal makers, not one of the
10  people that is involved in actually bringing them across the
11  border.  He has to bring himself across in border in order to do
12  this.  He's not profited largely because of this.  He doesn't
13  have a history of braking the law.  He has no history
14  whatsoever, Your Honor.  We would ask that The Court follow the
15  plea bargain based on the evidence presented before The Court.
16       THE COURT:  Sir, is there anything you wish to say to
17  The Court?
18       THE DEFENDANT:  I just want to apologize to Your Honor
19  and to the Government of the United States for having caused
20  such a big problem.  And I await my sentence.
21       THE COURT:  Very well.  Pursuant to the Sentencing
22  Reform Act of 1984, The Court hereby sentences you to a term of
23  imprisonment of 41 months.  Upon release from imprisonment, you
24  shall be placed on supervised release for a term of three years.
25  During this period of three years, you have to comply with all


          Captured and Transcribed by Computer - Eclipse

0
                                                        118

1  standard and mandatory conditions of supervised release that
2  included that you are not to violate the law, state, federal or
3  local.  Even if you are deported, you have to comply with those
                         Page 106

21ja03d_Cruz-Trejo.txt

4    conditions as such that if you violate the law during this

5    three-year period, you may be brought back into court in

6    connection with this case and be ordered to serve more time in

7    prison.  Do you understand that?

8         THE DEFENDANT:  Yes, ma'am.

9         THE COURT:  And if you get another -- a sentence for a

10   new offense committed during this three-year period, the

11   sentence that you serve in this case, should I revoke your term

12   of supervised release, may very well be ordered to be served

13   consecutively.  Do you understand that?

14        THE DEFENDANT:  Yes, ma'am.

15        THE COURT:  And in the future should you enter this

16   country illegally, you may be subject to a greater term of

17   imprisonment than what you were facing today.  Do you understand

18   that?

19        THE DEFENDANT:  Yes, ma'am.

20        THE COURT:  All right then.  Sir -- oh, in addition to

21   the condition that you not violate the law, you are ordered not

22   to illegally possess a controlled substance and to refrain from

23   any unlawful use of a substance; you shall not possess a firearm

24   or other destructive device; and you are not to re-enter the

25   United States illegally.


          Captured and Transcribed by Computer - Eclipse

▯
                                                            119

1         The Court finds that you do not have the ability to pay a

2    fine and therefore waives the imposition of a fine.  However,

3    The Court does impose a special assessment of $100, which The

4    Court will order remitted should the Government move to do so

5    based upon your indigency.

6         AUSA KIRKPATRICK:  So moved, Your Honor.

                         Page 107

21ja03d_Cruz-Trejo.txt
7        THE COURT:  Motion's granted.

8      Sir, this sentence is in conformance with the Sentencing

9    Reform Act of 1984.  As justification for this sentence, The

10   Court adopts the findings in the presentence report.

11      The law does provide that you have a right to appeal your

12   sentence and you can do so even though you are indigent, but you

13   must give notice of that intention within 10 days.

14      Anything else?

15        AUSA KIRKPATRICK:  Yes.  The Government moves to dismiss

16   the remaining counts.

17        THE COURT:  Motion's granted.  We're in recess.  Mr.

18   Villalobos, you are excused.

19      02-CR-377-09, The United States of America versus Juan

20   Olvera Martinez.

21        AUSA KIRKPATRICK:  Lynn Kirkpatrick for the Government,

22   Your Honor.  Present and ready.

23        MR. VILLARREAL:  Javier Villarreal for the Defendant.

24        THE COURT:  First, is there an objection to the report

25   and recommendation of the Magistrate Judge?


Captured and Transcribed by Computer - Eclipse

0

120

1        AUSA KIRKPATRICK:  None from the Government.

2        THE COURT:  From the Defendant?

3        MR. VILLARREAL:  No, Your Honor.

4        THE COURT:  Then the report is approved and adopted by

5    The Court and the Defendant's plea of guilty is accepted and

6    based upon the evidence in the record at re-arraignment, The

7    Court finds that the Defendant Juan Olvera Martinez is guilty of

8    the offense of transporting a certain alien within the United

9    States for private financial gain as alleged in Count Three of

Page 108

21ja03d_Cruz-Trejo.txt

10    this indictment.

11        Now, I'll also call Cause No. 01-M-884 and ask are you the

12    same Juan Olvera Martinez who was convicted of attempted illegal

13    entry into the United States on April 4th, 2001?

14            THE DEFENDANT:  Yes, Your Honor.

15            THE COURT:  And were you thereafter sentenced to a

16    three-year term of probation?

17            THE DEFENDANT:  Yes.

18            THE COURT:  And did you understand that the terms of

19    probation included that you were not to violate the law, state,

20    federal or local?

21            THE DEFENDANT:  Yes, Your Honor.

22            THE COURT:  Have you received a copy of the petition in

23    this case that alleges that you did violate the condition that

24    you not commit another crime by committing the offense of

25    transporting a certain alien within the United States for


            Captured and Transcribed by Computer - Eclipse

                                                                121

1    private financial gain on or about June 5th, 2002?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  How do you plead to that allegation in that

4    petition, true or not true?

5            THE DEFENDANT:  Yes.

6            THE COURT:  I think he said it is true.

7            THE DEFENDANT:  True.

8            THE COURT:  Based upon your plea of true, The Court

9    finds that you have violated your terms of probation in Cause

10   No. 01-M-884 and hereby revokes your term of probation.

11       Now, Mr. Villarreal, have you reviewed the presentence

12   report with your client?

                            Page 109

21ja03d_Cruz-Trejo.txt

13          MR. VILLARREAL:  Your Honor, I have not been able to get

14     a copy of that.  I have misplaced the copy of the presentence

15     report.  On the revocation?

16          THE COURT:  No, on the presentence report in 02-CR-377?

17          MR. VILLARREAL:  Yes, Your Honor.  We do and I have

18     three objections.

19          THE COURT:  Have you reviewed it with your client?

20          MR. VILLARREAL:  Yes, I have, Your Honor.

21          THE COURT:  And also, I don't know whether in leafing

22     through it again this morning, I was not sure whether you had

23     received a copy of a letter that was sent to The Court by the

24     Defendant and if you have not, then I'll give you a chance to

25     review it before I continue.  Have you received a copy of this

Captured and Transcribed by Computer - Eclipse

☐

122

1      letter?

2           MR. VILLARREAL:  Yes, Your Honor.  It is included in the

3      initial investigation report.  I have not reviewed it yet.

4           AUSA KIRKPATRICK:  I'm sorry, Your Honor, which letter

5      is The Court referring to?

6           THE COURT:  It was a letter to The Court and the

7      probation officer.

8           MR. VILLARREAL:  I don't have a copy of that, Your

9      Honor.

10          THE COURT:  Okay.

11          MR. VILLARREAL:  I think there's things in there.  I

12     have not gotten a copy of this.

13          THE COURT:  Okay.  Why don't you look at it and let me

14     call another case.

15          MR. VILLARREAL:  Okay.  Your Honor.

Page 110

21ja03d_Cruz-Trejo.txt

16    AUSA KIRKPATRICK:  For the record, the Government has

17    received a copy of that letter.

18    THE COURT:  Okay.

19    02-CR-377-13, The United States of America versus Juan

20    Gabriel Nino.

21    AUSA KIRKPATRICK:  Lynn Kirkpatrick for the Government,

22    Your Honor.  Present and ready.

23    MR. PULLEN:  Alberto Pullen for Mr. Nino, Your Honor.

24    We're present and ready.

25    THE COURT:  First, is there an objection to the report

Captured and Transcribed by Computer - Eclipse

☐

123

1    and recommendation of the Magistrate Judge?

2    AUSA KIRKPATRICK:  None from the Government, Your Honor.

3    THE COURT: · From the Defendant?

4    MR. PULLEN:  No, Your Honor.

5    THE COURT:  Then the report is approved and is adopted

6    by The Court and the Defendant's plea of guilty is accepted and

7    based upon the evidence in the record at re-arraignment and the

8    Defendant's plea of guilty, The Court finds that the Defendant,

9    Juan Gabriel Nino, is guilty of the offense of conspiracy to

10    transport and harbor certain aliens within the United States for

11    private financial gain as alleged in Count One of this

12    indictment.

13    The Court having found the Defendant guilty will proceed

14    with sentencing.  Mr. Pullen, have you reviewed the presentence

15    report with your client?

16    MR. PULLEN:  Yes, I have, Your Honor.

17    THE COURT:  And I'll now ask about the plea agreement.

18    If you'll recite in summary, Mrs. Kirkpatrick, the agreement

Page 111

21ja03d_Cruz-Trejo.txt

19    with the Defendant.

20         AUSA KIRKPATRICK:  Your Honor, the plea agreement in

21    this case calls for the Defendant's plea of guilty to Count No.

22    1 as well as his waiver of appeal rights as outlined within the

23    plea agreement.  In exchange, the Government hereby recommends

24    that the Government be sentenced at the bottom of the guideline

25    level for which he scores and be given full credit for


         Captured and Transcribed by Computer - Eclipse


0

                                                              124

1     acceptance of responsibility.  The Government further agreed

2     that it will not seek an upward departure for this defendant for

3     the number of aliens involved.

4          THE COURT:  Mr. Pullen, you may address The Court on the

5     objections as well as the reasons why I should accept the

6     recommendation made by the Government.

7          MR. PULLEN:  Thank you, Your Honor.  Our first objection

8     has to do with and relates to the assessment of nine points for

9     transporting and moving more than a hundred undocumented aliens.

10         First, I would like to make reference to the testimony here

11    today by Agent Torres.  When he first testified on direct, he

12    made absolutely no mention of Mr. Nino moving or transporting

13    any aliens at all.  That is further supported, Your Honor, by

14    the Presentence Investigation Report, as well.  Basically, in a

15    nutshell all that Mr. Nino was involved in is receiving money

16    and making phone calls.  He was not directly involved in any

17    type of transportation of aliens and there is no evidence or no

18    evidence has been presented to show the contrary.  If I may,

19    Your Honor, make reference to Page 10 of the presentence report,

20    Paragraph 37.

21         THE COURT:  I'm sorry, what was that page?

                            Page 112

21ja03d_Cruz-Trejo.txt

22      MR. PULLEN:  Page No. 10.  Paragraph 37.  Where it says,

23  Your Honor, government agents picked up 10 undocumented aliens

24  and it goes on to say how they called Mr. Nino.  And basically,

25  all he's involved in was there it was conversations -- telephone


Captured and Transcribed by Computer - Eclipse

☐
                                                           125

1   conversations.  And then again, we're talking about 10 aliens

2   there, Judge.

3       Also, if I may direct your attention to Page No. 12 at the

4   top of the page Paragraph 45.  Again, we're looking at two

5   aliens that Mr. Nino said he may have.  Again, this is just --

6   or he may be able to provide the transportation, but that was

7   all telephone calls.

8       And lastly on that same Page No. 12, Paragraph 48, it goes

9   on to the monies that he's received.  So, Judge, that supports

10  our contention that all his involvement in this case, according

11  to the evidence presented, was phone calls and receiving money.

12  I would ask that The Court take that into consideration and

13  sustain by objection that he was involved in more than --

14  transporting more than a hundred aliens.

15      THE COURT:  Mrs. Kirkpatrick?

16      AUSA KIRKPATRICK:  Your Honor, in response to the

17  Defendant's objection, we would argue that the testimony from

18  Agent Torres, as well as we would proffer if it wasn't already

19  introduced -- and I'm pretty sure it was -- that Witness No. 1

20  stated that Mr. Nino and also Witness No. 2 stated that Mr. Nino

21  would get head counts on the numbers from the aliens on this

22  side of the river and call family members and arrange for the

23  payment of fees.

24      Your Honor, we would argue that the Defendant then

                          Page 113

21ja03d_Cruz-Trejo.txt

25    proceeded, once he had already been arrested -- I'm sorry, once

Captured and Transcribed by Computer - Eclipse

▯

126

1    he had already been indicted, the agents were attempting to

2    locate him to execute an arrest, execute the arrest warrant.  By

3    doing so, managed to make arrangements with them to transport

4    additional 48 aliens.  They were doing this in order to bring

5    them to a site and arrest them, which proved to be fruitless.

6    However, they did arrest them later on, approximately two months

7    later.  We would argue there is plenty of evidence to suggest

8    that the Defendant was involved with more than 100 aliens.  We

9    are not asking for an upward departure of the hundred aliens; we

10   simply ask The Court find that he was, in fact, responsible for

11   over 100.

12       We do recommend bottom of the guideline level, Your Honor,

13   because he was not a major player in our organization and we had

14   no direct contact with him.  It was only through -- well, I --

15   actually, I correct myself, Your Honor -- we had direct contact

16   with him when agents were out in the field and were trying to

17   locate Alfonso Garcia-Coronado and we do recommend the low end

18   of the guidelines, but we argue that he is, in fact, responsible

19   for over 100 aliens.

20       THE COURT:  Okay.  I'm gonna find that the evidence is

21   such that he was -- his relevant conduct is, in fact, related to

22   a hundred aliens; so, that objection is overruled.  It is based

23   on the evidence in the record and the PSR, that it supports the

24   Probation Department's independent investigation as well as the

25   evidence in the hearing conducted today in that the -- this

Captured and Transcribed by Computer - Eclipse

Page 114

21ja03d_Cruz-Trejo.txt

127

1    defendant had been participating for an extended period of time
2    and although his contact with a law enforcement officer in --
3    actually, you know, I guess face-to-face contact rather than
4    just having an unindicted or unarrested or whoever the witnesses
5    who have placed him as being part of these numerous loads, The
6    Court finds that that information is credible and so that
7    supports a finding by The Court that his relevant conduct was
8    greater than 100 aliens.  And so for that reason, the
9    objection's overruled.
10       Now, Mr. Pullen, I don't know that you really spoke to the
11   issue of the substantial risk of death or serious bodily injury.
12           MR. PULLEN:  Yes, Your Honor.  That was my next
13   objection.
14       Judge, if I may go back to Page No. 10 of the same paragraph
15   that we looked at before.  It says the undercover agents picked
16   up 10 undocumented aliens within the United States to stage
17   apprehension of the alien load near Rivera, Texas.  This was
18   done in February 21.  The Government is saying that we are
19   placing the aliens in substantial risk of death or bodily harm
20   when they're doing exactly the same thing, to stage the
21   apprehension.  So, how -- if they're doing it, how can they come
22   and tell us, the defendants, that they were, in fact, putting
23   them in great bodily harm.  It just doesn't make sense, Your
24   Honor.  That's basically the substance of my argument.  I would
25   say that it wasn't cold enough to be dangerous.  And if they did

Captured and Transcribed by Computer - Eclipse

128

1    it, how can they come back and say that we were doing wrong?
2            THE COURT:  Okay.  Do you want to speak to the issue of
                          Page 115

21ja03d_Cruz-Trejo.txt

3    the number -- I mean the truck bed -- placement in the truck

4    bed?

5          MR. PULLEN:  Again, Your Honor, as far as that's

6    concerned, there's absolutely no evidence that my client was

7    involved in that particular transporting of aliens.  I didn't

8    see in the PSR.  I didn't hear it from the testimony.  And

9    therefore he shouldn't be assessed for conduct that does not

10    relate to him.

11          THE COURT:  Mrs. Kirkpatrick?

12          AUSA KIRKPATRICK:  Your Honor, for the record, the

13    incident in which Mr. Pullen is making reference to -- at all

14    times, first of all, when these aliens were transported by

15    undercover agents, they were transported in a van that is

16    utilized by the United States Border Patrol service.  In

17    addition to that, Your Honor, they never left the van when they

18    were arrested by the agents that day.  It was a planned arrest.

19    My undercover agent, my confidential informant, were to escape

20    and the load was to be intact.  Everything -- every precaution

21    that could have possibly been taken was taken to ensure the

22    safety of the aliens at all times when they were in the presence

23    of the United States Border Patrol.  At no time were they ever

24    walked around a checkpoint or left by themselves or obtained at

25    increased speeds.  They were being driven by agents and at no

Captured and Transcribed by Computer - Eclipse

129

1    time were their lives ever at risk while in the custody of the

2    United States Border Patrol.

3        Likewise, Your Honor, we would argue -- we would state on

4    the record that we have no direct evidence that this defendant

5    was involved either in the -- that he specifically drove aliens

Page 116

21ja03d_Cruz-Trejo.txt

6    in flatbed trucks, in these dually trucks that were typically

7    used by the Alfonso Garcia-Coronado organization.  We would

8    leave the matter of endangerment to the discretion of The Court.

9    We would not argue either way.

10       THE COURT:  I'll sustain that objection, that is, to the

11   endangerment of substantial risk of death or serious bodily

12   injury in that, you know, if there's nothing to put him at the

13   point where he is actually present with the aliens when they're

14   being transported such that he would be aware of the nature of

15   the placement in the bed of the truck.  And so for that reason,

16   I'll sustain the objection.

17       Now, tell me, Mr. Pullen, why I should accept the agreement.

18       MR. PULLEN:  First of all, Your Honor, I would ask The

19   Court to consider that this is the first that he's -- this is

20   the first offense that Mr. Nino has been pled guilty to and has

21   been convicted of.  He's been arrested for many years in this

22   country and he's been a law abiding citizen.  Let me say that he

23   there is no evidence to show that he has not been a law abiding

24   citizen since then up to now.  He has a family.  He will -- he

25   understands that he will be deported and not live in the United


Captured and Transcribed by Computer - Eclipse


⬚

130

1    States at the end of his sentence.

2        I would ask that The Court take that into consideration and

3    also, Your Honor, I'm sure we'll ask if my client has something

4    to say I want The Court to hear some of his words.

5        THE COURT:  All right, sir.  Anything you want to say?

6        THE DEFENDANT:  I ask the Government of the United

7    States to forgive me.  I did have knowledge of the money I

8    needed to take out, but I didn't know the purpose of it.  So
                          Page 117

21ja03d_Cruz-Trejo.txt

9   that maybe that was my only mistake to collect that money.  With

10  respect to the rest, I had no knowledge.  That's all.

11          THE COURT:  Are you saying you are not guilty of the

12  conspiracy?

13          THE DEFENDANT:  With respect of the money that was being

14  handled, I didn't know what the purpose was.

15          THE COURT:  Okay.  I'm gonna ask you very specifically

16  then.  Are you saying that what the agents have testified to and

17  what is in the presentence report is not accurate?

18  Specifically, in Paragraph 45 wherein they told you that they

19  were getting ready to deliver a load of aliens to Yanez-Flores

20  in Houston and that they asked you if you had any aliens that

21  needed transportation to Houston and that you negotiated with

22  those agents about the method of delivery and the charge for

23  each alien and that at this moment you only had two aliens, but

24  that you would call back to see how many of the aliens you could

25  get?  Are you saying that's not true?


        Captured and Transcribed by Computer - Eclipse

0
                                                              131

1           THE DEFENDANT:  I am in agreement with that.

2           THE COURT:  Okay.  So tell me what you meant when you

3   said you didn't know about any -- that you -- I mean, I know

4   what you are saying you're claiming you didn't know where the

5   money came from or what it was for, but you also indicated that

6   you didn't know anything about anything else.  Are you saying

7   you are not guilty, sir?

8           THE DEFENDANT:  No, there was a misunderstanding.  I

9   understand why I'm here and what the charges are.

10          THE COURT:  Okay.  So is that all you have to say on

11  your behalf?
                              Page 118

21ja03d_cruz-Trejo.txt

12          THE DEFENDANT:  That's all.

13          THE COURT:  All right.  Having sustained that objection,

14  what is the guideline range, please?

15          PROBATION OFFICER:  27 to 33 months, Your Honor.

16          AUSA KIRKPATRICK:  That's correct, Your Honor.

17          THE COURT:  All right.  I decline to follow the

18  recommendation that assesses -- I mean, for the low end of the

19  guideline.  And pursuant to the Sentencing Reform Act of 1984,

20  The Court hereby sentences you to a term of imprisonment of 37

21  months.  Upon release from imprisonment, you shall be placed on

22  supervised release for a term of three years.  During this

23  three-year period, you have to comply with all standard and

24  mandatory conditions of supervised release that include that you

25  are not to violate the law, state, federal or local.  If you are


        Captured and Transcribed by Computer - Eclipse

◻                                                          132

1  deported, because you lose your resident alien status,

2  understand that if you violate the law, you can be brought back

3  into court in connection with this case and be ordered to serve

4  more time in prison.  Do you understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  If you get a term of imprisonment in a new

7  case, the result may be that you serve the sentence in this case

8  and the sentence in that case consecutive to each other.  Do you

9  understand that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  If you return to this country illegally if

12  your resident alien status is revoked, the sentence that you

13  face in that case may be greater than the sentence that you are

14  facing today for this offense.  Do you understand that?
                    Page 119

21ja03d_Cruz-Trejo.txt

15        THE DEFENDANT:  Yes.

16        THE COURT:  All right.  The conditions shall also

17   include that you are not to possess a firearm or other

18   destructive device and you are not to illegally possess or

19   illegally use a controlled substance.  And again, you are not to

20   re-enter the United States illegally.

21        The Court finds that you do not have the ability to pay a

22   fine and therefore waives the imposition of a fine.  However,

23   The Court does impose a special assessment of $100, which The

24   Court will order remitted should the Government move to do so

25   based upon your indigency if, in fact, you are deported.


            Captured and Transcribed by Computer - Eclipse

☐
                                                          133

1         AUSA KIRKPATRICK:  The Government so moves, Your Honor.

2    I was just made aware of a point.  Apparently the range was 27

3    to 33 months, Your Honor.

4         THE COURT:  What did I say?

5         AUSA KIRKPATRICK:  37.

6         THE COURT:  Well, that was my mistake because I saw

7    seven in there, but I modify that sentence to be 33 months.

8         Sir, this sentence is in conformance with the Sentencing

9    Reform Act of 1984 and as justification for this sentence The

10   Court adopts the findings in the presentence report as well as

11   the evidence that's been received in testimony today that

12   supports The Court's sustaining the objections to the

13   presentence report made by your attorney.

14        The law does provide that you have a right to appeal your

15   sentence and you can do so even though you are indigent, but you

16   must give notice of that intention within 10 days.

17        Anything else?
                              Page 120

21ja03d_Cruz-Trejo.txt

18          AUSA KIRKPATRICK:  Your Honor, the -- no, I'm sorry,

19    there are no additional counts to be dismissed.

20          THE COURT:  Motion's granted and you are excused.

21          MR. PULLEN:  Thank you, Your Honor.

22          THE COURT:  Mr. Villarreal, are you ready to proceed?

23          MR. VILLARREAL:  I am, Your Honor.  Okay.  The Court now

24    again convenes Cause No. 02-CR-377-09, The United States of

25    America versus Juan Olvera Martinez.


            Captured and Transcribed by Computer - Eclipse

                                                              134

1     .   I guess basically what I wanted to find out is whether there

2    was anything you wanted to --

3          MR. VILLARREAL:  Yes, Your Honor, I just talked to the

4    probation office and I finally got ahold of the recommendation

5    in the revocation.  I tried getting ahold of it yesterday and

6    today and I finally got to see a copy of it for the revocation

7    purposes.  I have explained the presentence report to him in

8    regard to the conspiracy charges for which he is accused of

9    along with the other co-defendants.  And I also read the letter

10    that he wrote to The Court.  I've spoken to my client.  I asked

11    him if he wants me to still continue representing him.  He says

12    yes.  He says the reason that he wrote this was because he was

13    upset at me till then through October of last year.  And ever

14    since, he's been happy with my assistance and with my

15    counselling.  So, I believe he still wants me to represent him.

16    And basically the letter was written at a very -- he was in an

17    emotional instability, he was very upset.

18          THE COURT:  All right.  Sir -- and I'm not saying that I

19    would allow you to change attorneys at this point even if you

20    were unhappy with him, but is what Mr. Villarreal is telling me

                              Page 121

21ja03d_Cruz-Trejo.txt

21  what you have told him, as well?

22      THE DEFENDANT:  Well, for what is the reason on there

23  for him to continue and to see where we will arrive to.

24  According to what I wrote in the paper and what he said, it's

25  fine.


         Captured and Transcribed by Computer - Eclipse

                                                            135

1       THE COURT:  Okay.  I just don't want you to come back

2   later and say well, you know, I was never allowed to say

3   anything; that you were -- you know, made you do something that

4   you didn't want to do and so, you know, I have found you guilty

5   and -- but, you know, this was a plea that was taken before the

6   Magistrate Judge and you were given the opportunity to tell the

7   judge there if you understood what was happening and whether

8   anybody was forcing you to plead guilty, whether you were doing

9   it for any other reason other than the fact that you were

10  guilty.  Are you telling me that that is the case, that you --

11  the reason you pled guilty was because you are guilty?

12      THE DEFENDANT:  Yes, ma'am.

13      THE COURT:  Is anybody forcing you to plead guilty or to

14  do anything that you don't want to do in connection with this

15  case?

16      THE DEFENDANT:  No.

17      THE COURT:  All right then.  Mrs. Kirkpatrick, if you

18  will recite the agreement with this defendant.

19      AUSA KIRKPATRICK:  Yes, Your Honor.  In exchange for the

20  Defendant's plea of guilty to Count No. 5, which was the

21  substantive transporting count --

22      THE COURT:  Okay.  I'm sorry, I understood it was Count

23  No. 3.

                    Page 122

21ja03d_Cruz-Trejo.txt

24          AUSA KIRKPATRICK:  I'm sorry, I stand corrected.  It was

25     Count No. 3.  As well as his waiver of appeal rights outlined


          Captured and Transcribed by Computer - Eclipse

□
                                                              136

1     within the plea agreement, the Government hereby recommends that

2     the Defendant be given full credit for acceptance of

3     responsibility, be sentenced at the bottom of the guideline

4     level for which he scores, and the Government hereby recommends

5     to The Court that the Defendant's relevant conduct be limited

6     under 100 aliens and the Defendant be given four points in his

7     favor for his minimal role in the offense.  Furthermore, the

8     Government will move to dismiss the remaining counts at the time

9     of the Defendant's pronounced sentence.

10          THE COURT:  Mr. Villarreal?

11          MR. VILLARREAL:  Your Honor, we have three objections.

12     The first --

13          THE COURT:  And you did review the presentence report

14     with your client?

15          MR. VILLARREAL:  I did, Your Honor.  I reviewed it a few

16     days ago with him.

17          First one is the plea agreement.  We stipulated that he

18     transported less than a hundred aliens.

19          Second, when I asked on cross-examination Agent Torres how

20     many people have identified my client, Agent Torres said only

21     three people possibly identified him, and, that the agent knows

22     of, he's only transported six illegal aliens.  So, we'd ask The

23     Court to take into consideration the plea agreement, but also to

24     strongly consider the possibility of the downward departure on

25     the number of illegal aliens.  The plea agreement says under a

                              Page 123

21ja03d_Cruz-Trejo.txt

Captured and Transcribed by Computer - Eclipse

137

1    hundred, but I would venture to say, Your Honor, that the
2    evidence would not show that he transported more than 24 illegal
3    aliens.  He was captured with six illegal aliens and I believe
4    that the presentence report, to a certain point, misinterprets
5    my client's participation.  It is pretty clear from Agent
6    Torres's testimony that my client participated on four months,
7    which were March, April, May and June of 2002.  And the
8    presentence report takes into consideration those illegal aliens
9    that were captured prior to my client's participation and the
10   rules do not permit for that.  In addition, Mrs. Kirkpatrick
11   stated earlier that he might have been caught with -- he might
12   account for three loads.  We took the average of six loads that
13   he was caught with, times three, that would put him around 18
14   aliens.  That's so far away from 24.  So, we had ask this court
15   to please consider a downward departure from the actual plea
16   agreement to actually only give him three points for the number
17   of aliens as opposed to nine points which are recommended by the
18   presentence report.
19       The plea agreement actually agrees on six, but I think he
20   shouldn't -- this case doesn't warrant more than three points.
21   That's my first objection, Your Honor.
22       My second objection again concentrates on the fact that
23   Agent Torres contributes his participation to the months of
24   March, April, May and June.  The below freezing temperature,
25   that occurred in February.  My client was not part of the

Captured and Transcribed by Computer - Eclipse

138

21ja03d_Cruz-Trejo.txt

1    conspiracy then, and, therefore, he should not be attributed two

2    extra points for exposing illegal aliens to harsh environments.

3        Third of all, Your Honor, and my last objection is that the

4    presentence report fails to take into consideration the fact

5    that we've entered a plea agreement that my client's

6    participation was minimal and it fails to deduct four points

7    that we have asked for.  During my cross-examination of Agent

8    Torres, my last question to him was Do you consider my client's

9    participation to be minimal?  And I believe he stated that he

10   did think that my client's participation was minimal.

11       All in all, Your Honor, my calculations would lead me to

12   believe that he should not be awarded more than eight points for

13   his -- not more than eight points to be attributed to him, Your

14   Honor.

15       THE COURT:  Mrs. Kirkpatrick?

16       AUSA KIRKPATRICK:  Your Honor, in regards to the

17   numbers, the Government does, in fact, stand by its

18   recommendation that this defendant be limited to some of aliens

19   under a hundred.  We do realize that the Defendant's -- the

20   scope of the Defendant's involvement in the conspiracy is

21   limited to a few months.  We were told by witnesses numbers one

22   and two that the Defendant was driving for the organization.  We

23   do not have a number assessed to that, but we were told that he

24   didn't make too many trips.

25       Also, Your Honor, during the deposition of Mr. Taboada, he,


              Captured and Transcribed by Computer - Eclipse

□

1    in fact, indicated that this defendant had picked him up on a

2    previous occasion and identified him out of the courtroom.  We

3    would argue that based on the average number of people that are

21ja03d_Cruz-Trejo.txt

4    moved by this organization, that does place the Defendant well

5    over 25; however, because of the Defendant's limited involvement

6    we would argue that it would, in fact, probably place him at a

7    level under 100 actual aliens that this defendant was, in fact,

8    participated in.  So that is why we made the plea agreement,

9    Your Honor, and understand the law of conspiracy and we could be

10   held for, but we believe that this defendant had a very minimal

11   participation.  We do have evidence from witnesses one and two

12   that further stated that this defendant was working as a

13   mechanic initially.  Also, I believe was doing yard work or

14   something for Mr. Alfonso Garcia-Coronado.  And that his primary

15   purpose for being involved in the organization was not

16   necessarily to transport aliens, but he did get recruited on

17   several occasions.

18           THE COURT:  Okay.

19           MR. VILLARREAL:  Your Honor, may I respond?

20           THE COURT:  Sure.  I had a question, but go ahead, you

21   may touch upon what I had a question about.

22           MR. VILLARREAL:  The testimony offered by Mr. Taboada,

23   it was testimony that was offered by an individual who

24   previously transported illegal aliens and then was released and

25   I think that's a completely biased opinion and the witness

·Captured and Transcribed by Computer - Eclipse

⬚

                                                           140

1    lacked credibility because he had been released on mistake by

2    Mr. Torres.  And Mr. Torres admitted to mistakenly releasing

3    him.  So, I would challenge what Mr. Taboada would say about my

4    client participating in this conspiracy prior to March.

5           The neutral, I would call, aliens that were deposed said

6    that they had only seen him once.  And the presentence report

                          Page 126

21ja03d_Cruz-Trejo.txt

7    does state that as far as they're concerned, as far as they

8    know, my client was only involved for four months.

9        My other point, Your Honor, is I think the presentence

10   report commits a fatal error in trying to attribute all of the

11   aliens that were captured to my client.  I think they failed

12   to -- the sentencing guidelines are confusing enough, I think,

13   but as far as the relevant conduct of my client, he should not

14   be held responsible for the aliens that were captured when he

15   was not around or dealings that he wasn't involved with.  If I

16   may, Your Honor, I've highlighted a two sentence paragraph from

17   the sentencing guidelines which demonstrates how the relevant

18   conduct works when it comes to sentencing.  And my point of

19   reading it is to show how the presentence report is in error.

20   And if I may, Your Honor, with your permission I'd like to read

21   it.  It says, "Defendant R recruits Defendant S to distribute

22   500 grams of cocaine."  R recruits S.  "Defendant S knows that

23   Defendant R is a prime figure in this conspiracy involving

24   importing much larger quantities of cocaine.  As long as

25   Defendant S agreement and conduct is limited to distribution of

Captured and Transcribed by Computer - Eclipse

0

141

1    500 grams, Defendant S is accountable only for those 500 grams

2    and he may not be held accountable for a larger quantity

3    imported by Defendant R."

4        What I'm arguing, Your Honor, is he can only be held

5    accountable for the aliens that he transported and that he was

6    directly engaged with with this co-defendant.  He cannot be held

7    responsible for aliens that were transported when he was not

8    present.  And in this case, Your Honor, it is six.

9        THE COURT:  I'm gonna sustain the objection regarding

Page 127

21ja03d_Cruz-Trejo.txt

10   the less than 100 number in that, you know, since his

11   participation was limited to four months and it was assessed --

12   his role was assessed as a minimal role which, you know, I'll

13   accept that recommendation, as well; so, you know, although

14   there's a possibility that it would have been greater than the

15   25 or -- I guess greater than 24 -- from 25 to less than a

16   hundred -- there's really no solid evidence against him given

17   the fact that he was, I guess in a way, I mean placed in a

18   situation where he was made to fell beholding to his employer's

19   father.  And, you know, I guess the fact that he was left in

20   very horrible conditions, as well.  One, he was living there.  I

21   guess I'm just gonna do that just to placate myself because I

22   was concerned, too, about the circumstances under which he was

23   being housed by this family.  So that objection is also

24   sustained.  Again, but it will be less than 25 that I will find

25   that his relevant conduct to be responsible for.


            Captured and Transcribed by Computer - Eclipse

0

                                                            142

1         MR. VILLARREAL:  I guess the issue on the -- if I may,

2   Your Honor, on the adjustment -- well, on the victim related

3   adjustment, the harsh conditions, the below-freezing temperature

4   in February.

5         THE COURT:  Okay.

6         MR. VILLARREAL:  They've added two points.

7         THE COURT:  Oh, yeah.  But see, if he was also involved

8   in transporting, you know, it seems to me that it is logical

9   that he was involved in the transporting under the

10   circumstances.  There were two means by which defendants were

11   assessed the substantial risk of death or serious bodily injury.

12   Was the weather and the other was the method of transportation.

                         Page 128

21ja03d_Cruz-Trejo.txt

13    And so, you know, there's -- I mean, logical for me to infer

14    that he was knowledgeable about the circumstances under which

15    they were transported; so, that objection to this exposure to

16    substantial injury or, you know, risk of death or substantial

17    bodily injury is -- I think it is appropriate to give him those

18    points; so, that objection's overruled.

19              MR. VILLARREAL:  Okay, Your Honor.

20              THE COURT:  All right.  Then can somebody tell me what

21    the calculations would place us at?

22              MR. VILLARREAL:  I believe that would be 10 months, Your

23    Honor.

24              AUSA KIRKPATRICK:  Your Honor, I believe that that would

25    be 12 to 18 months.  Let me just verify that again, Your Honor.


              Captured and Transcribed by Computer - Eclipse

1              MR. VILLARREAL:  I get 10 to 16 months, Your Honor.

2              AUSA KIRKPATRICK:  Yes, Your Honor.  With the addition

3    of the three points for the six to 24 aliens plus two additional

4    points for the reckless endangerment, that brings the base

5    offense level up to 17, minus the four for minimal participant

6    takes the offense level to 13.  When it is under 15 -- when it

7    is under 16, there are only two points subtracted for

8    acceptance; so, that takes us to a base offense level of 11,

9    Your Honor --

10             THE COURT:  What's the bottom line?

11             AUSA KIRKPATRICK:  12 to 18.  Mr. Salas; is that

12   correct?

13             PROBATION OFFICER:  Yes, ma'am.

14             MR. VILLARREAL:  I would rather they take the --

15             THE COURT:  Well, I know what you would rather.

21ja03d_Cruz-Trejo.txt

16          MR. VILLARREAL:  -- calculation minus two.  Why don't we

17     take the minus three?

18          PROBATION OFFICER:  The guideline does not allow minus

19     three when the resulting offense level is under 16.  In this

20     case it is 13 -- I'm sorry -- yes, 13; so it does subtract two

21     only.

22          AUSA KIRKPATRICK:  That's correct, Your Honor.

23          MR. VILLARREAL:  Your Honor, we'd ask that you sentence

24     my client to the bottom of that range, just 12 months.

25          THE COURT:  All right.  Sir, anything you wish to say to

                Captured and Transcribed by Computer - Eclipse

☐
                                                              144

1      The Court?

2           THE DEFENDANT:  I wanted to ask the Government for their

3      forgiveness and to you, Your Honor, especially. ·I wish to ask

4      forgiveness for everything and I would like to be sent if Your

5      Honor allows me to be sent to a prison where I can be of help to

6      people in need.  That's all, Your Honor.

7           MR. VILLARREAL:  Your Honor, if The Court would consider

8      granting 12 months, we'd ask that it be 12 months and a day.

9           THE COURT:  Not if he's on probation for something I'm

10     revoking it.  So, sir, pursuant to the Sentencing Reform Act of

11     1984, in Cause No. 02-CR-377-09, The Court hereby sentences you

12     to a term of imprisonment of 12 months.  The Court, having

13     revoked your term of probation in Cause No. 01-M-884, The Court

14     hereby sentences you to a term of probation of six months.  Said

15     sentence is ordered to run consecutive to the sentence in Cause

16     No. 02-CR-377.

17          Upon supervised release from imprisonment, The Court orders

18     a term of supervised release of three years without supervision.

                              Page 130

21ja03d_Cruz-Trejo.txt

19    That means that should you be -- I mean, when you are deported,

20    you still have to comply with the conditions that include that

21    you are not to violate the law, state, federal or local.  If you

22    do violate the law, state, federal or local, you are subject to

23    being brought back into court in connection with this case and

24    order -- and I may order more time in prison for this case.  Do

25    you understand that?


            Captured and Transcribed by Computer - Eclipse

⬚                                                                    145

1              THE DEFENDANT:  Yes, ma'am.

2              THE COURT:  And that if you get convicted of a new

3    offense, the sentence in that case may very well be ordered to

4    be served consecutively to the sentence I would order in this

5    revocation if I do that.  Do you understand that?

6              THE DEFENDANT:  Yes, ma'am.

7              THE COURT:  And if you return to the United States

8    illegally, the sentence that you face in -- at that time, may be

9    greater than the 12 to 18 months that you are facing today.  Do

10   you understand that?

11             THE DEFENDANT:  Yes, ma'am.

12             MR. VILLARREAL:  Your Honor, I would just like to make

13   sure he will get credit for time served.

14             THE COURT:  Yes, he will get credit for time served.

15        Sir, these sentences -- I'm sorry, the conditions shall also

16   include that you are to possess a firearm or other destructive

17   device and that your not to illegally possess a controlled

18   substance or illegally use a controlled substance and you shall

19   not re-enter the United States illegally.

20        The Court finds that you do not have the ability to pay a

21   fine and therefore waives the imposition of a fine.  However,

                        Page 131

21ja03d_Cruz-Trejo.txt
25    have witnesses waiting at my office.


        Captured and Transcribed by Computer - Eclipse

                                                    147

1           THE COURT:  Okay.

2           MR. TROIANI:  I would prefer Thursday, if possible.

3           THE COURT:  Mr. Cardenas, what about you?

4           MR. CARDENAS:  I don't care.

5           THE COURT:  Do I have anything Thursday.

6           AUSA HOFFMAN:  Your Honor, I have a sentencing before

7    Judge Hinojosa on Thursday.

8           THE COURT:  Okay.  That's for Mr. Troiani's case?

9           MR. TROIANI:  Yes, Your Honor.

10          THE COURT:  Do you think your case will take all day in

11   front of Judge Hanen?

12          MR. TROIANI:  I think that it would take the majority of

13   the morning.  I don't think it would take the afternoon if The

14   Court would call us in the afternoon.  If I can check my

15   calendar.

16          THE COURT:  Okay.  Why don't you get together with the

17   case manager and if you got something in the morning on

18   Thursday, maybe we can do it Thursday afternoon.  I don't know.

19   Why don't y'all get together with her.  Thank you.  We're in

20   recess.

21       (Hearing recessed.)

22                      * * * * * *

23                 JANUARY 22, 2003 PROCEEDINGS

24                      * * * * * *

25          THE COURT:  All right.  All right.  Mr. Troiani, have


        Captured and Transcribed by Computer - Eclipse

                   Page 133

21ja03d_Cruz-Trejo.txt

148

1    you regrouped?

2         MR. TROIANI:  Yes, Your Honor.  I guess I have as much

3    as can be expected.

4         THE COURT:  Okay.  Then at this time The Court again

5    calls Cause No. 02-CR-377-01, The United States of America

6    versus Alfonso Garcia-Coronado and at this time The Court will

7    be calling this case for hearing of the report and

8    recommendation of the Magistrate judge on guilt or the

9    Defendant's plea of guilty as well as thereafter the sentencing,

10   and then the third part being the issue of forfeiture which I

11   understood that you had -- the Government had other evidence to

12   submit to The Court for consideration.  But I'll first start off

13   with the report and recommendation of the Magistrate judge.  Is

14   there any objection by the Government?

15        AUSA KIRKPATRICK:  None from the Government, Your Honor.

16        THE COURT:  By the Defendant?

17        MR. TROIANI:  None from the Defendant, Your Honor.

18        THE COURT:  Then, the report is approved and adopted by

19   The Court and the and the Defendant's plea of guilty is accepted

20   and based upon the evidence in the record at re-arraignment and

21   the Defendant's plea of guilty, The Court finds that the

22   defendant, Alfonso Garcia-Coronado, is guilty of the conspiracy

23   to conspiracy to transport and harbor certain aliens within the

24   United States for private financial gain as alleged in Count One

25   of this indictment, and possession of a firearm by a convicted

Captured and Transcribed by Computer - Eclipse

149

1    felon as alleged in Count Seven of this indictment.  The Court

2    having found the defendant guilty, will now proceed with
                              Page 134

21ja03d_Cruz-Trejo.txt

3    sentencing.

4        Mr. Troiani, have you reviewed the presentence report with

5    your client?

6            MR. TROIANI:  I have, Your Honor.

7            THE COURT:  And you have indicated that there are

8    objections; is that correct?

9            MR. TROIANI:  Yes, Your Honor, we have filed objections

10   to the Presentence Investigation Report and the objections deal

11   specifically with the number of aliens alleged in the PSI, and

12   then the second issue that we have objected to was the issue of

13   endangerment.

14           THE COURT:  Okay.  Since there's a plea agreement, I'll

15   allow the Government to now summarize the plea agreement.

16           AUSA KIRKPATRICK:  Your Honor, in exchange for the

17   Defendant's pleas of guilty to Count No. One, as well as Count

18   No. Seven and his waiver of appeal rights as outlined within the

19   plea agreement, the Government hereby recommends that he be

20   given full credit for acceptance of responsibility and we agree

21   that we will not seek an upward departure as to this defendant

22   for the number of aliens involved.

23       Furthermore, the Government will move to dismiss the

24   remaining counts at the time the sentencing is pronounced.

25           THE COURT:  Mr. Troiani you may address The Court on


             Captured and Transcribed by Computer - Eclipse

☐
                                                         150

1    your objections.

2            MR. TROIANI:  Your Honor, at the --

3            THE COURT:  Excuse me.  One, on the objection, and two,

4    on whether the Government -- I mean The Court will accept the

5    recommendation regarding the upward departure.
                         Page 135

21ja03d_Cruz-Trejo.txt

6          MR. TROIANI: Yes, Your Honor. First, on the

7    objections, the first objection that we had presented in our --

8    to The Court was to the number of aliens as submitted by the

9    Government in the PSI.  The reason that we're objecting to the

10   number is that the Government -- and I believe to a certain

11   extent the Probation Office -- has been unable to demonstrate

12   the number of aliens that were transmitted through Alfonso

13   Garcia-Coronado.  Okay.  Because, as was stated by the agent,

14   Mr. Torres, the other day, there are numbers of organizations

15   along the Rio Grande Valley.  The issue of a conspiracy involves

16   an agreement to enter into this transaction for the benefit of

17   the Defendant and to commit some sort of criminal act.  He did

18   not -- and as stated by the agent yesterday, illegals are moved

19   north by various organizations.  And whether or not an

20   individual receives remuneration for the illegal is dependent

21   upon whether or not it goes through his hands, okay, or the

22   hands of his underlings.  Okay.  And in this case, the agent

23   said that it would be speculation to determine the quantity of

24   individuals that went from the Infantes, which was his source

25   organization, through Mr. Alfonso Garcia-Coronado.  He stated

Captured and Transcribed by Computer - Eclipse

0

                                                              151

1    that -- and if The Court would look at Page 2 of my objections

2    to The Court, Paragraph 4, specifically, "Evidence that is

3    speculative or unsupported or unreliable should not be

4    standard."  I understand there's a lower burden at sentencing

5    and my client has pled guilty to the crime of transporting

6    illegal aliens.  It has to do with the number of aliens.

7          And repeatedly, Mr. Torres stated that he could not provide

8    a number of aliens that was transported by this organization and

                                Page 136

21ja03d_Cruz-Trejo.txt

9    that any attempt to do so from the Infantes or other

10   organizations would be speculation, and I believe he even said

11   conjecture.

12        The numbers -- and if I may approach the easel, Your Honor?

13            THE COURT:  Yes.

14            MR. TROIANI:  The number of verifiable illegal aliens

15   according to the Government was 116.  This is the hard number

16   that they said they could identify.  But then once on

17   cross-examination, Agent Torres indicated that 25 were

18   speculation -- they was his exact quote -- would be speculation

19   as to the -- as to these 25 aliens.  If you took the 25 from

20   116, you're down to 91.  That's under a hundred aliens that can

21   be determined by the Government.  The agents themselves moved

22   40.

23        Now, as we continue on with the -- as we continue on with

24   the objections, Paragraph 7 of Defendant's objections indicates

25   that "agents and informants should not be considered as

Captured and Transcribed by Computer - Eclipse

1    participants."  And we cite U.S. versus Fells, 920 F.2nd, 1179.

2        In here the agents had no intent to continue on with the

3    conspiracy, had no intent to commit an illegal act.  We submit

4    to The Court that those 40 individuals should not be included in

5    the totally number of illegal aliens moved by the Garcia

6    organization.

7        And when we say organization, from the testimony of Mr.

8    Torres and the testimony of Mr. Taboada, these are not

9    organizations such as an integrated organization like you would

10   find in a drug trafficking institution.  Mr. Taboada, when put

11   on cross-examination, even on direct examination, indicated if

Page 137

21ja03d_Cruz-Trejo.txt

12    Mr. Garcia was not available, he would use another individual.

13    Okay. And that it was simply a matter of being able to

14    communicate with Mr. Garcia. And that he did not give Mr.

15    Garcia advanced notice of the arrival of aliens from the border

16    area. Okay. There's no evidence to indicate that the other

17    smugglers -- the Infantes operated in any other fashion. And

18    actually, the testimony of the case agent in this case,

19    indicated that those individuals moved to others -- other than

20    Mr. Garcia and the PSI report indicates that the Infantes who

21    not -- and the Government will agree with this -- the Infantes

22    who were the main source of information for this investigation

23    and are unindicted and are not present in these proceedings.

24    Okay.

25            THE COURT:  I think they're indicted, but not arrested.


            Captured and Transcribed by Computer - Eclipse

☐
                                                              153

1            MR. TROIANI:  I'm sorry, Your Honor.  They're

2    unarrested.  They're unarrested co-defendants.  And those

3    individuals form the majority of the contacts with the agents,

4    those individual are at-large and those individuals supplied

5    more than Mr. Alfonso Garcia Coronado.  Okay.

6        Mr. Coronado's organization would include Mr. Olvera and I

7    believe Mr. Niño, from the agent himself.  He indicated that Mr.

8    Celestino Yanez-Flores had his own side operation.  And the

9    agent himself indicated he could not attribute -- he could not

10   attribute or differentiate between the aliens run Mr. Celestino

11   Yanez-Flores individually or with the Garcia organization.

12   Okay.

13       And because of that reason and because if we look at the

14   guidelines, it indicates that if you don't know about or you
                              Page 138

21ja03d_Cruz-Trejo.txt

15   don't receive remuneration for the transport and I think if we

16   look at Section 1D1.3, No.'s 5 and 7, the example given there is

17   "Defendant O is not accountable to the other drug sales made by,

18   in this case, in this example, her boyfriend because those sales

19   were not in furtherance of her jointly undertaken criminal

20   activity.  Okay.

21       And in this case, the agent has indicated that he cannot

22   attribute these other aliens specifically to Mr. Garcia because

23   he's already admitted from the stand that Celestino Yanez-Flores

24   has his own independent operation.  And the Infantes did not

25   solely supply Mr. Garcia-Coronado.  They used other individuals.


                Captured and Transcribed by Computer - Eclipse

☐
                                                                 154

1    And he could not, from the stand, give you or us any kind of

2    breakdown on which aliens would have been attributed to him --

3    to my client from those aliens coming up from the Infantes.  And

4    I think if we look at Mr. Taboada's deposition, that that's a

5    very accurate description of how this works.

6        Individual would come up north.  They'll look for someone to

7    get them to the next point and they'll go with who's available.

8    And I think that kind of dovetails into our argument regarding

9    the endangerment issue.  Because there's a complaint that people

10   were hauled around in pickup trucks before they got to Mr.

11   Garcia-Coronado.  Well, he didn't have any control over how the

12   people were moved to his section or his organization, nor does

13   he have any idea how that's going on.  But once they're in his

14   grasp, then he's responsible for them.  And then he should be

15   held accountable for what happens, once they're in his grasp and

16   Mr. Yanez-Flores indicated -- Mr. Taboada indicated that it

17   would take five to eight hours on occasion for Mr. Garcia to

                             Page 139

21ja03d_Cruz-Trejo.txt

18    arrive to assist him when he dealt with him.

19        And I think that the Government's estimates where they start

20    talking about 2,370 or where these other numbers where they

21    start projections are simply that, projections, Your Honor, that

22    are unverifiable.  They are conjecture and they are speculation

23    because, there's no way to target which organizations actually

24    moved this.  Was this the Infantes, was this Adonia Anna was

25    this another part of the Celestino Yanez organization or was it


        Captured and Transcribed by Computer - Eclipse

0
                                                                155

1    the responsibility Mr. Garcia-Coronado.  It is essentially

2    trying to attribute -- how can I explain this -- essentially if

3    you take it exponentially, the Government could essentially, by

4    their argument, hold Mr. Garcia-Coronado responsible for every

5    illegal alien that came into the south Texas region, because

6    based on what we have in the PSI.  Because if you look at 1B135,

7    they have not been able to show that he received any kind of

8    financial remuneration and it wasn't -- those other actions were

9    in furtherance of this jointly undertaken activity.

10        Now, if you look at No. 7, it talks about the agreement

11    portion and the agreement and conduct of limited distribution,

12    and No. 7, of the smaller amount, because that's what those

13    parties entered into.  Not the larger amount that may have been

14    moved by other individuals or other organizations unbeknownst to

15    Mr. Alfonso Garcia-Coronado.  And if you look at the projections

16    as to the monies that were provided by the Government.  And I

17    asked the case agent about this.  No actual receipts were

18    provided.  And I attached to my and I believe to The Court's and

19    the U.S. Attorney's Offices copies of the motion or objections.

20    No receipts, actual receipts, were provided for Mr. Alfonso
                            Page 140

21ja03d_Cruz-Trejo.txt

21  Garcia.  There are simply names and names.  None were provided

22  for Maria Garcia Cardenas.  There is Celestino Yanez-Flores and

23  there's those numbers provided for Natividad Flores and Orlando

24  Esquivel, but all of those numbers were included in the final

25  tabulations and there's no supporting evidence for those

Captured and Transcribed by Computer - Eclipse

156

1  numbers.  The agent talked about witnesses one, two, or three

2  and he admitted that none of that information had been provided

3  prior to the completion of discovery or at any point to the

4  defense counsel.  And based on that and the agent's own

5  statements throughout there and the case law, Your Honor, we

6  would ask that The Court find that there was less than 100

7  aliens transported by Mr. Alfonso Garcia-Coronado based on the

8  demonstrateble evidence, and then if The Court would like me to

9  I'll start talking about the endangerment issue.

10          THE COURT:  Go ahead.

11          MR. TROIANI:  Okay.  As far as the endangerment issue,

12  Your Honor, the testimony of Mr. Taboada, which has been

13  provided to The Court I believe yesterday, indicated that the

14  number of aliens that he transported was between three and six.

15      At the time that he was deposed, he indicated that they

16  traveled in the cab of an extended cab truck, not in the bed of

17  the truck.  Okay?  I don't believe that there's been any

18  testimony or information provided that these individuals, once

19  in the control of the Alfonso Garcia-Coronado organization,

20  actually were in the bed.  I believe the agents themselves

21  indicated that they used a van.  I believe the agents would

22  agree that the Alfonso Garcia-Coronado's vehicle is an extended

23  cab pickup truck which has space in the back of the truck.  I

Page 141

21ja03d_Cruz-Trejo.txt

24    believe that the other vehicles used by the organization were of

25    a similar type.  So that there would have been space for -- and

          Captured and Transcribed by Computer - Eclipse

157

1    I believe the largest number of aliens indicated moved was six

2    that was confirmed.  There was talk of a group of 15 waiting,

3    but there's more than one vehicle in this organization.  There's

4    no direct evidence or no evidence that is not hearsay upon

5    hearsay that Mr. Garcia-Coronado actually moved the individuals

6    in open-bed pickup trucks.  The issue as to the cold that is

7    subjective as to the cold.  Obviously, Mr. Jose Cruz-Trejo

8    called.  We don't know what time of the night or day that he

9    called to be picked up.  We don't know what the temperature was

10    at that time.  If you look at the National Weather Service

11    documentation, there's a broad range of temperatures on that

12    time during that time frame.  And there's no indication that

13    these individuals were suffered, were ill-equipped, et cetera.

14    That information though, the speculative or inferred, cannot be

15    supported by the record, Your Honor.

16          THE COURT:  Okay.  Anything else?

17          MR. TROIANI:  If The Court would like to -- if I can

18    refrain as far as the portion as to why The Court should follow

19    the plea bargain agreement.

20          THE COURT:  All right.

21          MR. TROIANI:  Your Honor, I would ask The Court to

22    follow the plea bargain agreement because in entering into that

23    plea bargain agreement, Mr. Alfonso Garcia-Coronado agreed to

24    his culpability, he accepted responsibility for his actions.  He

25    did not put the Government to the burden of proof as to his

Page 142

21ja03d_Cruz-Trejo.txt

Captured and Transcribed by Computer - Eclipse

158

1    guilt or innocence.  He agreed to waive the appeal of his guilt

2    or innocence.  He acknowledges his activity as a transporter of

3    illegal aliens and he also accepted responsibility for his own

4    actions in this organization.

5        We are only objecting as to the number of aliens here.  We

6    understand that Mr. Garcia had at least two other individuals

7    directly under his control.  We put issue to whether or not they

8    moved the number of aliens that the Government is alluding to as

9    highly speculative and conjecture, and that Mr. Alfonso

10   Garcia-Coronado, on the evening where they are also talking

11   about the aliens being out in the cold, I believe it was --

12   would have been impossible for him to arrive in a timely fashion

13   based on the fact that the Government itself has said that his

14   vehicle was broken down.  Even had he wanted to arrive in a

15   timely fashion, it would have been nearly impossible for that.

16   And as far as the pickup truck issue, there is no evidence that

17   while in the control of Mr. Alfonso Garcia-Coronado that they

18   were driven around in the bed.  There is evidence, and it is

19   from the witness stand in this case, from Mr. Taboada, that the

20   aliens were in the cab and the organization has more than one

21   vehicle.

22       THE COURT:  Mrs. Kirkpatrick?

23       AUSA KIRKPATRICK:  Your Honor, first of all, the

24   Government would argue that what defense counsel just stated in

25   regards to the fact Mr. Garcia-Coronado could have never arrived

Captured and Transcribed by Computer - Eclipse

159

Page 143

21ja03d_Cruz-Trejo.txt

1   there in timely fashion is precisely the point.  Those aliens

2   were out there on one of the coldest nights of the year

3   expecting to be picked up by this man and he was nowhere near an

4   area where he could even be there within two hours.  He had

5   complete disregard for their lives.  He had complete disregard

6   for the people who worked for him.  He would load up 30 aliens

7   in a truck and I would argue against what Mr. Troiani is stating

8   in that six aliens was the lowest amount that any record shows

9   that this man was ever responsible for transporting at one time.

10  Mr. Taboada's case was the exception, not the rule.  Our

11  witnesses have told us that they were sometimes told to drive

12  more than one time a day with up to 30 aliens in a truck.  That

13  they would take out the seats in a dually to load up these 30

14  aliens in one truck.  The trucks were specifically rigged so

15  that you could not tell from a normal standpoint that they were,

16  in fact, loaded down with so much weight.  That sometimes some

17  of our witnesses told us, in fact, when they were driving for

18  Mr. Garcia-Coronado they were exhausted because they had driven

19  to Houston twice in one day.

20      We would argue as far as the number -- if I may have the

21  pointer, Your Honor, I believe the -- may I approach, Your

22  Honor?  As far as the numbers are concerned, Your Honor, this

23  1800 number is from one of many drivers who came forward to us

24  and told us, "Yes, I drove 1800 aliens for Alfonso

25  Garcia-Coronado."


             Captured and Transcribed by Computer - Eclipse

0

                                                        160

1       Witness No. 2 tells us, "Yes, I drove 400 aliens for Alfonso

2   Garcia-Coronado."

3       Witness No. 3 stated, "I drove 150 aliens for Alfonso

                         Page 144

21ja03d_Cruz-Trejo.txt

4    Garcia-Coronado and I only worked with him for three months."

5        Mr. Taboada stated that he, in fact, contacted Mr. Alfonso

6    Garcia-Coronado for 20 aliens.  If you add that amount to the

7    amount above where we can actually corroborate with physical

8    human being aliens that we have seen, we're talking at least

9    2,486 aliens.  Your Honor, those are just from several

10   witnesses.  We know the scope of the organization is far beyond

11   that.  In fact, when we interviewed Witness No. 1, whose

12   testimony was, in fact, during informal discovery, not presented

13   in the form of a report because it was not discoverable at the

14   time, but we indicated to Mr. Troiani and to the Defendant while

15   he was in the presence of his attorney, we had Witness No. 1

16   said 30 aliens per day in a truck with sometimes up to three

17   trucks per pay.  That numbers 21,600 aliens.  That was not for

18   any other organization.  That was with this man, Alfonso

19   Garcia-Coronado.

20       Witness No. 2, when we asked him how many aliens did Alfonso

21   Garcia-Coronado move -- I'm sorry, Your Honor, that would be the

22   number 15,000 right there is the 30 per truck with up to three

23   trucks per day.  And that's just one truck per day.  Counting

24   500 days in the course of the conspiracy, this man's been

25   convicted twice of alien smuggling, our reports.  Kingsville

              Captured and Transcribed by Computer - Eclipse

▯

                                                                161

1    agents have been trying to get this man for years.  We think

2    he's been doing it since day one when he got out of prison.  We

3    indicted him on a conspiracy of a 17-month period.  During that

4    term alone, our witness tells us 15,000 aliens were moved.

5        When we initially started this undercover investigation, our

6    cooperating individual who brought us the most information that

21ja03d_Cruz-Trejo.txt

7    we could to begin this undercover investigation told us we're

8    talking 300 a week easily.  That's 21,600 aliens.

9         Even if you dismiss those two, even if you consider the fact

10   that that's exaggeration or puffing or any sort of hope to get a

11   better recommendation on a sentence because they're giving us

12   bigger numbers, we've had not only Witness No. 3 tell us that

13   through the Adan Infante organization, they gave Mr.

14   Garcia-Coronado 4,320 aliens, approximately 60 aliens per week,

15   and that's the conservative figure, times 72 weeks.  But if you

16   count one other person like the Ramirezes or like the

17   Infantes -- and it is Adan Infante-Ramirez -- like the Infantes,

18   just one other person would lead to a number of 8,640.  And

19   that's actually corroborated.  The 60 per week is actually

20   corroborated by undercover agent testimony and recordings where

21   we have the Infantes indicating that they gave at least 60 per

22   week to Alfonso Garcia-Coronado.  Not only that, Your Honor,

23   we're talking about the Infantes alone are moving 10,800 aliens.

24   We would argue to this court that even if The Court takes into

25   consideration that some of these people may have exaggerated and

Captured and Transcribed by Computer - Eclipse

￿

162

1    takes the most ultraconservative view of what this man could

2    have been responsible for through either indirect or indirect

3    control, 7,000, which is stated as the number in the PSI, is an

4    extraordinarily conservative figure.  And to say that he moved

5    at least 7,000 aliens, the Government argues would not be an

6    exaggeration in any way, shape, or form and would be the

7    ultraconservative argument.

8         Your Honor, in addition to that, we would draw attention to

9    the fact that we're talking about enormous sums of money being

Page 146

21ja03d_Cruz-Trejo.txt

10  transferred back and forth between -- Agent Torres, I would

11  argue against Mr. Troiani stating that Agent Torres said it was

12  speculative and conjecture.  I don't believe Agent Torres ever

13  said those words.  And I think that the testimony of Agent

14  Torres is, in fact, being misconstrued.  This testimony

15  regarding the numbers and regarding all the money is coming from

16  individuals who were actually within the organization.

17       Now, as part of the sentencing, the Government would also

18  argue that The Court may take into consideration the

19  stipulations by other defendants and the fact summary sheets

20  where they state that the organization moved thousands of

21  aliens.  We would also ask The Court to consider the other

22  sentencings of the co-defendants and stipulations and proffers

23  that they made during their sentencings.

24       Your Honor, we would argue this is not speculation.  This

25  is, in fact, coming from direct witness testimony to our agents.

Captured and Transcribed by Computer - Eclipse

0

163

1   It is not being hearsay because it is co-conspirator statements

2   against their own interest and in furtherance of their

3   conspiracy.  The numbers, the amount of money that was

4   transferred, Agent Torres testified, our witnesses have told us,

5   that large sums of money were transferred between Celestino

6   Yanez-Flores and driven down, sent down with drivers to Alfonso

7   Garcia-Coronado.  Not only that, Alfonso Garcia-Coronado drove

8   to Houston once a week to pick up proceeds.  If you count in the

9   amount of money not only from the Western Unions, but the amount

10  of money that the CI, our confidential informant was told that

11  he could expect from the Western Unions, we're talking obscene

12  amounts of money for obscene numbers of aliens.

Page 147

21ja03d_Cruz-Trejo.txt

13    The $300,000 that Mr. Troiani is using to come up with his

14    calculation of three aliens is a small portion of what we can

15    find. A lot of these transactions occur in cash. We did not

16    have the luxury of knowing every Western Union office across the

17    United States that was used or knowing every alias. As

18    evidenced by the testimony yesterday, Western Unions were coming

19    in from every different name. They were contacting our CI and

20    making you go pick these up in your name. We just have the

21    names, the times that those individuals actually used their own

22    names and we have at least $300,000 in that. Your Honor, that's

23    not taking into consideration the fact that a lot of money is

24    paid up front, a lot of money is paid in cash, a lot of money

25    may have been sent to other Western Unions, they may have been

Captured and Transcribed by Computer - Eclipse

0

164

1    given money in kind or payment in kind. The Defendant was found

2    with 25 firearms. Maybe some of those were in kind for alien

3    smuggling, but we'll never be able to know the exact figures of

4    how much money. We can only estimate based on the numbers that

5    we have.

6        Your Honor, we would argue that the fact that Mr. Troiani is

7    minimizing participation of his client and of the seriousness of

8    this organization, we would argue, Your Honor, alien smuggling

9    is a serious issue. It has massive homeland security issues

10   attached to it, bringing in individuals who may have come in --

11   who may come in to commit acts of terrorism in our country is a

12   major concern. And we would submit to The Court that this is a

13   massive large scale alien smuggling organization which brought

14   in thousands of illegal aliens into this country without any

15   sort of inspection by the immigration and naturalization

Page 148

21ja03d_Cruz-Trejo.txt

16    service.  The notice of -- in regards to Mr. Troiani's argument

17    that he was not providing notice of the numbers, we would argue

18    that the PSI does, in fact, give the numbers as well as through

19    an informal discovery.  They were notified that we had a witness

20    who would testify to the 30 aliens were brough with up to three

21    trucks per day.

22        In regards to endangerment, Your Honor, as stated before, we

23    already argued about the temperature and the fact that Mr.

24    Garcia was in no way, shape, or form anywhere near in order to

25    pick up the aliens who were out there in the cold.  We would

            Captured and Transcribed by Computer - Eclipse

                                                            165

1    also argue with the Probation Officer's report that, in fact,

2    his method of transportation.  I believe this court heard the

3    sentencings during Joseph Antonio-Flores sentencing who we have

4    linked through independent evidence the truck and the material

5    witnesses have linked Alfonso Garcia-Coronado to that.  That

6    truck was used in a high-speed chase.  We think that actions

7    such as that are completely foreseeable in this situation and

8    that at that point the aliens were in grave danger.

9        Your Honor, we would argue basically because of the

10    magnitude of this organization, because of the magnitude of this

11    defendant's participation within this organization, because of

12    the massive numbers involved, we would argue that and concur

13    with the recommendation by the Probation Office that this

14    defendant be sentenced to the high end of the guideline range

15    which he faces.

16            THE COURT:  All right.

17            MR. TROIANI:  Your Honor, may I have a brief moment to

18    rebut?

                        Page 149

21ja03d_Cruz-Trejo.txt

19        THE COURT:  Okay.

20        MR. TROIANI:  Your Honor, my client acknowledges the

21   seriousness of this offense.  He's pled guilty to the offense.

22   I understand the seriousness of the offense, as does Mr. Alfonso

23   Garcia-Coronado.  The issues though here have to do with the

24   Government's burden of proving the numbers for sentencing.  And

25   the basis for that here is because of the evidence and if we're

Captured and Transcribed by Computer - Eclipse

166

1    going the look at the aggravating factor, then it should be a

2    clear and convincing standard based on U.S. V. Patterson and

3    also U.S. V. Kirgamura.  And in this case, their own agents have

4    indicated that they cannot differentiate between aliens smuggled

5    by Celestino Yanez-Flores independently or the Infantes

6    independently or Alfonso Garcia-Coronado.

7        THE COURT:  Okay.  You have already said that.

8        MR. TROIANI:  I understand that, but I wanted to

9    reiterate that to The Court.

10       And then also that this new information about an unknown

11   defendant in another case where he was involved in a high-speed

12   pursuit has nothing to do with this PSI.  And if The Court would

13   like at the 2L1.1, smuggling, transporting, harboring or the

14   U.S. Sentencing Guidelines, and if it looks at Note No. 6,

15   regarding reckless conduct, it says, that it should not be

16   considered when you have one endangerment issue.  If it is for

17   flight, then they should not consider it reckless endangerment.

18   And I'm pointing The Court to 2L1.1, Note 6.  And that

19   information is so far from left field that I'm shocked that

20   that -- by that, Your Honor.

21       And again, I would reiterate that it is essentially

Page 150

21ja03d_Cruz-Trejo.txt

22  impossible to differentiate between the different organizations

23  along the border and up further north based on the way these

24  organizations operate.

25      The conspiracy charge that we plead to had to do solely with

Captured and Transcribed by Computer - Eclipse

167

1   his activity and he accepts responsibility for his activity.

2   And we'd ask The Court to consider the plea agreement.  We

3   entered that for the benefit of not only my client, but also

4   benefitted the Government and my client gave up his right to

5   appeal the issue of guilt and innocence in that plea agreement,

6   Your Honor.

7       THE COURT:  All right.  Then the objection's overruled.

8   The Court finds that the scope of and length of the conspiracy

9   was such that the numbers that have been found to be at minimum

10  of the 7,000 as specified in Paragraph 65 would justify the

11  increase of nine levels pursuant to Sentencing Guidelines

12  2L1.1B2C.

13      Further, The Court finds that the evidence regarding the

14  reckless endangerment or the substantial risk of death or

15  serious bodily injury during the scope of the conspiracy is

16  justified that -- or the assessment of the two levels pursuant

17  to 2L1.1B5 in that the testimony has been that in the area where

18  these aliens were staged, that they were subjected to harsh

19  weather conditions on February 26th, 2002.

20      The Court takes judicial notice of the distance between the

21  Corpus Christi National Weather Service temperature and the area

22  generally where the -- these aliens were staged in those

23  circumstances and that would be in the area of 100 miles.  And

24  also that The Court heard testimony from the agents about the

Page 151

21ja03d_Cruz-Trejo.txt

25   temperature being in the mid-20s.  And so on that basis, as well

Captured and Transcribed by Computer - Eclipse

168

1    as on the basis of the method of transportation in extended cab

2    trucks, whether the bed or in the back of the cab itself, does

3    place a person who is unrestrained at a substantial risk of

4    death or serious bodily injury.  And so for that reason, The

5    Court is convinced that the Defendant is entitled -- or that The

6    Court is entitled to add an additional two levels again pursuant

7    to the Sentencing Guideline 2L1.1B5.

8        The Court also takes note of the other adjustments for role

9    in the offense being four for being the leader/organizer, and

10   the fact that there's sufficient evidence to find that he was

11   responsible for recruiting, smuggling, harboring, and

12   transporting approximately 7,500 aliens from the Rio Grande

13   Valley to Houston and beyond.  And so because he was

14   leader/organizer and that -- involved in a criminal activity

15   that involved five or more participants, these levels are

16   increased by four.  And also The Court finds that pursuant to

17   the Sentencing Guideline 2K2.1, that a base offense level of 14

18   is appropriate if the Defendant was a person prohibited from

19   possession of a firearm.  And given that the number of firearms

20   was 25 that were located at his residency, an increase of six

21   levels pursuant to 2K1.1 -- I'm sorry, 2K2.1B1C.  And the

22   multiple -- the combined adjusted offense level then being 31

23   and then the -- an adjustment of three levels for the acceptance

24   of responsibility.  The Court finds then that that -- The Court

25   does accept the recommendation of the Probation Department as

Captured and Transcribed by Computer - Eclipse

Page 152

21ja03d_Cruz-Trejo.txt

169

1   the evidence as appropriate to be considered by The Court in

2   assessing punishment in this case.

3       Sir, is there anything you wish to say to The Court before

4   you are sentenced?

5       THE DEFENDANT:  Yes, ma'am.  Well, just that I feel sad

6   when I look at my family.  I feel bad for the position that I am

7   not that person.

8       MR. TROIANI:  Your Honor, can I talk to my client?

9       (Consultation between Mr. Troiani and the Defendant.)

10      THE COURT:  Go ahead.

11      THE DEFENDANT:  What I was telling you is that I don't

12  feel right because of the position I'm being leader.  I am not

13  the leader that you think.  The only thing I did is whenever

14  they would call me for help, if I could help, I would give it to

15  them.  If they would ask me for help, I would give it to them.

16      And Mr. Torres knows that several of his friends, they would

17  call me on several occasions and I couldn't give them the help

18  and I hope to get your forgiveness, but I am not the leader.

19      THE COURT:  You know, I was very amazed when I was

20  reading the presentence report in that I saw that the

21  information you gave to your probation officer was that you

22  earned only about $800 a month that was your salary, given that

23  there was an estimate of jewelry in the amount of -- that had a

24  value of about $20,000; that you had a credit card debt of

25  3,500; that you had in your house 25 firearms was just totally

Captured and Transcribed by Computer - Eclipse

170

1   inconsistent with what I believe a person with only $800 a month

2   supplemented by what the Probation Department said was $300 from

Page 153

21ja03d_Cruz-Trejo.txt

3   your son who had a mechanic's shop. So, frankly, I don't
4   believe anything you have to say. Maybe I believe that you feel
5   sorry for your family; that you feel sad, I believe that. But I
6   also believe that the evidence that the Government has presented
7   to The Court is more -- gives me more than justification for the
8   sentence I am now prepared to pronounce; that is, that pursuant
9   to the Sentencing Reform Act of 1984, The Court, having found
10  you guilty of Counts One and Seven, The Court hereby sentences
11  you to a term of imprisonment of 120 months as to Count One.
12  And The Court imposes a sentence of 120 months as to Count
13  Seven. Those sentences are ordered to run concurrently with
14  each other.
15      Upon release from imprisonment, you are ordered to serve a
16  term of three years of supervised release as to Count One and
17  three years as to Count Seven. Those terms of supervised
18  release are ordered to run concurrently.
19      The Court assesses a fine of $10,000 as to Count One and a
20  fine of $7,500 as to Count Seven for a total fine of $17,500.
21  The Court further imposes a special assessment of $100 as to
22  Counts One and Seven for a total of $200.
23      The conditions of supervised release include that you are
24  not to -- I'm sorry, that the -- as a basis for this sentence,
25  The Court adopts the findings in the presentence report, as well

Captured and Transcribed by Computer - Eclipse

0

171

1   as the evidence developed during the sentencing hearing for all
2   of the Defendants in this indictment; that is, 02-CR-377. And
3   The Court again, as the condition of supervised release, you are
4   ordered not to illegally possess a controlled substance and to
5   refrain from any unlawful use of a controlled substance, to not
                        Page 154

21ja03d_Cruz-Trejo.txt

6    possess a firearm or other destructive device, and if your

7    resident alien status is revoked, you are -- and deported, you

8    are ordered not to re-enter the United States illegally.

9         The Court orders that the payment of the fine of $17,500 be

10   paid immediately, as well as the special assessment of $200.

11        Sir, this sentence is in conformance with the Sentencing

12   Reform Act of 1984.  Again, as justification for this sentence,

13   The Court adopts the findings in the presentence report, as well

14   as evidence elicited during the sentencing hearing of this case.

15        The law does provide that you have a right to appeal your

16   sentence and you can do so even though you are indigent, but you

17   must give notice of that intention within 10 days.

18        AUSA KIRKPATRICK:  Your Honor, the Government moves to

19   dismiss the remaining counts and would ask The Court permission

20   to proceed with the asset forfeiture.

21        THE COURT:  Yes, the motion's granted.  You may proceed.

22   Do you have other evidence to submit?

23        AUSA KIRKPATRICK:  Your Honor, at this time I'll turn it

24   over to co-counsel, Alan Hoffman.

25        AUSA HOFFMAN:  Briefly, Your Honor.  We would recall


                Captured and Transcribed by Computer - Eclipse

0
                                                              172

1    Agent Torres to the stand.

2         THE COURT:  All right, sir.

3                        CHARLIE TORRES,

4    the witness, having been first duly cautioned and sworn to tell

5    the truth, the whole truth and nothing but the truth, testified

6    as follows:

7                       DIRECT EXAMINATION

8    BY AUSA HOFFMAN:
                        Page 155

21ja03d_Cruz-Trejo.txt

9   Q   Would you please state your full name for the record, sir?

10  A   My name is Charlie Torres.

11  Q   Are you the same Charlie Torres who testified in this case

12  yesterday?

13  A   Yes, sir.

14  Q   And you are the case agent for this case; is that correct?

15  A   Yes, sir, that is correct.

16  Q   As part of your investigation, did you examine the

17  involvement of 172 County Road 1020, Kingsville, Kleberg County,

18  Texas, in its connection with the alien smuggling conspiracy?

19  A   Yes, sir, I did.

20  Q   And is that the resident of defendant Alfonso

21  Garcia-Coronado?

22  A   Yes, sir, it is.

23  Q   And as far as you know, is that his only residence?

24  A   Yes, sir, that's correct.

25  Q   And as a part of this investigation was a Title Search


Captured and Transcribed by Computer - Eclipse

D

173

1   Report of 172 County Road 1020, Kingsville, Kleberg County,

2   Texas obtained?

3   A   Yes, it was, sir.

4       AUSA HOFFMAN:  May I approach the witness, Your Honor?

5       THE COURT:  Yes.

6   BY AUSA HOFFMAN:

7   Q   Mr. Torres, I'm gonna show you what's been marked as

8   Government's Exhibit No. 1 is this the Title Search Report that

9   was prepared for that property as a part of your investigation?

10  A   Yes, sir, it is.

11      AUSA HOFFMAN:  Offer Government's 1, Your Honor.

Page 156

21ja03d_Cruz-Trejo.txt

12        MR. TROIANI:  No objections.

13        THE COURT:  Please stand when you address The Court.

14        MR. TROIANI:  Excuse me, Your Honor.  No objections.

15        THE COURT:  Admitted.

16        AUSA HOFFMAN:  Thank you, Your Honor.

17  BY AUSA HOFFMAN:

18  Q    As a part of your investigation, did you examine telephone

19  calls made to 172 County Road 1020, Kingsville, Kleberg County,

20  Texas, during the period of the conspiracy charged in this case?

21  A    I did, sir.

22  Q    And did you find telephone calls made to that residence from

23  co-conspirators during that time period?

24  A    I did.

25  Q    And did you prepare a chart to help demonstrate the results


           Captured and Transcribed by Computer - Eclipse

                                                              174

1   of your investigation, sir?

2   A    Yes, sir, I did.

3         AUSA HOFFMAN:  Do I have The Court's permission to

4   display that chart, Your Honor.

5         THE COURT:  Yes.

6         AUSA HOFFMAN:  It is already turned.

7   BY AUSA HOFFMAN:

8   Q    Would you -- directing your attention to -- I've never used

9   one of these before -- directing your attention to the chart

10  which is on display there, is that the blowup of the chart that

11  you prepared?

12  A    Yes, sir, that chart right there provides lengthy analysis

13  of the telephone calls made to or from the residence of 172

14  County Road 1020.

                    Page 157

21ja03d_Cruz-Trejo.txt

15  Q    Would you explain this chart for Her Honor?

16  A    Basically, what it does, the lines indicate the length

17  between the Defendant Alfonso Garcia-Coronado, his residence,

18  and co-defendants in this.  There's a little arrow that points

19  which direction the call was made.  It shows the defendant's and

20  the co-defendant's telephone number and name and below in red or

21  in red the dates when the first call was initiated during this

22  contact.

23  Q    So, in essence, calls were made into the residence and calls

24  are made out from co-conspirators and to co-conspirators?

25  A    Yes, sir.  The primary means of communication between Mr.


Captured and Transcribed by Computer - Eclipse

□

175

1   Alfonso Garcia-Coronado and other defendants in this case was

2   cellular telephone, which had a lot of outgoing calls.  At his

3   residence from my analysis here, it indicates that he received a

4   lot of phone calls into his house, but could possibly have

5   answered these calls over the cell phone.

6   Q    I see.  So the incoming -- there were incoming calls to the

7   house and the outgoing calls would be from his cellular

8   telephone?

9   A    Yes, sir.

10  Q    All right.  And now, of course, there was to wiretap or

11  anything like that; so, it was not really known what was

12  discussed except that it is of interest that these calls were

13  coming from co-conspirators and other calls going out to

14  co-conspirators, correct?

15  A    That's correct, sir.

16  Q    And the inference that you draw from that is that these were

17  part conversations connected with the alien smuggling

21ja03d_Cruz-Trejo.txt

18  transaction?

19  A   That is correct, sir.

20  Q   In your investigation, did you also talk with numerous

21  persons who were involved in the alien smuggling conspiracy?

22  A   Yes, I did, sir.

23  Q   And did some of those persons talk you the about the

24  involvement of 172 County Road 1020, Kingsville, Kleberg County,

25  Texas, the Defendant's residence, in the alien smuggling

                Captured and Transcribed by Computer - Eclipse

▯
                                                              176

1   operation?

2   A   Yes, they did, sir.

3          MR. TROIANI:  Your Honor, for purposes of the forfeiture

4   issue, we'll object to hearsay.

5          THE COURT:  Overruled.

6   BY AUSA HOFFMAN:

7   Q   And what did these individuals tell you about the

8   involvement of his residential property in the smuggling

9   conspiracy?

10  A   Some of the individuals that I spoke to, including

11  co-defendants, neighbors, and local law enforcement officers,

12  including the border patrol, related to me that on many

13  occasions they had seen and reported undocumented aliens being

14  harbored in what is basically a junkyard located immediately

15  behind the principal residence and within the same lot.

16  Q   So on his property that the aliens were harbored on their

17  way towards their ultimate destination?

18  A   Yes, sir.

19  Q   And from your analysis of telephone records, it appears that

20  it was also a nexus where telephone communications were received

                            Page 159

21ja03d_Cruz-Trejo.txt

21    to further the conspiracy?

22    A    Yes, sir, that is correct.  That is what the lengthy

23    analysis chart shows.

24            AUSA HOFFMAN:  I'll pass the witness, Your Honor.

25            THE COURT:  Are you talking about the junkyard?


        Captured and Transcribed by Computer - Eclipse

□
                                                                177

1            THE WITNESS:  Yes, ma'am.

2            THE COURT:  I mean the last part of your --

3            THE WITNESS:  Yeah, the junkyard.

4    BY AUSA HOFFMAN:

5    Q    Let me ask you one more question.  Was a search warrant

6    conducted of this property?

7    A    Yes, ma'am -- yes, sir, it was.

8    Q    And would you tell The Court about what was found during the

9    search warrant?

10    A    Okay.  Amongst items found during the search warrant were,

11    of course, the weapons, jewelry, numerous notebooks, ledgers and

12    other documents which contained the names, telephone numbers of

13    co-conspirators, and also included lists of what is commonly

14    referred to in the alien smuggling area as pollo lists.  This

15    list, what they are, is lists of undocumented aliens and next to

16    it is a fixed amount, an amount which indicates the number of

17    dollars that this particular person is to pay for the smuggling

18    fee.

19    Q    So would it be correct to say that your conclusion was that

20    this residence was also used as a place where records pertinent

21·   to the alien smuggling organization were kept and kept secure

22    and kept accessible to the Defendant?

23    A    Yes, sir.  Without those records, it would be pretty hard to
                        Page 160

21ja03d_Cruz-Trejo.txt

24    run an alien smuggling operation.

25        AUSA HOFFMAN:  I'll pass the witness, Your Honor.


        Captured and Transcribed by Computer - Eclipse

☐

                                                            178

1        THE COURT:  Mr. Troiani.

2                        CROSS-EXAMINATION

3    BY MR. TROIANI:

4    Q    Go afternoon, Agent Torres.

5    A    Good afternoon, sir.

6    Q    How are you doing?

7    A    Good.

8    Q    Good.  You've prepared a chart and you have a phone number

9    there, (361)592 --

10   A    -- 0004.

11   Q    Okay.  Is that a cell phone number?

12   A    No, sir, that is the land line to the residence itself.

13   Q    Okay.  Do you have his cell phone number, as well?

14   A    I have it in memory.  I don't have it written there

15   (361)318-3850.

16   Q    And these are all incoming phone calls, correct?

17   A    Some are incoming, some are outgoing as indicated by the

18   little arrow about the middle of that line.

19   Q    Is there any way of telling whether or not these phone calls

20   were answered?

21   A    Not by that chart, sir.

22   Q    Okay.  Were the phone records made available to the

23   Defendant during the discovery period?

24   A    Yes, sir.

25   Q    Okay.  Now, were the -- those were the cellular phone calls,

                        Page 161

21ja03d_Cruz-Trejo.txt

Captured and Transcribed by Computer - Eclipse

179

1   correct?

2   A   No, sir, this is the house line, the land line and this

3   particular calls were included in a toll, the telephone company

4   tolls which they were charged.  You know, obviously they weren't

5   answered; so, he received a charge for them.

6   Q   Okay.  You have no way of knowing whether or not the

7   conversations involved in these calls had anything to do with

8   either illegal or legal activity, correct?

9   A   Correct, sir.

10  Q   Okay.  Now, you indicated that the junkyard was the location

11  where these individual may have been stored or harbored in the

12  process, correct?

13  A   Statements and declarations made to me from neighbors,

14  border patrol agents, law enforcement officers, indicated that

15  illegal aliens were harbored at the junkyard, sir.

16  Q   Okay.  That is not the residence?

17  A   That is within the lot where the residence is located in

18  terms of it is approximately, I would say, probably 75 yards

19  behind the -- or there within 75 yards of each other or so.

20  Q   Does that make up a separate tract of property?

21  A   No, sir.

22  Q   So you're saying that's included in the same plat?

23  A   Yes, sir.

24      THE COURT:  Excuse me, is that the junkyard that

25  supposedly belongs to Rolando Esquivel.


Captured and Transcribed by Computer - Eclipse

180

21ja03d_Cruz-Trejo.txt

1        THE WITNESS:  No, ma'am.  The one for Rolando Esquivel
2   is in Falfurrias.  Is officially a junkyard.  This other one is
3   more like a parking lot for vehicles in disrepair.  It is his
4   own personal lot.
5        THE COURT:  And there was discussion about a mechanic's
6   shop belonging to a family member.  Is that on that property.
7        THE WITNESS:  No, ma'am.  It is actually what you're
8   referring to is a tire shop -- tire repair shop that is
9   located -- does business in Kingsville on 14th Street.
10        THE COURT:  Okay.  Thank you.
11  BY MR. TROIANI:
12  Q   Now, turning to the search warrant.
13  A   Yes, sir.
14  Q   You're saying that there were lists of illegal aliens?
15  A   Yes.
16  Q   Okay.  Were those provided in discovery?
17  A   I believe they were, sir.
18  Q   They were?
19  A   I believe those documents came from those search were
20  provided.
21  Q   Okay.  I don't want to argue about this, but I never
22  received any lists of illegal aliens in my office.
23        THE COURT:  Excuse me just a second.  If you want to
24  testify, you can do so, but ask him if he has personal knowledge
25  about whether you received it.  If he does not then --

        Captured and Transcribed by Computer - Eclipse

▯

                                                            181

1        MR. TROIANI:  Yes, Your Honor.  I apologize.
2   BY MR. TROIANI:
3   Q   Do you have any personal knowledge that the items, these
                        Page 163

21ja03d_Cruz-Trejo.txt

4   ledgers and pollo lists were delivered to my office?

5   A   Okay.  Copies of the notebooks and ledgers, I think they

6   were delivered.  They should have been delivered and I'm not

7   sure.

8   Q   And I don't want to -- I guess my question is you may have

9   just answered it:  You don't have any direct personal that those

10  items were delivered to my office?

11  A   Don't have any recollection as such.

12  Q   Okay.

13         MR. TROIANI:  I'll pass the witness, Your Honor.

14         AUSA HOFFMAN:  I have nothing else, Your Honor.  I do

15  have argument, however, but no more evidence.

16         THE COURT:  Sir, you may step down.

17  Mr. Troiani, any evidence that you wish to present?

18         MR. TROIANI:  No, Your Honor.  We have no evidence to

19  present.

20         THE COURT:  All right then.

21  Mr. Hoffman?

22         AUSA HOFFMAN:  Thank you, Your Honor.

23     Title 18, Your Honor, Section 982(A)(6) of the United States

24  Code, provides that in imposing sentence on a person convicted

25  of violation of -- or conspiracy to violate Section 274(A) of

Captured and Transcribed by Computer - Eclipse

▯

182

1   the Immigration and Nationality Act, The Court shall order the

2   person to forfeit to the United States all property, real or

3   personal, which constitutes or is derived from proceeds obtained

4   from the commission of that crime that was used to facilitate

5   that crime.

6         Section 274(A) of the Immigration and Nationality Act is

Page 164

21ja03d_Cruz-Trejo.txt

7  codified as Title 8, Section 1324, which prohibits the
8  transportation of illegal aliens and the conspiracy to do the
9  same.

10    The forfeiture of proceeds of these crimes and the
11  properties used to facilitate the crimes is charged in the
12  indictment and proven by the evidence.  And when such is done,
13  it is mandatory, Your Honor.  If a property is proceeds of alien
14  smuggling or is used to facilitate alien smuggling, then the
15  forfeiture of the defendant's property, that interest in that
16  property, is mandatory as a part of that sentence.  And being a
17  part of a sentence, it must be announced at the defendant's
18  sentencing and must be included in the criminal judgment.

19    The Government's burden of proof in this matter is by a
20  preponderance of the evidence.  Notice of the forfeiture action
21  was afforded to the Defendant, Alfonso Garcia-Coronado, in this
22  case.  The indictment returned against him gave him notice that
23  for the crimes he was charged with he should forfeit to the
24  United States all property that constitutes or was derived from
25  the commission of those crimes or that was used to facilitate or

Captured and Transcribed by Computer - Eclipse

□

183

1  was intended to facilitate the crime charged.

2    Included among the properties identified for whose -- of
3  whose forfeiture is sought is the sum of approximately $5
4  million.  Now, The Court has recently ruled on the number of
5  aliens involved in this case as The Court has found it to be the
6  7,500 figure.  The evidence presented yesterday was the lowest
7  sum that was mentioned as a charge for smuggling the aliens was
8  $1,500.  Applying that number and that sum, we get well over $5
9  million already.  So therefore, Your Honor, under the evidence

Page 165

21ja03d_Cruz-Trejo.txt

10    presented the forfeiture of $5 million is fully proven by the

11    evidence as The Court has found the number of aliens involved.

12        Most importantly, the case law makes clear that the

13    defendant's liability is for the gross proceeds of the

14    enterprise, not for his profit.  And so therefore, the Defendant

15    is liable for the $5 million.

16        Now, of course, there is no $5 million that we know of in

17    any kind of bank account; so, in a sense, that is, in essence,

18    is a money judgment.  And then the United States can try to find

19    his properties and then bring that evidence to The Court and ask

20    The Court to say these are his properties and these are his

21    criminal liability.  We ask you to levy against these properties

22    to try to make up this judgment.  So, in that sense, Your Honor,

23    it is -- although it is a large sum of money, it is the sum of

24    money which was generated by this criminal enterprise actually

25    not nearly as much, but we are limiting ourselves to what was

Captured and Transcribed by Computer - Eclipse

0

184

1    charged in the indictment which was $5 million.

2        Now, under Rule 32.2 of the Federal Rules of Criminal

3    Procedure, which became effective on December 1, 2000, this

4    codifies the practice of seeking a money judgment against a

5    convicted defendant for the sum of the proceeds generated by his

6    crimes.  And those -- the case law makes clear that the illegal

7    proceeds need not be available or found in any particular bank

8    account or asset.  For as one circuit court ruled, if that were

9    the case, then the clever criminal who has hidden his gains so

10    well that they cannot be traced or found, that would be a

11    allowing a profit for his diligence to being so clever and

12    thereby escape forfeiture liability.

Page 166

21ja03d_Cruz-Trejo.txt

13    So, Your Honor, we are requesting a forfeiture judgment of

14    $5 million to be entered as a money judgement against this

15    defendant against the time that hopefully we can find his assets

16    and then bring that to The Court's attention and ask for further

17    proceedings.

18        The indictment also identifies four pieces of real property

19    that's been subject to forfeiture.  The United States is

20    proceeding only against the last one of those four properties

21    which is located at 172 County Road 1020, Kingsville, Kleberg

22    County, Texas, which is the residence of the Defendant Alfonso

23    Garcia-Coronado.

24        Government's Exhibit 1, which is in evidence, is the Title

25    Search Report, which shows that the Defendant is a half-owner of


Captured and Transcribed by Computer - Eclipse

☐

                                                                    185

1    this property by warranty deed or vendor's lien filed in Volume

2    98, Page 413 of the deed record of Kleberg County.  And it

3    further shows that the legal description of this property is

4    Tract Four, County Subdivision, an addition to Kleberg County as

5    shown in the map or plat and in the 155 of the map records of

6    the Kleberg County.

7        The evidence presented before The Court demonstrates that

8    this property did facilitate the criminal conspiracy of which

9    the defendant stands convicted.  It was a place where telephone

10    communications were received from co-conspirators and it is a

11    reasonable inference that these telephone calls were about

12    criminal enterprise.  Moreover, the evidence was that people who

13    have debriefed and spoken to us say that from time to time

14    illegal aliens were kept there on their way somewhere else and

15    so that was another act of facilitation.  And, of course,

Page 167

21ja03d_Cruz-Trejo.txt

16   interestingly enough and not surprisingly they were not kept in

17   a house or anyplace nice.  They were kept somewhere out in the

18   junk cars on the property.

19        And then also the evidence demonstrates that this was a

20   recordkeeping place where records could be accessed and

21   telephone numbers could be found, also which furthers assists

22   the criminal conspiracy.

23        Therefore, the United States is seeking an order of

24   forfeiture for the Defendant's interest in 172 County Road 1020,

25   Kleberg County, Texas, in addition to Kleberg County as shown in

              Captured and Transcribed by Computer - Eclipse

1    the map or plat found in Volume 155 of the map records of that

2    county, and also in the sum of $5 million and respectfully

3    requests that The Court announce these forfeitures today as part

4    of this defendant's sentencing and these be reflected in the

5    criminal judgment.  And the United States has prepared and would

6    tender to The Court also a proposed preliminary order of

7    forfeiture to that effect, which a copy of this has been

8    provided to opposing counsel.

9         Thank you, Your Honor.

10            THE COURT:  Mr. Troiani?

11            MR. TROIANI:  Your Honor, very briefly, the Defendant

12   would ask that The Court consider only his portion of the

13   profit, which, as discussed yesterday, would have been between

14   two to $500 immediately being $300.  That would be a judgement

15   in the amount $255,000 against the Defendant.  Also, Your Honor,

16   the order as provided to me by the Government does not indicate

17   solely Alfonso Garcia-Coronado's interest and we would ask that

18   the order reflect that the forfeiture is solely for his interest

                          Page 168

21ja03d_Cruz-Trejo.txt

19   in the property.

20      That would be it.

21         THE COURT: All right.  Thank you.  Then The Court

22   having taken judicial notice of the matters on file in this case

23   and all the evidence presented, The Court makes the following

24   findings and enters the following preliminary order of

25   forfeiture, that is, that a federal grand jury sitting in


        Captured and Transcribed by Computer - Eclipse

                                                           187

1    Southern District of Texas, Brownsville Division, returned an

2    indictment.  Assigned Criminal Cause No. B-02-377-S-1 by the

3    Clerk of the Court charging Alfonso Garcia-Coronado with

4    conspiracy to transport and move aliens who had come to,

5    entered, and remained in the United States in violation of law

6    in violation of Title 8, United States Code, Section

7    1324(a)(1)(A)(5)(i), as well as other crimes.  Indictment

8    B-02-377-S-1 gave defendant Alfonso Garcia-Coronado notice that

9    as a result of the offense charged pursuant to 18, United States

10   Code, Section 982(A)(6), he shall forfeit to the United States

11   any property real or personal that constitutes or his devised

12   from or is traceable to proceeds obtained directly or indirectly

13   from the commission of the offenses charged or that was used to

14   facilitate or was intended to be used to facilitate the

15   commission of the violations of Title 8, United States Code,

16   Section 1324, as charged in the indictment.

17      The properties that were described as subject to forfeiture

18   were approximately $15 million (sic) United States dollars and

19   real property located at 172 County Road 1020, Kingsville,

20   Kleberg County, Texas, as well as other property -- oh, 5

21   million.  I'm sorry, if I said 15, I misspoke -- as well as

                        Page 169

21ja03d_Cruz-Trejo.txt

22  properties.

23       The Court also takes judicial notice that Alfonso

24  Garcia-Coronado has pled guilty to the offense charged in Count

25  One of this indictment and The Court has accepted the


              Captured and Transcribed by Computer - Eclipse

▯                                                                    188

1  Defendant's plea and that the Defendant has been found guilty.

2       The Court now determines pursuant to Rule 32.2 of the

3  Federal Rules of Criminal Procedure, the question of forfeiture

4  as sought by the United States in this case.  The Court,

5  having -- finds that based on the evidence in the record that

6  now that The Court has imposed a sentence on the Defendant of

7  conspiracy the violate Section 27 -- 274(A) of the Immigration

8  and Nationality Act, now orders that Alfonso Garcia-Coronado

9  forfeit to the United States all property, real or personal,

10  that constitutes or is derived from or is traceable to the

11  proceeds obtained directly or indirectly from the commission of

12  that offense or that was used to facilitate or was intended to

13  facilitate the commission of that offense.

14       The Court finds from the evidence and by the standard

15  required by law that Alfonso Garcia-Coronado has a one-half

16  ownership interest in the real property located at 172 County

17  Road 1020, Kingsville, Kleberg County, Texas.  And The Court

18  finds that this property was used to facilitate and is intended

19  to be used to facilitate the commission of the offense of which

20  the Defendant, Alfonso Garcia-Coronado, stands convicted.

21       The Court finds from the evidence by the standard required

22  by law that the proceeds generated from the crime of which the

23  defendant stands convicted is $5 million in United States

24  dollars, which is ordered forfeited to the United States of

21ja03d_Cruz-Trejo.txt

25    America pursuant to Title 18, United States Code, Section

Captured and Transcribed by Computer - Eclipse

189

1    982(A)(6) and stands as a money judgment in that sum against

2    defendant, Alfonso Garcia-Coronado.

3        The interest in the real property described supra by The

4    Court is ordered -- is forfeited to the United States and that

5    The Court now orders the United States of America to seize and

6    detain this real property as testified to that the Defendant has

7    a half interest in; that is, the United States is -- the

8    forfeiture is for the Defendant's one-half interest.  And I

9    guess, Mr. Hoffman, I'll ask you about this language regarding

10   the seizure and detention of the real property given that there

11   is another owner of the half interest.

12       AUSA HOFFMAN:  Yes, Your Honor.  That would be standard

13   in order to put it into The Court's jurisdiction, the seizure of

14   the property.  The next thing would be, as you will be getting

15   to in a moment, sending out notice to other interested parties.

16   There's a lienholder of record that will be receiving notice and

17   also the wife and it is -- whether or not those people come

18   forward to claim an interest, I expect both would, but I do not

19   believe we have any evidence that the wife was involved and we

20   certainly do not expect any -- we have no evidence that the bank

21   was involved.  So, their claims would be acknowledged and

22   recognized by the United States.

23       THE COURT:  Okay.  Well, in any event, The Court hereby

24   orders the United States to proceed with the notice that is

25   required by law to other ownerships or individuals and entities

Captured and Transcribed by Computer - Eclipse

Page 171

21ja03d_Cruz-Trejo.txt

190

1  with interest in the property.  And then The Court shall order
2  that it will retain jurisdiction to take such additional action
3  and enter such other orders as are necessary to implement and
4  enforce this forfeiture order.
5      Anything else on behalf of the Government or the Defendant.
6          AUSA HOFFMAN:  No, Your Honor.
7          MR. TROIANI:  No, Your Honor.
8          THE COURT:  All right.  Then we're in recess.
9          AUSA KIRKPATRICK:  Your Honor, if I may, I'm sorry.
10  There's one thing that the Government would like to put on
11  record, if I may, Your Honor.
12      This is not in regards to the sentencing, but the Government
13  became aware of some information by independent sources that Mr.
14  Alfonso Garcia-Coronado is considers retaliatory action against
15  my undercover agents, the agents involved in the case and
16  witnesses.  We do not have evidence at this time of such a sort
17  that we would have presented at sentencing; however, we would
18  like to put Mr. Garcia-Coronado and anyone else involved,
19  including family members or any other co-conspirators on notice
20  that the Government is aware of this information.  We are taking
21  it extremely seriously.  We have notified the Federal Bureau of
22  Investigations.  And if any such retaliatory actions should be
23  taken against any of the agents, witnesses, or others involved
24  in this case, we will prosecute that and those persons who are
25  either directly or indirectly involved to the fullest extent of

Captured and Transcribed by Computer - Eclipse

191

1  the law.
2          THE COURT:  All right.  We're in recess.
                    Page 172

21ja03d_Cruz-Trejo.txt

3      AUSA KIRKPATRICK:  Thank you.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


Captured and Transcribed by Computer - Eclipse

☐

192

1    UNITED STATES DISTRICT COURT    *

2    SOUTHERN DISTRICT OF TEXAS    *

3      I, BRECK C. RECORD, Official Court Reporter, United States

4    District Court, Southern District of Texas, do hereby certify

5    that the foregoing is a correct transcript from the record of
Page 173

21ja03d_Cruz-Trejo.txt

6   proceedings in the above-entitled matter.

7      I certify that the transcript fees and format comply with

8   those prescribed by the Court and Judicial Conference of the

9   United States.

10

11   _____                    _____
                                   BRECK C. RECORD,
12                                 Official Court Reporter
                                   United States District Court
13                                 Southern District of Texas

14

15

16

17

18

19

20

21

22

23

24

25


                Captured and Transcribed by Computer - Eclipse

□

                              Page 174

<u>CERTIFICATE OF SERVICE</u>

I, Tony R. Roberts, do hereby certify that a copy of the foregoing Respondent's Answer and Motion to Dismiss was mailed on July 8, 2004, via certified mail, return receipt requested to:

Jose Luis Cruz-Trejo
No. 12230-179
Reeves Co. Det. Center
P.O. Box 1560
Pecos, Texas 79772

TONY R. ROBERTS
Assistant United States Attorney

16